IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Snyder, Michael | * | |
|    Plaintiff | * | |
| v. | * | Case No.: 1:06cv02213 JR |
| Dale Lowery et al. | * | |
|    Defendants | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF SNYDER'S OPPOSITION TO
DEFENDANTS' RULE 11 MOTION**

COMES NOW THE PLAINTIFF, Michael Snyder, by counsel, and files this Opposition to Defendants' Motion for Sanctions under Rule 11.[1]

INTRODUCTION

Dale Lowery founded CASEtech, Inc. more than ten years ago. Some time after that, Lowery met Michael Snyder and began to recruit him to come to work for CASEtech. Over time, as the men worked together and came to know each other professionally, they built a relationship of mutual respect and trust. As a result of this relationship, the two men agreed that Snyder should come to work for CASEtech and, provided he secured a contract for CASEtech with the U.S. Coast Guard, he could buy a 20% interest in CASEtech. This would

---

[1] At the Scheduling Conference in Chambers on March 13, 2007, the possibility of a Rule 11 Motion was raised. At that time the Court clearly indicated that it would not grant any Rule 11 Motion absent something more than a Complaint Defendant found objectionable.

give Snyder some "skin in the game", *i.e.*, an interest in the success of CASEtech.  It would also assure Lowery that a key employee would not leave the firm, and that CASEtech's success would be foremost in Snyder's mind.  It would also provide Lowery with an opportunity to concentrate on growing the company from a foundation of clients secured by both men, to CASEtech's benefit. It was a win-win situation.

CASEtech continued in this vein for several years with considerable success.  Snyder did the technical work and Lowery managed the company.

After a period of time, Lowery and Snyder decided to start another business--L&S LLC.  L&S would own and rent out property in Washington, D.C.  Lowery would own 66.7% of L&S and Snyder would own 33.3%.  Over time L&S acquired three (3) properties in Washington, D.C.

About two years before the events that gave rise to this lawsuit, CASEtech began having financial problems.  Lowery arranged for CASEtech to borrow money.  Then Lowery lent money to CASEtech himself.  Snyder objected to these actions and repeatedly said so to Lowery to no avail.  Finally, CASEtech became financially precarious and Lowery wanted to sell his interest in the company.  Snyder agreed because by this time he had lost faith in Lowery and the two owners were not getting along.

Snyder tried to keep CASEtech going, working long hours and even giving up paychecks

but it wasn't working. He agreed to sell one of the buildings that L&S owned and was willing to invest some of the profits he would receive from the sale back into CASEtech. He expected that Lowery would also contribute to the same extent and in the same proportion that they owned CASEtech.

That didn't happen and this lawsuit is the result.

## EXHIBIT A

Lowery's Motion for Sanctions hinges on the existence and validity of the document he calls "Exhibit A.[2]" Lowery repeatedly cites to Exhibit A as complete justification and defense against each and every count in the Complaint. Clearly, Lowery believes that Exhibit A is a complete defense to his actions and grounds for his request for Sanctions.

But Snyder is challenging Exhibit A--Snyder believes that Exhibit A is void for lack of consideration. If Snyder's challenge is upheld by the Court, his suit has validity, and Lowery had no right to do what he did. Thus, Lowery's Motion for Sanctions should be denied.

> **It is ludicrous to argue that by signing Exhibit A Snyder intended to give Lowery 13.3% of the profits from L&S in exchange for nothing at all.**

Exhibit A, provides that, after L&S sells one of its properties, the money will be used to

---

[2] Snyder never saw Exhibit A before this dispute first came up and Exhibit A as provided to the Court is the clearest, best copy Snyder has ever seen.

pay the mortgage on the property that was being sold and then, the remainder of the funds (1/3 of which were Snyder's) would be used to pay off CASEtech's debt, including CASEtech's debt to Lowery.  Thus, Exhibit A calls for Snyder's money from the sale of L&S's property to pay 1/3 of CASEtech's bank debt, when his share of CASEtech is only 20%.  Exhibit A also calls for Snyder's money from the sale of L&S's property to be used to repay Lowery 1/3 of the CASEtech debt to Lowery--even though Snyder only owns 20% of CASEtech.  Finally, only after Lowery is repaid from L&S's funds will Snyder see any of the profit from his investment.  In exchange for this gift to Lowery, Exhibit A provides that Snyder would get exactly nothing.  Exhibit A contains no consideration for Snyder in exchange for his agreement to use his money as described above.

In essence, if Exhibit A is valid Snyder voluntarily gave Lowery over $100,000 in exchange for ... nothing at all.  Snyder did not intend to do that and never would have done that had he not been deceived into doing that.  This case will show that is what happened.

> **What happened on Friday, November 4, 2005, shows Lowery tricked Snyder into signing Exhibit A--and that Snyder received no consideration for doing so.**

The week ending on Friday, November 4, 2005, had been a grueling one for Snyder.  He had been working long hours--over 12 hours plus 2 hours commuting time on November 2, over 12 hours plus 2 hours commuting time on November 3, and on November 4th he worked another 11 hours.  Snyder Affidavit ¶¶6-8.  That evening he was at the CASEtech office doing administrative work when Lowery walked into his office with some news.  *Id.*  ¶9.

Lowery's news was distressing. The bank where CASEtech had a line of credit would call the note unless he, Snyder agreed to sign the paper Lowery had prepared. That paper would commit L&S and it's properties to pay off the bank's $200,000.00 line of credit. If they would do that, the bank would not call the note. *Id.* ¶¶10-11.

Snyder had no idea the bank was contemplating this step. He was unprepared to consider the ramifications and Lowery had given him no forewarning that such a situation was impending. *Id.* ¶¶4-5 Nonetheless, trusting Lowery was a habit with Snyder and he was sure that Lowery would not ask him to act in a way that was inimical to his interests. *Id.* ¶13.

Snyder therefore took less than 2 minutes to scan the paper Lowery handed him, signed it and gave it back to Lowery. *Id.* Snyder never realized that Exhibit A was Lowery's attempt to have Snyder pay a disproportionate share of CASEtech's debts--much of them debts owed to Lowery himself.

### After November 4th Snyder learned nothing more until it was too late to prevent Lowery taking the funds.

After signing the paper Lowery presented to him on November 4th, Snyder did not discuss the financial situation or the bank's alleged calling of the note with Lowery. *Id.* ¶3. He was never given a copy of the document, and he does not know, today, whether Exhibit A of Lowery's Motion is the document he now recalls signing. *Id.* ¶¶1, 2 & 14. He completely forgot about it.

Snyder only saw the document Lowery now calls Exhibit A again when he complained about the disbursement of the money from the sale of the L&S property. *Id.* ¶2. Certainly he never realized that the document meant that he would be giving Lowery 13.3% of the money he, Snyder, would receive from selling the L&S property. Nor did he realize that he would be paying off 1/3 of CASEtech's debts--even though he only owned 20% of CASEtech[3]. Finally, Snyder never understood that the paper he supposedly signed meant that Lowery would recover all the monies he, Lowery, had loaned to CASEtech before any remainder would be distributed to Snyder.

Clearly all the benefit to the document went to Lowery and none went to Snyder.

**Exhibit A is void because Snyder received no consideration from Lowery for signing it.**

It is basic hornbook law that a contract with no consideration is void. "Consideration is necessary to make a promise enforceable." *Rinck v. Ass'n of Reserve City Bankers*, 676 A.2d 12, 16 (D.C. 1996). *See also* RESTATEMENT (SECOND) OF CONTRACTS, § 71 (1981). But in this case, as shown above, Snyder received nothing from Lowery in exchange for his signature on Exhibit A. Nothing of value, not even a promise came to Snyder. Therefore Snyder received no consideration and Exhibit A is not a valid contract.

---

[3] For example, Snyder's 20% share of the $200,000.00 bank debt was $40,000.00. But by getting Snyder to pay 1/3 of the debt, Snyder actually paid $66,666.67--$26,666.67 more than he should have; $26,666.67 that was actually Lowery's share of the debt.

Lowery's analysis supporting his Motion for Sanctions stands or falls on whether Exhibit A is void for lack of consideration. Snyder's position is also clear: Exhibit A provides no consideration to Snyder from Lowery. Exhibit A is not a valid contract. Hence, each and every part of Lowery's analysis which is dependent on Exhibit A fails.

For all these reasons, Lowery's Motion for Sanctions should be denied.

                                                                    Michael Snyder,
                                                                    By Counsel

KAUFMAN LAW, A Professional Corporation
11350 Random Hills Rd. Suite 800
Fairfax, VA 22030
703.764.9080
703.764-0014 (fax)
David@dzklaw.com
Counsel for Plaintiff

By: _____
     D.Z. Kaufman, Bar # 435123

## CERTIFICATE OF SERVICE

     I hereby certify that on May 8, 2007, a copy of the above document was served via ECF of the U.S. District Court of the District of Columbia on counsel for Defendants Dale A. Cooter, Esq. and James E. Tompert, Esq., 5301 Wisconsin Ave., NW, Suite 500, Washington, D.C. 20015.

                                    _____
                                    David Zachary Kaufman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Snyder, Michael            *
                           *
    Plaintiff              *
                           *
    v.                     *    Case No.: 1:06cv02213 JR
                           *
Dale Lowery  et al.        *
                           *
        Defendants         *

*   *   *   *   *   *   *   *   *   *   *   *   *

AFFIDAVIT

I, Michael Snyder, being first duly sworn, under penalty of perjury, hereby declare that I have personal knowledge of the facts recounted below and am prepared to testify to their accuracy.

1. I had no independent recollection of signing the document Lowery calls Exhibit A until Lowery provided me a copy just prior to this lawsuit.

2. I was never given a copy of the document Lowery calls Exhibit A until after the dispute arose with Lowery.

3. I never discussed the document Lowery calls Exhibit A with Lowery prior to signing it.

4. I never discussed the implications of the document Lowery calls Exhibit A after signing it either.

5. It was not until Lowery used the monies realized from selling L&S property to repay himself that I learned what he claimed I had agreed to when I signed Exhibit A.

6. I worked 12 hours on November 2, 2005, plus two(2) hours of commuting time.

7. I worked 12 hours on November 3, 2005, plus two(2) hours of commuting time.

8. I worked 11 hours on November 4, 2005.

9. The evening of November 4, 2005, I was working at the CASEtech office when Lowery first told me that CASEtech's bank would call the loan unless I signed the document he calls Exhibit A.

10. I understood this to be an emergency because if the bank called the note CASEtech would be unable to operate.

11. Lowery told me that if I signed the paper he was holding the bank would not call the note. Lowery told me that the paper would commit L&S to selling at least one of it's properties and using the profits to pay off the bank's $200,000.00 line of credit.

12. Lowery represented the situation to be an emergency and that time was of the essence. I understood from Lowery that there was no time for me to carefully review the paper, analyze it and reflect on its implications.

13. Because I trusted Lowery's explanation of what the paper would do and why, I took less than 2 minutes to scan the paper and signed it.

14. I do not know if the document I signed is the same as the document Lowery calls Exhibit A.

This ends my Affidavit.

May 4, 2007

_____
Michael Snyder

Witness my hand and seal this _____, 2007.

SUBSCRIBED AND SWORN TO THIS 4 day of May , 2007.

JOHN DIGGS
My commission expires   Notary Public, District of Columbia
My Commission Expires Jan. 1, 2011

Notary Public _____