IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Snyder, Michael                          *
                                         *
        Plaintiff                        *
                                         *
        v.                               *        Case No.: 1:06cv02213 JR
                                         *
Dale Lowery   et al.                     *
                                         *
        Defendants                       *

*    *    *    *    *    *    *    *    *    *    *    *    *

**PLAINTIFF SNYDER'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Comes now Plaintiff Michael Snyder, by undersigned counsel, and Cross-Moves for

Summary Judgment against all Defendants and in support thereof incorporates by reference the

accompanying Memorandum.

                                        Michael Snyder,
                                        By Counsel

KAUFMAN LAW,  A Professional Corporation
11350 Random Hills Rd.  Suite 800
Fairfax, VA 22030
703.764.9080
703.764-0014 (fax)
David@dzklaw.com
Counsel for Plaintiff

By:  _____
        D.Z. Kaufman, Bar # 435123

Page 1 of  2

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2007, a copy of the above document was served via ECF of the U.S. District Court of the District of Columbia on counsel for Defendants Dale A. Cooter, Esq. and James E. Tompert, Esq., 5301 Wisconsin Ave., NW, Suite 500, Washington, D.C. 20015.

_____
David Zachary Kaufman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Snyder, Michael                         *
                                        *
          Plaintiff                     *
                                        *
     v.                                 *     Case No.: 1:06cv02213 JR
                                        *
Dale Lowery   et al.                    *
                                        *
          Defendants                    *

*     *     *     *     *     *     *     *     *     *     *     *     *

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF
PLAINTIFF SNYDER'S CROSS-MOTION FOR SUMMARY JUDGMENT**

COMES NOW THE PLAINTIFF, Michael Snyder, by counsel and files this Opposition

to Defendants' Motion for Summary Judgment and his own Cross-Motion for Summary

Judgment and states:

**I.    Introduction**

Plaintiff Snyder filed an 11-count Complaint on December 27, 2006.  Initial discovery

under F.R.C.P. 26(a)(1) has occurred and Defendants have filed a Motion for Summary

Judgment.

Snyder has filed, contemporaneously with this Opposition and Cross-Motion for

Summary Judgment, a Motion to Amend his Complaint and the Amended Complaint.  Snyder's

Amended Complaint does not contain a request for an injunction (Count I), or claims that

Lowery wasted CASEtech assets (Count V) or committed Fraud (Count VI).  The Amended

Complaint also drops the request for a Declaratory Judgment (Count IX) and for an accounting

(Count X).  Finally, the Amended Complaint clarifies Plaintiff's theory of the case.

Snyder is, therefore, opposing Summary Judgment on those counts remaining (2, 3, 4, 7,

8, and 9) from the original Complaint and seeks Summary Judgment on the new counts set forth

more clearly in his Amended Complaint.

Lowery's summary judgment motion is premised almost entirely on the same facts as are

alleged in the Complaint, and comes early in discovery. Moreover, Snyder does not argue that

any genuine issues of material fact preclude summary judgment in this case. Accordingly, from a

procedural standpoint, Lowery's motion is similar to a motion to dismiss. Although local

practice indicates that the Court may simply grant Snyder's motion to amend and deny Lowery's

summary judgment motion with prejudice (*see National City Mortgage v. Navarro*, 220 F.R.D.

102, 106 (D.D.C. 2004) (Urbina, J.) (denying motion to dismiss that was made before plaintiff

successfully sought leave to amend complaint, on ground that amended complaint was operative

pleading), Snyder suggests that the Court treat Lowery's summary judgment motion as directed

to the amended complaint. *Cf. Sunset Financial Resources, Inc. V. Redevelopment Group V,

LLC*, 417 F. Supp. 2d 632 (D.N.J. 2006) (addressing arguments made in motions to dismiss

original complaint as if they were directed to amended complaint to extent applicable, and giving

moving defendants leave to move to dismiss any new claims raised in amended complaint).[1]

Alternatively, once the Court grants Snyder's motion to amend, Lowery's summary

judgment motion should be denied without prejudice. *Cf. National City Mortgage v. Navarro*,

220 F.R.D. at 106; *Turner v. Kight*, 192 F. Supp. 2d 391, 397 (D. Md. 2002) (denying as moot

defendants' motion to dismiss, since amended complaint superceded original complaint).

## II.    Summary of Case

CASEtech is a consulting company originally founded by Dale Lowery in 1994.  Snyder

---

[1]Since Snyder has cross-moved for summary judgment, Lowery has a full and fair
opportunity to address Snyder's arguments in opposition to Lowery's motion and in support of
Snyder's cross-motion without having to fear that, in so responding, he would be improperly
introducing new issues in his reply brief.

joined CASEtech as a minority partner in 1999.  In April, 2000, Lowery and Snyder formed a

real estate investment company, L&S, LLC.  During the entire period, Lowery and Snyder acted

as partners in both businesses.

Over time, CASEtech incurred considerable debt—mainly to Lowery.  After a while,

rather than work on rebuilding CASEtech, Lowery decided that he wanted to sell his share and

leave the consulting business.  Lowery searched for and found a buyer for his share of the

company (Most Ventures, LLC, a/k/a "MV").  MV wanted CASEtech to be debt-free before it

would purchase Lowery's share of the business

Lowery hatched a scheme under which L&S's assets would be used to retire CASEtech's

debts.  But L&S's assets couldn't be loaned to CASEtech: that would merely substitute one

creditor for another.  So Lowery decided that he would have to sell one of L&S's properties

(located on Second Street in Washington D.C.) and give the resulting money to CASEtech.  But

Snyder was a partner in L&S and owned 1/3 of L&S's assets.  So Lowery got Snyder to sign

Exhibit A and took the money from the sale of L&S's Second Street property and used it to pay

off CASEtech's debts—including, and especially, CASEtech's debts to Lowery himself.

When Snyder realized what Lowery had done, he demanded that Lowery reverse these

acts.  Lowery refused.  Snyder now seeks the return of all his funds from the sale of L&S's

Second Street property that were applied to CASEtech's debt in accordance with Defendants'

Exhibit A, as well as the dissolution of L&S, LLC.

III.    **Analysis**

Two legal issues will determine the final outcome of this case.  These issues are:

1.    Is Defendants' Exhibit A a contract?

-3-

2.      Are Lowery and Snyder partners?

For the reasons explained more fully below, if Exhibit A is not a contract, then Lowery's

Motion for Summary Judgment on Counts III (Breach of Contract), IV (Breach of Covenant of

Good Faith and Fair Dealing), VII (Unjust Enrichment) and VIII (Trover and Conversion), must

be denied.  In the same vein, if Exhibit A is not a contract, Snyder's Cross-Motion for Summary

Judgment on his claims for unjust enrichment (Amended Complaint Count 4) and trover and

conversion (Amended Complaint Count 5) must be granted.

If Lowery and Snyder are partners in CASEtech and/or L&S, then Snyder's Cross-

Motion for Summary Judgment on his claim for breach of fiduciary duty (Amended Complaint

Count 1) must be granted.


**A.      Exhibit A is not a contract because it is not supported by consideration**

It is basic hornbook law that there must be consideration for there to be a contract.

According to the Restatement (Second) of Contracts,

> (1) To constitute consideration, a performance or a return promise
> must be bargained for.  (2) A performance or return promise is
> bargained for if it is sought by the promisor in exchange for his
> promise and is given by the promisee in exchange for that promise.

Restatement (Second) of Contracts, § 71 (1981).

"The essence of consideration . . . , at least as viewed in the American Law Institute,

Restatement of Contracts Sec. 75, is that it is a bargained-for equivalent." *Clay v. Chesapeake &*

*Potomac Tel. Co.*184 F.2d 995, 997 (D.C. Cir.  1950). Thus, consideration may be either a

benefit to the promisor (Snyder) or a detriment to the promisee (Lowery).  *See Kidwell &*

*Kidwell, Inc. v. W. T. Galliher & Bro., Inc.*, 282 A.2d 575, 578  (D.C. 1971) (holding that

relinquishing a right in exchange for a promise is consideration); *Clay v. Chesapeake & Potomac*

*Telephone Co.*, 184 F.2d 995 (D.C. Cir. 1950) (holding that a promise to take a new phone was "adequate consideration for any number of promises or performances on the other side"); *accord Mathews v. Libbey Bros.*, 42 App. D.C. 272 (1914); *O'Neill v. Frederick Trading Co.*, 164 A.2d 537 (Md. 1960) (forbearance from filing a lien is sufficient consideration to support an agreement to pay for labor and materials).

Here, the uncontested facts show that, as a direct result of Exhibit A, Snyder paid 33% of CASEtech's outstanding debt from his share of the profits of the sale of L&S's Second Street property. However—as a minority shareholder whose CASEtech shares were likely unmarketable and, in any event, were not up for sale—Snyder received no benefit as a result of that payment. Snyder's Statement of Uncontested Facts (hereinafter "SUF"), ¶¶ 19 and 24.

The uncontested facts also show that Lowery: (1) needed to put the profits he received from the sale of L&S's Second Street property into CASEtech so he could sell his majority interest in CASEtech (*id.*, ¶¶12-14 and 19.iv); (2) recovered in full the monies he had "loaned" to CASEtech (*id.*, ¶19.iii. and (3) neither gave up any rights nor suffered any detriment. *Id.*, ¶¶19.i-viii.

Since, under Exhibit A, there was no benefit to the promisor (Snyder) or detriment to the promisee (Lowery), Exhibit A is not a contract.

### B. Lowery and Snyder operated L&S and CASEtech as partnerships and were, therefore, partners

In Washington, D.C., there is a 50-year old rule that small corporations may, under certain circumstances, be treated as partnerships, especially in disputes between the owners:[2]

---

[2]Since the limited liability company is a fairly new type of business entity, the case law involving LLCs is relatively undeveloped. However, LLCs are often likened to close corporations (*See, e.g., HB Mgt., LLC v. Brooks*, 2005 WL 225993, at *1 (D.C. Super. Feb. 1,

> [i]n an intimate business venture such as this, stockholders of a close corporation occupy a position similar to that of joint adventurers and partners.  While courts have sometimes declared stockholders 'do not bear toward each other that same relation of trust and confidence which prevails in partnerships,' this view ignores the practical realities of the organization and functioning of a small 'two man' corporation organized to carry on a small business enterprise in which the stockholders, directors and managers are the same persons.  A distinguishing characteristic of such a corporation is the absence of a division between the stockholder-owners and the director-managers, for the former either personally manage and direct the business or so dominate the directors as to render the latter agents.  Yet, the fiduciary capacity of directors and dominant or controlling stockholders is unquestioned.  *Pepper v. Litton,* 1939, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281.  **We believe that the holders of a closely held stock in a corporation such as shown here bear a fiduciary duty to deal fairly, honestly, and openly with their fellow stockholders and to make disclosure of all essential information**.

*Helms v. Duckworth* 249 F.2d 482, 486-487 (D.C. Cir. 1957) (emphasis added); *see also Wright v. Herman*, 230 F.R.D. 1 (D.D.C. 2005) (applying the same principle to a Virginia LLC operating in Washington, D.C.).

Washington D.C. is not alone in this.  Virginia courts have long held that where two owners

> consistently, utterly disregarded its corporate entity, and dealt with its rights, property and business as if they belonged to a partnership composed of themselves . . . , as between themselves . . . , they should not be heard to say that (except for the purpose of suing and being sued in its corporate name) it is other than a partnership . . . .

*Deeds v. Gilmer,* 162 Va. 157, 258-59 174 S.E. 37, 77 (1934); *see also Boyd, Payne, Gates & Farthing, P.C. v. Payne, Gates, Farthing & Radd, P.C.,* 244 Va. 418, 422, 430 S.E.2d 784

---

2005) (recognizing that "[t]he LLC is often characterized as a hybrid of the corporation and the partnership.")), and "close corporation doctrine is now influencing the law of limited liability companies." Daniel S. Kleinberger, *The Closely Held Business Through the Entity-Aggregate Prism*, 40 Wake Forest L. Rev. 827, 830 (Fall 2005) (citing cases).

(1992) ("Because Boyd P.C. was a close corporation and its shareholders validly conducted the internal affairs of their law practice as a partnership, we hold that the trial court properly settled their rights and liabilities according to partnership law.").

Other states and scholars are in agreement. *See, e.g., Cressy v. Shannon Continental Corp.*, 378 N.E.2d 941, 945 (Ind. App. 1978) ("While parties incorporate to obtain the benefits of limited liability, perpetual existence of business entity or tax considerations accruing to the corporate form, they often expect to act and to be treated as partners in their dealings among themselves. When this intention is manifest and no harm results to outsiders thereby, there appears little reason to frustrate the parties' actual intent by strict adherence to the traditional norms of corporate law."); Conway, *The New York Fiduciary Concept in Incorporated Partnerships and Joint Ventures,* 30 Ford L. Rev. 297, 309-311 (1962); Hornstein, *Judicial Tolerance of the Incorporated Partnership*, 18 Law & Cont. Problems 435 (1952).

In *Wright*, the court refused to dismiss claims in which the minority member of an LLC sought to impose partnership duties upon the controlling member. 230 F.R.D. at 9. Instead, the court explained that courts have imposed partnership remedies on members of a corporate entity where there is "(1) evidence of the actual intentions of the parties, and (2) evidence of the actual operations of the partnership/corporate entity." *Id*.

### 1.     L&S was operated as a partnership rather than as an LLC

Snyder and Lowery did not operate L&S as if it were an LLC, nor did they hold themselves out as anything but partners.  SUF ¶¶3-11 and Exhibits 1 and 2.  That is how Lowery repeatedly referred to himself and Snyder in Exhibit A, and in conversations with third parties. SUF ¶¶ 6 and 7.  Snyder himself never thought of himself as anything other than Lowery's junior partner.  SUF ¶¶5-7 and 11 and Exhibits 1 and 2.  And Lowery, who kept the books for L&S,

repeatedly referred to loans Snyder made to L&S as being loans from "Partner Snyder."  SUF ¶¶8-10 and Exhibit 2.

Equally telling, L&S did not hold any Member meetings upon written notice, as provided for in ¶5.2.1 of the L&S Operating Agreement, and the only actions to which Lowery obtained Snyder's written consent were the actions he took pursuant to Exhibit A.  Exhibit 4.

Thus, under *Helms v. Duckworth* and *HB Management v. Brooks,* Lowery owed Snyder a duty to deal fairly, honestly, and openly with Snyder as a fellow member of L&S, LLC.

### 2.    CASEtech was operated as a partnership rather than as a close corporation

There is no doubt that Snyder thought he was the minority partner in CASEtech.  SUF ¶¶3-11, 15-18 and Exhibits 1 and 2.  After all, that is what he was called when he initially purchased a 10% interest in CASEtech from Lowery.  Exhibit 1.  Since Lowery drafted Exhibit 1, it is also clear that he thought of Snyder as his minority partner in CASEtech.  Furthermore, Lowery repeatedly referred to himself and Snyder as "partners."  SUF, ¶¶6 and 7.

Moreover, CASEtech did not comply with its own bylaws or the legalities of being operated as a Close Corporation.  SUF ¶¶25 and 26.  CASEtech held no properly noticed annual or special shareholder meetings, as required by its bylaws.  *Id.*

For all these reasons, Snyder should be treated as Lowery's minority partner in both firms.  Lowery, therefore, owed Snyder certain fiduciary duties and obligations to Snyder as his partner.

### C.    Even if the Court declines to evaluate Lowery's conduct in the context of the fiduciary duties imposed on a partner, Lowery still owed Snyder fiduciary duties under the L&S Operating Agreement

Even if the Court declines to evaluate Lowery's conduct in the context of the fiduciary duties imposed on him as a partner in L&S, Lowery still owes Snyder the fiduciary duties specified in the L&S Operating Agreement. Pursuant to that agreement, Lowery owes Snyder the duty to "refrain[] from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law."  Exh.3, ¶5.4.3(b).

## V.     Application of the Analysis

Since Snyder is withdrawing Counts 1 (Injunction), Count V (Waste), Count VI (Fraud) and Count IX (Declaratory Judgment) this section will not address those counts in the original Complaint.  Instead, where applicable, the analyses will address the original Count and the Amended Count at the same time.

### A.     Breach of Fiduciary Duties (Original Complaint Count 2; Amended Complaint Count I)

Defendants argue that Lowery owed Snyder no fiduciary duties.  But

> [p]artners are accountable to one another as fiduciaries. D.C. Code § 41-120 (1981) ("Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners . . ."). That means, fundamentally, that they owe one another the utmost good faith, fairness and loyalty. CRANE & BROMBERG, LAW OF PARTNERSHIP § 68 (1968). "The fiduciary nature of the partnership relation requires at all times the highest degree of good faith, and precludes any secret profit, benefit or advantage of any kind." 1 SCOTT ROWLEY, ROWLEY ON PARTNERSHIP 515 (1960). "Good faith will not permit any one partner to advantage himself singly and alone, at the expense of the firm." 1 SCOTT ROWLEY, THE MODERN LAW OF PARTNERSHIP 458 (1916), *cited in* Paula J. Dalley, The Law of Partner Expulsions: Fiduciary Duty and Good Faith, 21 CARDOZA L. REV. 181, 189 n.42 (1999) . . . *See Beckman v. Farmer*, 579 A.2d 618, 651 (D.C. 1990) (*citing Day v. Avery*, 179 U.S. App. D.C. 63, 74 n.56, 548 F.2d 1018, 1029 n.56 (1976)) ("breach of fiduciary relationship is

> not actionable unless injury arose to the beneficiary or the
> fiduciary profits thereby"); THEOPHILUS PARSONS, A
> TREATISE ON THE LAW OF PARTNERSHIP 225 (1867)
> (partner is liable "if he makes any private bargain . . . for his own
> benefit, which either inflicts a loss upon the partnership, or turns to
> himself advantages which belong to all in common . . . .").

*Marmac Inv.  Co.  v.  Wolpe*, 759 A.2d 620, 627 (D.C. 1999)

As discussed below, because Exhibit A was not an enforceable contract, Lowery's refusal to pay Snyder his full 1/3 share of the profits from the sale of L&S's Second Street property (*i.e.*, without deduction of any amounts paid to or invested in CASEtech) after Snyder objected to the actions that Lowery had taken pursuant to Exhibit A constitutes trover and conversion and unjust enrichment. *See infra*, V.C and D. Furthermore, as discussed above, Lowery has the fiduciary duties of a partner towards Snyder.  *See supra* IV.B. Lowery's trover and conversion and unjust enrichment constitute a breach of his fiduciary duties towards Snyder because Lowery enriched himself at Snyder's expense and against Snyder's wishes.  *Marmac Inv.  Co.*, 759 A.2d at 627 (partners owe one another the duty of good faith and fair dealing).  Therefore, Lowery's motion for summary judgment dismissing Snyder's breach of fiduciary duty claim (original Complaint, Count I; Amended Complaint, Count II) should be denied, and Snyder's cross-motion for summary judgment on that claim should be granted.

In the alternative, even if the Court determines that there is a material question of fact concerning the issue of whether Lowery has fiduciary duties towards Snyder, Lowery's motion for summary judgment with respect to the breach of fiduciary duty claim still fails and discovery should start immediately.

**B.    Breach of Contract (Original Complaint Count 3; Amended Complaint Count 2)**

Lowery argues that he lived up to every term of Exhibit A so there is no breach of

contract.  But, as explained above (*supra* IV.A.), Exhibit A is not an enforceable contract because it is not supported by consideration. Therefore, Snyder agrees that he has no claim based on any alleged breach of Exhibit A.

Paragraph 5.4.3(b) of the L&S Operating Agreement specifically states that "[a] Member's duty of loyalty to the Company and the other Members in the conduct and winding up of the Company business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of the law."  Lowery's trover and conversion and unjust enrichment constitute intentional misconduct and/or a knowing violation of the law, and therefore constitute a breach of Lowery's duty of loyalty to Snyder, as set forth in the L&S Operating Agreement.   The Court should, therefore, grant Snyder's Cross-Motion for Summary Judgment as to Amended Count 2 and deny Lowery's Motion for Summary Judgment as to (original) Count 3.

### C.    Breach of Covenant of Good Faith and Fair Dealing (Original Complaint Count 4; Amended Complaint Count 3)

Lowery argues that, because he complied with the terms of Exhibit A, he did not breach the covenant of good faith and fair dealing implied in Exhibit A and the L&S Operating agreement.  Since, as discussed above, Exhibit A is not an enforceable contract because it is not supported by consideration, Snyder agrees that he has no claim based on any alleged breach of the duty of good faith and fair dealing with respect to Exhibit A.

> "[A]ll contracts contain an implied duty of good faith and fair
> dealing, which means that 'neither party shall do anything which
> will have the effect of destroying or injuring the right of the other
> party to receive the fruits of the contract.'" ... "If the party to a
> contract evades the spirit of the contract, willfully renders
> imperfect performance, or interferes with performance by the other
> party, he or she may be liable for breach of the implied   covenant
> of good faith and fair dealing."

-11-

*Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) *quoting Paul v. Howard Univ.,* 754

A.2d 297 (D.C. 2000) (citations and internal quotations omitted)

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving [*202] "bad faith" because they violate standards of decency, fairness or reasonableness.

*Allworth v. Howard Univ.*, 890 A.2d at 201-02 (citing ~~the~~ Restatement (Second) of Contracts

§205 (1981)

> 'Subterfuges and evasions' are not included in examples of good faith; bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Bad faith involves evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. Bad faith means more than mere negligence. . . .

*Id.*

Lowery's contention that "there can only be a breach of the covenant of good faith and

fair dealing when there is a breach of an express term or condition of a contract" (Memorandum

of Points and Authorities in Support of Defendants' Motion for Summary Judgment ["Lowery

Memo"], p.12) misstates the law: there can be a breach of the covenant of good faith and fair

dealing even in the absence of the breach of an express term or condition of a contract. *See*, *e.g.*,

*Overseas Private Inv. Corp. v. Industria de Pesco, N.A., Inc.*, 920 F. Supp. 207, 211 (D.D.C.

1996). Thus, even if the Court determines that Lowery's conduct does not constitute a breach of

Lowery's duty of loyalty to Snyder, as explicitly set forth in paragraph 5.4.3(b) of the L&S

Operating Agreement, it can still find that Lowery's conduct constitutes a breach of the covenant

of good faith and fair dealing implied in that agreement. Accordingly, the Court should not

dismiss Lowery's claim for breach of the covenant of good faith and fair dealing (Original

Complaint Count 4; Amended Complaint Count 3) but, instead, should grant Snyder's cross-

motion for summary judgment with respect to that claim.

### D.  Unjust Enrichment (Original Complaint Count 7; Amended Complaint Count 4)

In order to prove unjust enrichment, Snyder must show that: (1) he conferred a benefit

upon Lowery; (2) Lowery accepted and retained the benefit; and (3) it would be unjust for

Lowery not to pay Snyder the value of the benefit. *See*, *e.g.*, *Rappaport v. United States Dep't of

Treasury, Office of Thrift Supervision*, 59 F.3d 212, 217 (D.C. Cir. 1995), *cert. denied*, 516 U.S.

1073 (1996) (discussing elements of unjust enrichment claim). Here, Lowery argues that he was

not unjustly enriched as a result of his diversion and/or retention of a full 33% of the profits from

the sale of L&S's Second Street property from Snyder, through CASEtech to Lowery himself

because he complied with the terms of Exhibit A.  But, as shown in IV.A.  Exhibit A is not a

contract.  Since, the $314,000.00 Lowery diverted from Snyder, through CASEtech, to Lowery

himself, conferred a benefit on Lowery (both by making his CASEtech shares marketable and by

enabling CASEtech to repay in full the "loans" he had made to the company); Lowery accepted

and retained that benefit; and it would be unjust for Lowery to retain that benefit (since the funds

were profits from the sale of property owned by L&S, in which Snyder owend a 1/3 interest),

Lowery was unjustly enriched.  For this reason, Lowery's Motion for Summary Judgment as to

Snyder's unjust enrichment claim (Original Complaint Count 7; Amended Complaint Count 4)

should be denied and Snyder's Cross-Motion for Summary Judgment as to that claim should be

granted.

### E.    Trover and Conversion (Original Complaint Count 8; Amended Complaint

**Count 5)**

"The tort of conversion is defined as an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other full value of the chattel." *Federal Fire Protection Corp. V. J.A. Jones/Tompkins Builders, Inc.*, 267 F. Supp. 2d 87, 92 n.3 (D.D.C. 2003). "Money can be the subject of a conversion claim only if the plaintiff has the right to a specific identifiable fund of money."*Calvetti v. Antcliff,* 346 F. Supp. 2d 92, 106 (D.D.C. 2004) (*quoting Curaflex Health Servs., Inc. v. Bruni*, 877 F. Supp. 30, 32 (D.D.C. 1995)). In this case, Snyder has identified the funds that Lowery has taken without permission.

Lowery, in his Motion for Summary Judgment, contends that, since he complied with the terms of Exhibit A, there can be no conversion. But as demonstrated in IV.A. *supra*, Exhibit A is not a contract. Lowery, under the guise of Exhibit A, and (mis)using his authority as majority owner of L&S, simply decided to give over $953,000.00 L&S realized from selling the Second Street property to CASEtech, which Lowery, in his capacity as majority owner of CASEtech then used to enrich himself. But 33.3% of these funds belonged to Snyder. Absent a contract, Lowery had no right to take these actions and, as a result, he converted Snyder's property to CASEtech's and/or his own use when he transferred $314,000 of the profits from the sale of the Second Street property to CASEtech and/or when he refused to return that sum to Snyder upon Snyder's request.

For these reasons, the Court should deny Lowery's motion for summary judgment with respect to Snyder's trover and conversion claim (Original Complaint, Count 8; Amended Complaint, Count 5) and grant Snyder's cross-motion for summary judgment with respect to that claim.

**F.      Lien/Trust (Original Complaint Count 10; Amended Complaint Count 6)**

Lowery, quite properly, sets out the standard for obtaining a constructive trust: "'(1) there must be a wrongful act; (2) specific property acquired by the wrongdoer must be traceable to the wrongful conduct; and (3) there must be a reason why the party holding the property should not, in good conscience, be allowed to keep the property.  *Alsco-Harvard Fraud Litigation*, 523 F. Supp.  790, 806-07 (D.D.C. 1981).'" Lowery Memo, p.19.  Lowery then contends that Snyder cannot meet this standard because Lowery complied with the terms of a valid contract—Exhibit A.  But as shown in IV.A. *supra*, Exhibit A is not a contract: it fails for want of consideration.  Accordingly, the Court should not dismiss Snyder's claim for the imposition of an equitable lien or constructive trust (Original Complaint, Count 10; Amended Complaint, Count 6).

Furthermore, Snyder is entitled to an accounting and the imposition of an equitable lien or constructive trust as a matter of law because: (1) there is a wrongful act (since Lowery's transfer to CASEtech of a full 1/3 of the profits from the sale of the Second Street property and/or his and/or CASEtech's retention of those funds constitutes trover and conversion and unjust enrichment, as discussed above); (2) the $314,000 that Lowery transferred and/or retained (or caused CASEtech to retain) is traceable to Lowery's wrongdoing; and (3) Lowery and/or CASEtech should not be allowed to retain the $314,000, because those funds rightfully belong to Snyder as the holder of a 1/3 interest in L&S.

**G.      Dissolution of L&S (Original Complaint Count 11; Amended Complaint Count 7)**

As set forth in IV.B., L&S was operated as a partnership.  Under District of Columbia law, where there is no written partnership agreement,

> [a] partnership is dissolved, and its business must be wound up, only upon the occurrence of any of the following events:

(1) In a partnership at will, the partnership's having notice from a partner, ...of that partner's express will to withdraw as a partner, or on a later date specified by the partner;

\* \* \*

(5) On application by a partner, a judicial determination that:

(A) The economic purpose of the partnership is likely to be unreasonably frustrated;

(B) Another partner has engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner; or

(C) It is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement;

D.C. Code §33-108.01. Courts interpreting these provisions have consistently held that serious and irreconcilable differences between the parties are proper grounds for dissolution by decree of court. *Cooper v. Isaacs,* 448 F.2d 1202, 1205-6 (D.C. Cir. 1971) (holding that under former D.C. Code a court can order a dissolution and appoint a receiver when parties have irreconcilable differences) (internal citations omitted).

Under the circumstances of this case, it is not reasonably practical for the partnership to continue, per paragraphs 5(B) and/or (C). *See Nemazee Capital Corp. V. Angulo Capital Corp.,* 1996 WL 426381, at \*1 (S.D.N.Y. July 30, 1996) (citing *Cooper v. Isaacs* in support of its determination that dissolution was proper where parties' mutual antagonism resulted in a barrage of acrimonious charges and countercharges, even though parties' alleged acts did not rise to level of independent breaches of partnership agreement); *W.A.W Van Limburg Stirum v. Whalen*, 1993 WL 241464, at \*8-\*9 (N.D.N.Y. June 29, 1993) (applying New Jersey law) (judicial dissolution was appropriate under same standard as set forth in D.C. Code §33-108.01 where partner

committed conversion and breached fiduciary duties)

The Court should therefore deny Lowery's summary judgment motion insofar as it seeks dismissal of Snyder's claim for dissolution of L&S (Original Complaint Count 11; Amended Complaint Count 7); grant Snyder's Cross-Motion for Summary Judgment on that claim; and order the dissolution of L&S.

**VI      Conclusion**

For all the reasons set out above, the Court should deny Lowery's Motion for Summary

Judgment, grant Snyder's Cross-Motion for Summary Judgment on his Amended Complaint and

grant such other, further and different relief as may be just and proper.


Dated:   June 11, 2007

                                        Michael Snyder,
                                        By Counsel


KAUFMAN LAW,  A Professional Corporation
11350 Random Hills Rd.  Suite 800
Fairfax, VA 22030
703.764.9080
703.764-0014 (fax)
David@dzklaw.com
Counsel for Plaintiff

By:
         D.Z. Kaufman, Bar # 435123


CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2007, a copy of the above document was served via ECF
of the U.S. District Court of the District of Columbia on counsel for Defendants Dale A.  Cooter,
Esq.  and James E.  Tompert, Esq., 5301 Wisconsin Ave., NW, Suite 500, Washington, D.C.
20015.




                               David Zachary Kaufman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Snyder, Michael                          *
                                         *
         Plaintiff                       *
                                         *
         v.                              *       Case No.: 1:06cv02213 JR
                                         *
Dale Lowery   et al.                     *
                                         *
         Defendants                      *

*     *     *     *     *     *     *     *     *     *     *     *     *

**ORDER**

THIS COURT, AFTER CONSIDERING Defendants' Motion for Summary Judgment and Plaintiff's Opposition thereto and considering Plaintiff's Cross-Motion for Summary Judgment and Defendants' Opposition thereto, hereby

DENIES Defendants' Motion for Summary Judgment and

GRANTS Plaintiff's Motion for Summary Judgment as to all Counts in Plaintiff's Amended Complaint and

ORDERS that Defendant Lowery provide a full accounting of the monies spent and received for L&S, LLC.;

ORDERS that Defendant Lowery provide a full accounting of the monies spent and received for CASEtech, Inc.;

ORDERS that L&S, LLC be dissolved as soon as economically practicable and the proceeds distributed to Defendants Lowery and Snyder according to their percentage share of ownership; and

ORDERS that Defendant Lowery pay Plaintiff $_____ in damages.


Entered this _____, 2007.




_____
Robertson, Judge

Copies to:

David Zachary Kaufman, Esq.
KAUFMAN LAW,  A Professional Corporation
11350 Random Hills Rd.  Suite 800
Fairfax, VA 22030

Dale A.  Cooter, Esq.
James E.  Tompert, Esq.,
5301 Wisconsin Ave., NW,
Suite 500,
Washington, D.C.  20015.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Snyder, Michael                          *
                                         *
          Plaintiff                      *
                                         *
     v.                                  *      Case No.: 1:06cv02213 JR
                                         *
Dale Lowery  et al.                      *
                                         *
          Defendants                     *

*    *    *    *    *    *    *    *    *    *    *    *    *

**SNYDER'S STATEMENT OF UNCONTESTED FACTS**

COMES NOW THE PLAINTIFF, Michael Snyder, by counsel and files this Statement of

Uncontested Facts to accompany his Cross- Motion for Summary Judgment and states:

Snyder agrees with and hereby incorporates by reference Lowery's Uncontested Facts

Nos. 1, 3-7, 9-12.  But Snyder objects to Lowery's "uncontested" fact No. 2 because it is a legal

conclusion, not fact.  Furthermore, Snyder objects to Lowery's "uncontested" fact No. 8 because

it misquotes paragraph Third.  Snyder believes that Defendants' Exhibit A speaks for itself and

Snyder asks the Court to refer only to Exhibit A and not to the misquotation contained in

Defendants'  "Uncontested" fact No. 8.

In addition to those Defendants' Uncontested Facts, to which Snyder does not object,

Snyder offers the Court the following additional Uncontested Facts:

1.      CASEtech, Inc. is a Delaware Close Corporation.  Exhibit 4.

2.      L&S, LLC  is a District of Columbia LLC which was created in April, 2000.  Exhibit 3.

3.      Exhibit 1, which is written in Defendant Lowery's handwriting, effectuated the sale by

Lowery of a 10% interest in CASEtech to Snyder.

4.     Exhibit 1 refers to Snyder as the "minority partner."

5.     Snyder always believed himself to be Lowery's minority partner in CASEtech.

6.     Lowery regularly referred to Snyder as his "partner" in conversations with various CASEtech employees. *See* Affidavits of Oron Strauss, Christine Kirby, Kathleen Edwards, Greg Jarmiolowski, and Eric Cohen.

7.     Lowery regularly referred to Snyder as his "partner" in conversations with Oren Strauss, of Most Ventures, Inc. *See* Affidavit of Oron Strauss.

8.     Exhibit 2 is a printout from one of the Quickbooks accounts for L&S maintained by Defendant Lowery and produced by Lowery as Exhibit 5 of Defendants' Initial Discovery.

9.     Exhibit 2 documents two loans Snyder made to L&S.

10.    Exhibit 2 refers to Snyder as a "partner" in L&S.

11.    Snyder always believed himself to be Lowery's minority partner in L&S.

12.    In 2005, Lowery was interested in selling his interest in CASEtech and withdrawing from the firm.  Lowery's Answer (Exhibit 5) at ¶15.

13.    Lowery found a buyer for his interest in CASEtech, MOST Ventures, LLC ("MV").  *Id.*

14.    MV was interested in purchasing Lowery's interest in CASEtech only if CASEtech was debt-free.  Affidavit of Oren Strauss.

15.    On November 4, 2005, Lowery presented a document called a "Funding Allocation Agreement" to Snyder for signature.  This Agreement is what Defendants are calling Exhibit A.

16.    This Funding Allocation Agreement provided that the funds realized from the sale of a property owned by L&S would be used to repay a bank loan to CASEtech.

17.    Exhibit A also provided that monies Lowery had advanced to CASEtech would be repaid out of the proceeds of the sale of L&S's property.

18.    Exhibit A also referred to Lowery and Snyder as "Partners."

19.    As a result of Lowery's implementation of Exhibit A, the following things occurred:

      i.    CASEtech paid off its debt to the Bank;

      ii.    CASEtech paid off its debt to Lowery;

      iii.    Lowery recovered the monies he had "loaned" to CASEtech;

      iv.    Lowery's majority share of CASEtech became marketable;

      v.    Snyder's minority share of CASEtech was unaffected;

      vi.    Lowery paid a reduced share of CASEtech's debts, only 66.7% rather than 80%;

      vii.    The funds Lowery had "loaned" to CASEtech were repaid in full; and

      viii.    No action or inaction that resulted directly from the implementation of Exhibit A was to Lowery's detriment.

20.    The practical effect of Exhibit A was that Snyder paid over $314,000.00, towards CASEtech's approximately $953,000.00 debt from his share of the profits from the sale of L&S's Second Street property.  Snyder Affidavit at ¶ 9.

21.    The approximately $314,000.00 that Snyder paid towards CASEtech's debt represented 33% of CASEtech's debt.  *Id.*  at ¶10.

22.    No action or inaction  that resulted directly from the implementation of Exhibit A was to Snyder's benefit.  *Id.*  at ¶13.

23.    CASEtech held no properly noticed annual meetings of the Shareholders, as required by the Bylaws. *Id.*  at ¶14.

Dated:   June 11, 2007

                                                    Michael Snyder,
                                                    By Counsel

KAUFMAN LAW,  A Professional Corporation
11350 Random Hills Rd.  Suite 800
Fairfax, VA 22030
703.764.9080
703.764-0014 (fax)
David@dzklaw.com
Counsel for Plaintiff

By:
         D.Z. Kaufman, Bar # 435123


                    CERTIFICATE OF SERVICE

         I hereby certify that on June 11, 2007, a copy of the above document was served via ECF
of the U.S. District Court of the District of Columbia on counsel for Defendants Dale A.  Cooter,
Esq.  and James E.  Tompert, Esq., 5301 Wisconsin Ave., NW, Suite 500, Washington, D.C.
20015.



                              David Zachary Kaufman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Snyder, Michael                              *
                                             *
        Plaintiff                            *
                                             *
        v.                                   *          Case No.: 1:06cv02213 JR
                                             *
Dale Lowery    et al.                        *
                                             *
        Defendants                           *

*    *    *    *    *    *    *    *    *    *    *    *    *

AFFIDAVIT

I, Oron Strauss, being first duly sworn, under penalty of perjury, hereby declare that I have personal knowledge of the facts recounted below and am prepared to testify to their accuracy.

1.    I am one of the co-owners MOST Ventures, LLC ("MV").

2.    In 2005 and 2006 MV was interested in purchasing Dale Lowery's ownership share of CASEtech, Inc.

3.    I therefore met several times with Lowery as we negotiated the sale of his interest in CASEtech.

4.    In the course of these discussions, when talking to me or talking to others in my presence, Dale Lowery referred regularly to Michael Snyder as his "partner".

5.    In the course of negotiating to purchase his ownership share of CASEtech I told Dale Lowery that MV was only interested in completing the purchase if CASEtech were debt-free.

Page 1 of 2

06/08/07  FRI 14:59 FAX 703 525 9770        VCB-CLARENDON-BR#01-BANK                    ☑002

This ends my Affidavit.

June 8, 2007

STATE OF VIRGINIA
COUNTY OF Arlington
SWORN AND SUBSCRIBED BEFORE ME
THIS 8 DAY OF June 20 2007

Oron Strauss

NOTARY PUBLIC
MY COMMISSION EXPIRES 4/30/2010.

Witness my hand and seal this                    June 8    , 2007.

SUBSCRIBED AND SWORN TO THIS            day of                , 2007.

My commission expires

Notary Public

Jun-08-2007 14:47    From-MAIL BOXES ETC                617 730 8300        T-712  P.002/002  F-056

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Snyder, Michael                          *
                                         *
    Plaintiff                         *
                                         *
    v.                                *        Case No.: 1:06cv02213 JR
                                         *
Dale Lowery   et al.                     *
                                         *
    Defendants                        *

*      *      *      *      *      *      *      *      *      *      *      *      *

### AFFIDAVIT

I, Christine Kirby, being first duly sworn, under penalty of perjury, hereby declare that I have

personal knowledge of the facts recounted below and am prepared to testify to their accuracy:

1.   I was an employee of CASEtech in 2005 and 2006.

2.   As a CASEtech employee I worked with Michael Snyder and Dale Lowery on a regular basis.

3.   When talking to me or talking to others in my presence, Dale Lowery referred regularly to

    Michael Snyder as his "partner".

    This ends my Affidavit.

June 7, 2007


Christine Kirby

Witness my hand and seal this    June 8th    , 2007.

SUBSCRIBED AND SWORN TO THIS    8    day of    June    , 2007.

My commission expires    04 | 19 ) 2013

Notary Public

**LEEZA KONOPLYOVA**
Notary Public
Commonwealth of Massachusetts
My Commission Expires April 19, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Snyder, Michael                    *
                                   *
        Plaintiff                  *
                                   *
        v.                         *       Case No.: 1:06cv02213 JR
                                   *
Dale Lowery    et al.              *
                                   *
        Defendants                 *

*    *    *    *    *    *    *    *    *    *    *    *    *

AFFIDAVIT

I, Kathleen Edwards, being first duly sworn, under penalty of perjury, hereby declare that I

have personal knowledge of the facts recounted below and am prepared to testify to their accuracy.

1.    I was an employee of CASEtech in 2002 *2001* and 2006.

2.    As a CASEtech employee I worked with Michael Snyder and Dale Lowery on a regular basis.

3.    When talking to me or talking to others in my presence, Dale Lowery referred regularly to

       Michael Snyder as his "partner".

       This ends my Affidavit.

June 7, 2007

                          _____
                               Kathleen Edwards

       Witness my hand and seal this   June   7              , 2007.


       SUBSCRIBED AND SWORN TO THIS   7th   day of   June      , 2007.

       My commission expires   March 20, 2010.

                          Notary Public      Weily Carl Dawn

06/08/2007 12:17 FAX 4106598864          Y & B  ENTERPRISES.                              ☒001/001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Snyder, Michael                                 *
                                                *
        Plaintiff                               *
                                                *
        v.                                      *       Case No.: 1:06cv02213 JR
                                                *
Dale Lowery    et al.                           *
                                                *
        Defendants                              *

*       *       *       *       *       *       *       *       *       *       *       *

AFFIDAVIT

        I, Greg Jarmiolowski, being first duly sworn, under penalty of perjury, hereby declare that I

have personal knowledge of the facts recounted below and am prepared to testify to their accuracy.

1.      I was an employee of CASEtech in 2006.

2.      As a CASEtech employee I worked with Michael Snyder and Dale Lowery on a regular basis.

3.      When talking to me or talking to others in my presence, Dale Lowery referred regularly to

        Michael Snyder as his "partner".

        This ends my Affidavit.

June 7, 2007



                                        _____
                                        Greg Jarmiolowski

        Witness my hand and seal this        JUNE    8    , 2007.


        SUBSCRIBED AND SWORN TO THIS    8    day of   June    , 2007.

                My commission expires

        EUN Z. YANG
        NOTARY PUBLIC STATE OF MARYLAND        Notary Public
        My Commission Expires June 11, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Snyder, Michael      *
         *
   Plaintiff      *
         *
   v.        *    Case No.: 1:06cv02213 JR
         *
Dale Lowery   et al.    *
         *
     Defendants   *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AFFIDAVIT

I, Michael Snyder, being first duly sworn, under penalty of perjury, hereby declare that I have personal knowledge of the facts recounted below and am prepared to testify to their accuracy.

1. I always believed myself to be Lowery's minority partner in CASEtech.

2. Lowery always referred to me as his "partner" in conversations with others about CASEtech that occurred in my presence.

3. Lowery and I founded L&S, LLC in April, 2000.

4. I always believed myself to be Lowery's minority partner in L&S.

5. Lowery always referred to me as his "partner" in conversations with others about L&S that occurred in my presence.

6. Lowery told me that he had found a buyer for his interest in CASEtech provided that CASEtech was debt-free.

7. CASEtech held no annual meetings of the Shareholders, as required by the Bylaws. I base this

1

statement on the fact that I never received notice of an annual meeting, as required by Art. II, §5 of the Bylaws.

8. L&S did not hold any Member meetings upon written notice, as provided for in ¶5.2.1 of the L&S Operating Agreement.

9. To the best of my knowledge, aside from the actions Lowery took pursuant to Exhibit A, L&S never took any actions by written consent, as provided for in ¶5.2.3 of the L&S Operating Agreement.

10. The practical effect of Exhibit A was that I paid over $314,000.00, towards CASEtech's debt of approximately $953,000.00 from my share of the profits from the sale of L&S's Second Street property

11. The approximately $314,000.00 that I paid towards CASEtech's debt represented about 33% of CASEtech's debt.

12. If I had paid CASEtech's debt from my share of the profits from the sale of L&S's Second Street property in proportion to my 20% ownership interest in CASEtech, I would have paid only about $190,000.00.

13. The difference between the amount I paid as a result of Exhibit A and the amount I would have paid if I had paid CASEtech's debt from my share of the profits from the sale of L&S's Second Street property in proportion to my 20% ownership interest in CASEtech is about $124,000.00.

14. No action or inaction that resulted directly from the implementation of Exhibit A was to my benefit.

15. I was never informed of any annual meetings of the CASEtech Shareholders, as required by

2

the Bylaws. Exhibit 4, Article II Section 1.

16. After I objected to the actions that Lowery had taken pursuant to the November 4, 2005 Funding Allocation Agreement and requested that Lowery pay me my full 1/3 share of the profits from the sale of L&S's Second Street property, Lowery refused to pay me 1/3 of the profits f(i.e., without deduction of any amounts paid to or invested in CASEtech) from the sale of that property.


This ends my Affidavit.

June 8, 2007

_____
Michael Snyder

Witness my hand and seal this    8ᵗʰ  day  of   June        , 2007.

SUBSCRIBED AND SWORN TO THIS    8ᵗʰ.   day of     June      , 2007.

My commission expires          THIERRY K. SOFON
                        Notary Public State of Maryland
                      My Commission Expires Sept. 15, 2009

                   Notary Public

3

3/5/99

(1) Whereas CASEtech, Inc (the "Company") and I. Michael Snyder (the "minority partner") desire to enter into a binding business relationship, do hereby consent and agree that in exchange for certain considerations the minority partner will receive an interest in the Company as follows:

(A) For $20,000 US in cash or cash equivalent the minority partner will be entitled to and will receive a ten percent (10%) interest in the Company.

(B) At such time as the minority partner causes to be delivered exclusively to the company a sub-contract with OAO Corporation for work on the US Coast Guard Fleet Logistics System (estimated value remaining in this Fiscal Year $350,000), he will be entitled to and will receive an additional 10% interest in the Company, for a total of 20%. It is understood that Mr. Snyder will acquire said contract from another Vendor using funds independent of his initial contribution to the Company.

Dale Lowery, Ph.D.
President
3/9/99

DL

I. Michael Snyder
Minority Partner
3/9/99

EXHIBIT 1



I. MICHAEL SNYDER
PHYLLIS E. ENGLISH
301-460-0443
13514 WINDING TRAIL COURT
SILVER SPRING, MD 20906

101

9/23/99

CHEVY CHASE BANK
CHEVY CHASE, MARYLAND 20815

⑆255071981⑆    834090554⑆ 0101

OAO CORPORATION         134838

| REF NO | YOUR INVOICE NO | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN | NET CHECK AMOUNT |
|---|---|---|---|---|---|---|
| 07536 | 99270 | 08/31/99 | 3875.00 | 3875.00 | 0.00 | 3875.00 |
| TOTALS | | | 3875.00 | 3875.00 | 0.00 | 3875.00 |



OAO CORPORATION
7500 GREENWAY CENTER DRIVE
GREENBELT MD 20770-3585

NATIONSBANK NA
7 16/3520

134838

| DATE | CONTROL NO | AMOUNT |
|---|---|---|
| 09/08/9- | 134838 | ****3875.00 |

****3875 DOLLARS AND 00 CENTS**

PAY
TO THE
ORDER OF

CASETECH, INC
661 PENNSYLVANIA AVE S E
SUITE 105
WASHINGTON   DC 20003

5

EXHIBIT 2

**Register 21320: Loan fm Partner Snyder**
**01/01/2003 - 06/16/06**

Register: 21320 · Loan from Partner - Snyder          From 01/01/2003 through 04/11/2007

| Date | Number | Payee | Account |
|------|--------|-------|---------|
| 5/4/2004 | 126 | I. Michael Snyder | 10110 · NCB Working Capital 7785 |
| 11/29/2004 | 412 | American Express C | 20310 · Credit Cards Payable [split] |
| 12/7/2004 | 1186 | I. Michael Snyder | 10110 · NCB Working Capital 7785 |
| 12/15/2004 | 74 | | 20410 · Payroll Payable [split] |
| 12/17/2004 | 82 | | 63310 · Employee Bonuses |
| 12/22/2004 | 1216 | Phyllis E English | 10110 · NCB Working Capital 7785 |
| 1/1/2005 | 107 | | 20410 · Payroll Payable [split] |
| 1/3/2005 | 2024 | I. Michael Snyder | 10110 · NCB Working Capital 7785 |
| 1/31/2005 | 83 | | 20410 · Payroll Payable [split] |
| 1/31/2005 | PD_01Feb05 | I. Michael Snyder | 10210 · NCB Payroll 2118 |
| 2/15/2005 | 84 | | 20410 · Payroll Payable [split] |
| 3/21/2005 | 1 | I Michael Snyder | 10110 · NCB Working Capital 7785 |
| 5/26/2005 | 505 | Chevy Chase Bank | 20110 · Supplier Accts Payable |
| 6/8/2005 | 2302 | Chevy Chase Bank | 10110 · NCB Working Capital 7785 |
| 9/15/2005 | 98 | | 20410 · Payroll Payable [split] |
| 9/30/2005 | 99 | | 20410 · Payroll Payable [split] |
| 6/16/2006 | | | 20410 · Payroll Payable [split] |
| 6/16/2006 | 22 | | 30310 · I.M. Snyder |

**Register 21320: Loan fm Partner Snyder**
**01/01/2003 - 06/16/06**

Sorted by: Date, Type, Number/Ref

| Memo | Increase | C Decrease | Balance |
|---|---|---|---|
| $17,000.00 for paying bills | 17,000.00 | | 17,000.00 |
| Michael Owes CASEtech, Inc. | | 505.93 | 16,494.07 |
| Personal Printer for Home | 505.93 | | 17,000.00 |
| PED 12/15/04; CKD 1/03/05 | 3,125.00 | | 20,125.00 |
| Holiday Bonus | | 1,500.00 | 18,625.00 |
| Pay Back of Amex Charge for Home Printer | 505.93 | | 19,130.93 |
| Missed Payrolls in 2004 | 4,375.00 | | 23,505.93 |
| Printer_Personal_Home | | 505.93 | 23,000.00 |
| PED 1/31/05; CKD 2/15/05 | 3,125.00 | | 26,125.00 |
| Check for PD_01Feb05 | 42,500.00 | | 68,625.00 |
| PED 2/15/05; CKD 3/1/05 | 3,125.00 | | 71,750.00 |
| Loan to pay 401(K) for PD_16MAR05 | 2,000.00 | | 73,750.00 |
| Principal paid towards Michael's LOC | | 2,000.00 | 71,750.00 |
| To Pay back the Loan I.M. Snyder made to CT. | | 58,000.00 | 13,750.00 |
| This Loan is Now Zeroed Out as of 08June05 | | | |
| PED 9/15/05; CKD 9/30/05 | 4,333.00 | | 18,083.00 |
| PED 9/30/05; CKD 10/15/05 | 4,333.47 | | 22,416.47 |
| CKD 06/16/06 | 4,333.47 | | 26,749.94 |
| To correct partners basis in partnership | | 26,749.94 | 0.00 |

## L&S REAL ESTATE, L.L.C.
### Operating Agreement

This Operating Agreement (this "Agreement") is entered into this 26th day of April, 20000 by and among Dale E. Lowery, and Michael Snyder.

### Explanatory Statement

The parties have agreed to organize a limited liability company in accordance with the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, the parties agree as follows:

### Article I
### Defined Terms

The following capitalized terms shall have the respective meanings specified in this Article I. Capitalized terms not defined in this Agreement shall have the meaning specified in the Act.

*"Act"* means the Limited Liability Company Act of 1994, as amended from time to time.

*"Adjusted Capital Account Deficit"* means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i) the deficit shall be decreased by the amounts which the Interest Holder is obligated to restore pursuant to *Section* 4.4.2 or is deemed obligated to restore pursuant to Regulation Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g) and 1.704-2(i)(5); and

(ii) the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

*"Affiliate"* means (a) Person directly or indirectly controlling, controlled by, or under common control with another Person; (b) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities or beneficial interests of another Person; (c) an officer, director, partner, or member of the immediate family of an officer, director or partner, of another Person; and/or (d) any affiliate of any such Person.

*"Agreement"* means this Operating Agreement, as amended from time to time including each exhibit hereto.

*"Assignee"* means the Person who has acquired an Economic Interest in the Company but is not a Member.

EXHIBIT 3

*"Capital Account"* means the account to be maintained by the Company for each Interest Holder in accordance with the following provisions:

(i) an Interest Holder's Capital Account shall be credited with the amount of money and the fair market value of any property contributed to the Company (net of liabilities secured by such property that the Company either assumes or to which such property is subject), the amount of any Company unsecured liabilities assumed by the Interest Holder, and the Interest Holder's distributive share of Profit and any item in the nature of income or gain specially allocated to the Interest Holder pursuant to the provisions of *Section* 4.3 (other than *Section* 4.3.3); and

(ii) an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder (net of liabilities secured by such distributed property that the Interest Holder either assumes or to which such property is subject), the amount of any unsecured liabilities of the Interest Holder assumed by the Company, and the Interest Holder's distributive share of Loss and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of *Section* 4.3 (other than *Section* 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to *Section* 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

*"Cash Flow"* means all cash derived from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Members.

*"Code"* means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding revenue law.

*"Company"* means the limited liability company formed in accordance with this Agreement.

*"Contribution"* means any money, property, or services rendered, or a promissory note or other binding obligation to contribute money or property, or to render services as permitted in this Agreement or by law, which a Member contributes to the Company as capital in that Member's capacity as a Member pursuant to this Agreement or any other agreement between the Members, including an agreement as to value.

*"Economic Interest"* means a Person's right to share in the income, gains, losses, deductions,

2

credit, or similar items of, and to receive Distributions from, the Company, but does not include any other rights of a Member including, without limitation, the right to Vote or to participate in management, or any right to information concerning the business and affairs of the Company.

*"Interest Holder"* means any Person who holds an Economic Interest, whether as a Member or as an Assignee of a Member.

*"Involuntary Withdrawal"* means, with respect to any Member, the affirmative Vote of Members, excluding the Member whose withdrawal is being Voted upon, holding not less than seventy-five percent 75% of the Membership Interests to terminate such Member's Membership Interest.

*"Member"* means any Person who executes a counterpart of this Agreement as a Member and any Person who subsequently is admitted as a Member of the Company.

*"Member Loan Nonrecourse Deductions"* means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulation Section 1.704-2(i).

*"Member Nonrecourse Debt Minimum Gain"* has the meaning set forth in Regulation Section 1.704-2(i)(2) (determined by substituting "Member" or "Interest Holder" for "partner").

*"Membership Interest"* means a Member's rights in the Company, collectively, including the Member's Economic Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

*"Minimum Gain"* has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under IRC Section 704(b).

*"Negative Capital Account"* means a Capital Account with a balance of less than zero.

*"Nonrecourse Deductions"* has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

*"Nonrecourse Liability"* has the meaning set forth in Regulation Section 1.704-2(b)(3).

*"Percentage"* means, as to a Member, the Percentage set forth after the Member's name on *Exhibit* A, as amended from time to time, and as to an Interest Holder who is not a Member, the

Percentage or part of a Percentage that corresponds to the portion of a Member's Economic Interest that the Interest Holder has acquired, to the extent the Interest Holder has succeeded to a Member's interest.

*"Person"* means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

*"Positive Capital Account"* means a Capital Account with a balance greater than zero.

*"Profit"* and *"Loss"* means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with IRC Section 703(a), with the following adjustments:

(i) all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to IRC Section 703(a)(1) shall be included in computing taxable income or loss;

(ii) any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(iii) any expenditures of the Company described in IRC Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv) gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the book value as adjusted under Regulation Section 1.704-1(b) ("adjusted book value") of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v) in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi) notwithstanding any other provision of this definition, any items which are specially allocated pursuant to *Section* 4.3 shall not be taken into account in computing Profit or Loss.

*"Regulation"* means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

*"Transfer"* means, when used as a noun, any sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, to sell, hypothecate, pledge, assign, or otherwise transfer.

*"Voluntary Withdrawal"* means a Member's disassociation from the Company by means other than a Transfer or an Involuntary Withdrawal.

4

## Article II
## Formation and Name; Office; Purpose; Term

2.1. *Organization*. The parties hereby organize a limited liability company pursuant to the Act and the provisions of this Agreement. The Company has caused Articles of Organization to be prepared, executed, and filed with the Department of Consumer and Regulatory Affairs.

2.2. *Name of the Company*. The name of the Company is L&S Real Estate, L.L.C.

2.3. *Purpose*. The Company is organized to engage in the business owning and operating real estate, including acting as lessor thereof and to do any and all things necessary, convenient, or incidental to that purpose, and to engage in any other lawful purpose and/or business.

2.4. *Term*. The Company shall continue in existence until December 31, 2040, unless sooner dissolved as provided by this Agreement or the Act.

2.5. *Principal Place of Business*. The Company's Principal Place of Business shall be located at 816B North Carolina Avenue, NW, Washington, DC 20003, or at any other place within the District of Columbia upon which the Members agree.

2.6. *Resident Agent*. The name and address of the Company's resident agent in the District of Columbia is Dale E. Lowery, Ph.D.

2.7. *Members*. The name, present mailing address, taxpayer identification number, and Percentage of each Member are set forth on *Exhibit* A.

## Article III
## Members; Capital; Capital Accounts

3.1. *Initial Contributions*. Upon the execution of this Agreement, the Members shall make capital contributions to the Company with the value and as described in *Exhibit* A.

3.2. *No Additional Contributions*. No Member shall be required to contribute any additional capital to the Company, and no Member shall have personal liability for any obligations of the Company except as expressly provided by law.

3.3. *No Interest on Contributions*. Neither Members nor any Interest Holders shall be paid interest with respect to Contributions.

3.4. *Return of Contributions*. Except as otherwise provided in this Agreement, no Member nor Interest Holder shall have the right to receive the return of any Contribution or withdraw from the

5

Company, except upon the dissolution of the Company.

3.5. *Form of Return of Capital.* If a Member or an Interest Holder is entitled to receive the return of a Contribution, the Company may distribute in lieu of money, notes, or other, property having a value equal to the amount of money distributable to the Interest Holder money distributable to such Person.

3.6. *Capital Accounts.* A separate Capital Account shall be maintained for each Member and Interest Holder.

3.7. *Loans and Other Business Transactions.* Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Company and the Member agree. Members may also transact other business with the Company and, in doing so, as they shall have the same rights and be subject to the same obligations arising out of any such business transaction as would be enjoyed by and imposed upon any Person, not a Member, engaged in a similar business transaction with the Company.

### Article IV
### Profit, Loss, and Distributions

4.1. *Distribution of Cash Flow.* Except as provided in Section 4.4, Cash Flow for each taxable year of the Company shall be distributed to the Interest Holders in proportion to their Percentages no later than seventy-five (75) days after the end of the taxable year.

4.2. *Allocation of Profit or Loss.* After giving effect to the special allocations set forth in *Section* 4.3, for any taxable year of the Company, Profit and Loss shall be allocated to the Interest Holders in proportion to their Percentages. If Losses are reallocated under Section 4.3.1., subsequent allocations of Profit and Loss shall be made so that, to the extent possible, the net amount allocated pursuant to this Section 4.2 equals the net amount that would have been allocated to each Interest Holder if no reallocation had occurred under Section 4.3.1.

4.3. *Regulatory Allocations.*

4.3.1. *Impermissible Deficits and Qualified Income Offset.* No Interest Holder shall be allocated Losses or deductions if the allocation causes the Interest Holder to have an Adjusted Capital Account Deficit; instead, such items shall be allocated to the other Interest Holders. If an Interest Holder for any reason (whether or not expected) receives (1) an allocation of Loss or deduction (or item thereof) or (2) any Distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year (other than an allocation under *Section* 4.3.2), in the amount and in proportions required to eliminate the excess as quickly as possible. This *Section* 4.3.1 is intended to

6

comply with, and shall be interpreted consistently with, the "alternate test for economic effect" and "qualified income offset" provisions of the Regulations promulgated under IRC Section 704(b).

4.3.2. *Minimum Gain Chargebacks*. In order to comply with the "minimum gain chargeback" requirements of Regulation Sections 1.704-2(f)(1) and 1.704-2(i)(4), and notwithstanding any other provision of this Agreement to the contrary, in the event there is a net decrease in an Interest Holder's share of Minimum Gain and/or Member Nonrecourse Debt Minimum Gain during a Company taxable year, such Interest Holder shall be allocated items of income and gain for that year (and if necessary, other years) as required by and in accordance with Regulation Sections 1.704-2(f)(1) and 1.704-2(i)(4) before any other allocation is made. It is the intent of the parties hereto that any allocation pursuant to this *Section* 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f) and 1.704-2(i)(4).

4.3.3. *Contributed Property and Book-Ups*. In accordance with IRC Section 704(c) and the Regulations thereunder, including Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of Contribution (or deemed Contribution). If the adjusted book value of any Company asset is adjusted under Regulation Section 1.704-1(b)(2)(iv)(f), subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under IRC Section 704(c) and the Regulations thereunder. The parties hereto agree to use the traditional method with curative allocations, as described in Regulation Section 1.704-3(c), for making IRC Section 704(c) allocations.

4.3.4. *IRC Section 754 Adjustment*. To the extent an adjustment to the tax basis of any Company asset pursuant to IRC Section 734(b) or IRC Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.5. *Nonrecourse Deductions*. Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.3.6. *Member Loan Nonrecourse Deductions*. Any Member Loan Nonrecourse Deductions for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deductions are attributable in accordance with Regulation Section 1.704-2(i).

4.3.7. *Guaranteed Payments*. To the extent any compensation paid to any Interest Holder by the Company, including any fees payable to any Interest Holder pursuant to Section 5.3

7

hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under IRC Section 707(c) or is not paid to the Interest Holder other than in the Person's capacity as a partner (Interest Holder) within the meaning of IRC Section 707(a), the Interest Holder shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Interest Holder's Capital Account shall be adjusted to reflect the payment of that compensation.

4.3.8. *Unrealized Receivables.* If an Interest Holder's Economic Interest is reduced (provided the reduction does not result in a complete termination of the Interest Holder's Interest), the Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of IRC Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to *Section 4.4* hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Interest Holder, be specially allocated among the Interest Holders in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture

4.3.9. *Withholding.* All amounts required to be withheld pursuant to IRC Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

4.3.10. *Nonrecourse Liabilities.* Solely for purposes of determining an Interest Holder's proportionate share of "excess nonrecourse liabilities" of the Company within the meaning of Regulation Section 1.752-3(a)(3), the Interest Holders' interest in Company profits shall be based on their respective Percentages.

4.3.11. *Intent of Allocations.* The tax allocation provisions of this Agreement are intended to produce final Capital Account balances of the Interest Holders that will permit liquidating Distributions that are made in accordance with such final Capital Account balances under *Section 4.4.1* to be equal to the Distributions that would occur if such Distributions were made to the Interest Holders in proportion to their Percentages. To the extent that the tax allocation provisions of this Agreement would not produce such final Capital Account balances, (1) such provisions shall be amended by the Members (General Manager) if and to the extent necessary to produce such result and (2) taxable income or taxable loss of the Company for prior open years (or items of gross income and deduction of the Company) shall be reallocated among the Interest Holders to the extent it is not possible to achieve such result with allocations of income (including gross income) and deduction for the current year and future years. This *Section 4.3.11* shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

8

4.3.12. *Income Tax Provisions.* The Interest Holders are aware of the income tax consequences of this Article IV and agree to be bound by these provisions in reporting their shares of Profit, Losses, and other items for federal and state income tax purposes.

4.4. *Liquidation and Dissolution.*

4.4.1. Upon liquidation of the Company, the assets of the Company shall be distributed to the Interest Holders in accordance with their positive balances in their respective Capital Accounts, after giving effect to all Contributions, Distributions, and allocations for all periods. Distributions to the Interest Holders pursuant to this *Section* 4.4.1 shall be made in accordance with Regulation Section 1.704-1(b)(2)(ii)(b)(2).

4.4.2. No Interest Holder shall be obligated to restore a Negative Capital Account.

4.5. *General.*

4.5.1. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Members.

4.5.2. If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Interest Holders so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Members. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in *Section* 4.2 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the Distribution of the assets in liquidation pursuant to *Section* 4.4.

4.5.3. All Profit and Loss shall be allocated and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or Distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to a Capital Transaction or to any other extraordinary non-recurring items of the Company.

4.5.4. The Members are hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated under IRC Section 704(b); provided, however, that no amendment shall materially affect Distributions to an Interest Holder without the Interest Holder's prior written consent.

## Article V
## Management: Rights, Powers, and Duties

5.1. *Management*. The Company shall be managed by the Members. Except as specifically provided otherwise in this Agreement, only a Member or members owning not less than 51% of the Company shall have the right to act for and bind the Company in the ordinary course of its business.

5.2. *Meetings of and Voting by Members*.

5.2.1. A meeting of the Members may be called by any Member. However, without the consent of Members owning not less than 51% interest in the Company, meetings may not be called more frequently than once per calendar quarter. Meetings of Members shall be held at the Company's principal place of business or at any other place within or without the District of Columbia, designated by the Person or Persons calling the meeting. Not less than ten (10) nor more than sixty (60) days before each meeting, the Person or Persons calling the meeting shall give written notice of the meeting to each Member entitled to Vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice may waive notice, either before or after the meeting, by executing a waiver of such notice, or by appearing at and participating, in person or by proxy in the meeting. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by Proxy of Members holding Percentages which aggregate not less than fifty-one percent (51%) constitutes a quorum. A Member may Vote either in person or by written Proxy signed by the Member or by the Member's duly authorized agent.

5.2.2. Except as otherwise provided in this Agreement, the affirmative Vote of Members holding a majority of the aggregate Percentages present at the meeting in person and by proxy shall be required to approve any matter coming before the Members.

5.2.3. In lieu of holding a meeting, the Members may take action by written consents specifying the action to be taken, which consents must be executed and delivered to the Company by Members whose combined Voting Power constitutes not less than 51% of the total Voting Power of all Members. Any such approved action shall be effective immediately. The Company shall give prompt notice to all Members of any action approved by Members by less than unanimous consent.

5.2.4. The following matters shall require the Vote or consent of the percentage interest of Members indicated after each such item for such action to be approved by the Members:

(a) A decision to continue the business of the Company after dissolution of the Company (51%);

(b) Approval of the transfer of a Membership Interest and admission of an Assignee as a Member (51%); any such consent to transfer or admission may be unreasonably withheld in the sole and absolute discretion of the consenting party;

10

(c) An amendment to the Articles of Organization or this Agreement (51%).

5.3. *Personal Service*. No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Members, no Member shall be entitled to compensation for services performed for the Company. However, upon substantiation of the amount and purpose thereof, the Members shall be entitled to reimbursement for expenses reasonably incurred, and advances of funds reasonable made, in furtherance of the business of the Company.

5.4. *Duties of Parties*.

5.4.1. Each Member shall devote such time to the business and affairs of the Company as is necessary to carry out the Member's duties set forth in this Agreement.

5.4.2. Except as otherwise expressly provided in *Section* 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and no Member shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to the Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

5.4.3. The only fiduciary duties a Member owes to the Company and the other Members are the duty of loyalty and the duty of care set forth in subdivisions (a) and (b):

(a) A Member's duty of loyalty to the Company and the other Members is limited to the following:

(1) To account to the Company and hold as trustee for it any property, profit, or benefit derived by the Member in the conduct or winding up of the Company's business or derived from a use by the Member of Company property, including the appropriation of a Company opportunity, without the consent of the other Members;

(2) To refrain from dealing with the Company in the conduct or winding up of the Company business as or on behalf of a party having an interest adverse to the Company without the consent of the other Members; and

(3) To refrain from competing with the Company in the conduct of the Company business before the dissolution of the Company without the consent of the other Members.

(b) A Member's duty of care to the Company and the other Members in the conduct and winding up of the Company business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

11

5.5. *Indemnification of Members.*

5.5.1. A Member shall not be liable, responsible, or accountable, in damages or otherwise, to any other Member or to the Company for any act performed by the Member with respect to Company matters, and within the standard of care specified in *Section* 5.4.3(b).

5.5.2. The Company shall indemnify each Member for any act performed by the Member with respect to Company matters, unless such act constitutes grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

## Article VI
### Transfer of Interests and Withdrawals of Members

6.1. *Transfers.* Except as herein provided, no Member may Transfer all, or any portion of, or any interest or rights in, the Membership Interest owned by the Member. Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members. The attempted Transfer of any portion or all of a Membership Interest in violation of the prohibition contained in this *Section* 6.1 shall be deemed invalid, null and void, and of no force or effect, except any Transfer mandated by operation of law and then only to the extent necessary to give effect to such Transfer by operation of law.

6.1.1. A Member may Transfer all or any portion of or any interest or rights in the Member's Economic Interest if each of the following conditions ("Conditions of Transfer") is satisfied:

6.1.1.1. the Transfer may be accomplished without registration, or similar process, under federal and state securities laws;

6.1.1.2. the transferee delivers to the Company a written agreement to be bound by the terms of Article VI;

6.1.1.3. the Transfer will not result in the termination of the Company pursuant to IRC Section 708;

6.1.1.4. the Transfer will not result in the Company being subject to the Investment Company Act of 1940, as amended;

6.1.1.5. the transferor or the transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number; and (ii) the transferee's initial tax basis in the transferred Membership Interest; and

6.1.1.6. the transferor complies with the provisions set forth in *Section* 6.1.3.

12

6.1.2. If the Conditions of Transfer are satisfied, the Member may Transfer all or any portion of the Member's Economic Interest. The Transfer of an Economic Interest pursuant to this *Section* 6.1 shall not result in the transfer of any of the transferor's other Membership rights. The transferee of the Economic Interest shall have no right to: (i) become a Member; (ii) exercise any Membership rights other than those specifically pertaining to the ownership of an Economic Interest; or (iii) act as an agent of the Company.

### 6.1.3. *Right of First Offer.*

6.1.3.1. If a Member (a "Transferor") desires to Transfer all or any portion of, or any interest or rights in the Transferor's Economic Interest (the "Transferor Interest"), the Transferor shall notify the Company of that desire (the "Transfer Notice"). The Transfer Notice shall describe the Transferor Interest. The Company, or its nominee(s), shall have the option (the "Purchase Option") to purchase all of the Transferor Interest for a price (the "Purchase Price") equal to the amount the Transferor would receive if the Company were liquidated and an amount equal to the Appraised Value were available for distribution to the Members pursuant to *Section* 4.4.

6.1.3.2. The Purchase Option shall be and remain irrevocable for a period (the "Transfer Period") ending at 11:59 P.M. local time at the Company's principal office on the thirtieth (30th) day following the day the Transfer Notice is given to the Company.

6.1.3.3. At any time during the Transfer Period, the Company and/or its nominee (the "Purchaser(s)") may elect to exercise the Purchase Option by giving written notice of its election to the Transferor. The Transferor shall not be deemed a Member for the purpose of Voting on whether the Company shall elect to exercise the Purchase Option.

6.1.3.4. The Purchaser's notice of its election to purchase the Transfer Interest shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be earlier than five (5) days after the date of the notice of election nor more than thirty (30) days after the expiration of the Transfer Period.

6.1.3.5. The Purchase Price shall be paid in cash on the Transfer Closing Date unless the Purchasers elect to pay the Purchase Price in installments pursuant to Section 6.5.

6.1.3.6. If the Company's Purchase Option is not exercised, the Transferor shall be permitted to offer and sell the Transferor Interest to any other person for a period of six (6) months (the "Free Transfer Period") after the expiration of the Transfer Period. If the Transferor does not Transfer the Transferor Interest within the Free Transfer Period, the Transferor's right to Transfer the Transferor Interest pursuant to this Section shall cease and terminate.

6.1.3.7. Any Transfer of the Transferor Interest made after the last day of the Free Transfer Period or without strict compliance with the terms, provisions, and conditions of this Section and all other terms, provisions, and conditions of this Agreement, shall be null and void and of no force or effect.

6.2. *Voluntary Withdrawal.*

6.2.1. No Member shall have the right or power to effect Voluntary Withdrawal from the Company, except as otherwise provided by this Agreement.

6.2.2. Upon withdrawal of any Member as permitted under the terms of this *Section* 6.2, the withdrawn Member and the Company shall have the respective rights and obligations set forth in *Section* 6.3 provided, however, that the Withdrawn Member's Membership Interest shall be valued at Book Value and, provided further, that the Company shall have the right to pay the amount due the Withdrawing Member in installments pursuant to Section 6.5.

6.3. *Involuntary Withdrawal.* Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become an Interest Holder but shall not become a Member. If the Company is continued as provided in *Section* 7.1.3, the successor Interest Holder shall have all the rights of an Interest Holder but shall not have the right to exercise any other rights of a Member.

6.4. *Appraised Value.*

6.4.1. The term "Appraised Value" means the appraised value of the Company as hereinafter provided. Within fifteen (15) days after demand by either one to the other, the Company and the Withdrawn Member shall each appoint an appraiser to determine the value of the Company. If the two appraisers agree upon such value, they shall jointly render a single written report stating that value. If the two appraisers cannot agree upon the value of the Company, they shall each render a separate written report and shall appoint a third appraiser, who shall appraise the Company, determine its value, and render a written report of such appraiser's opinion thereon. Each party shall pay the fees and other costs of the appraiser appointed by such party, and the fees and other costs of the third appraiser shall be shared equally by both parties.

6.4.2. The value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the value of the equity contained in the appraisal report of the third appraiser is more than the higher of the first two appraisals, the higher of the first two appraisals shall govern; and provided, further, that if the value of the equity contained in the appraisal report of the third appraiser is less than the lower of the first two appraisals, the lower of the first two appraisals shall govern.

6.5. If the Company or the Remaining Members, as the case may be (the "Purchaser"), elects to pay the Purchase Price (the "Indebtedness") on an installment basis, such payments shall be in equal monthly installments of principal over a period that shall expire no later than seven (7) years from the Transfer Closing Date, and the Purchaser shall evidence the obligation to pay the Indebtedness by executing and delivering its or their promissory note to the Withdrawn Member or the Transferor (the "Payee").

14

## Article VII
## Dissolution, Liquidation, and Termination of the Company

7.1. *Events of Dissolution.* The Company shall be dissolved upon the happening of the first to occur of an event specified in Section 29-1347 of the Act or any of the following events:

7.1.1. on the date fixed for its termination in *Section* 2.4; or

7.1.2. death of a Member.

7.2. *Procedure for Winding Up and Dissolution.* If the Company is dissolved, the remaining Members shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with *Section* 4.4.

7.3. *Filing of Articles of Dissolution.* Upon completion of winding up the affairs of the Company, the Members shall promptly file the Articles of Dissolution with the D.C. Department of Consumer and Regulatory Affairs. If there are no remaining Members, such Articles shall be filed by the last Person to be a Member; if there are no remaining Members, or last Person to be a Member, the Articles shall be filed by the legal or personal representatives of the last Person to be a Member.

## Article VIII
## Books, Records, Accounting, and Tax Elections

8.1. *Bank Accounts.* All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The Members shall determine the financial institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2. *Maintenance of Books and Records.*

8.2.1. The Members shall keep or cause to be kept complete and accurate books, records, and financial statements of the Company and supporting documentation of transactions with respect to the conduct of the Company's business. The books, records, and financial statements of the Company shall be maintained on the cash method of accounting. Such books, records, financial statements, and documents shall include, but not be limited to, the following:

(1) a current list of the full name and last known business or residence address of each Member and Interest Holder, in alphabetical order, with the Contribution and the share in profits and losses of each Member and Interest Holder specified in such list;

(2) the Articles of Organization, including all amendments; and any powers-of-attorney

15

under which the Articles of Organization or amendments were executed;

(3) federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(4) this Agreement and any amendments, and any powers-of-attorney under which this Agreement or amendments were executed;

(5) financial statements for the six most recent years;

(6) internal books and records for the current and three most recent years; and

(7) a true copy of relevant records indicating the amount, cost, and value of all property which the Company owns, claims, possesses, or controls.

8.2.2. Such books, records, and financial statements of the Company and supporting documentation shall be kept, maintained, and available at the Company's office within the District of Columbia.

8.3. *Right to Inspect Books and Records; Receive Information.*

8.3.1. Upon the reasonable request of a Member for a purpose reasonably related to the interest of that Member the Company shall promptly deliver to the requesting Member at the expense of the Company a copy of this Agreement, as well as the information required to be maintained by the Company under paragraphs (1) and (3) of *Section 8.2.1.*

8.3.2. Each Member and Manager has the right upon reasonable request, and for purposes reasonably related to the interest of that Member or Manager of the Company, to do the following:

(1) to inspect and copy during normal business hours any of the records required to be maintained by the Company under *Section 8.2.1*; and

(2) to obtain from the Company promptly after becoming available, a copy of the Company's federal, state, and local income tax or information returns for each year.

8.3.3. If the Company has more than thirty-five (35) Members, Members representing at least five percent (5%) of the Voting interests of all Members, or three or more Members, may make a written request to a Manager for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current fiscal year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. The statement must be delivered or Mailed to the Members within thirty (30) days thereafter. The financial statements referred to in this Section shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of a Manager of the

16

Company that the financial statements were prepared without audit from the books and records of the Company.

8.3.4. If the Company has more than thirty-five (35) Members, the Company shall cause an annual report to be sent to each Member not later than one hundred twenty (120) days after the close of the Company's fiscal year. Such report must contain the Company's balance sheet as of the end of the Company's fiscal year and an income statement and statement of changes in financial position for such fiscal year. The financial statements referred to in this Section shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of a Manager of the Company that the financial statements were prepared without audit from the books and records of the Company.

8.3.5. The Company shall send or shall cause to be sent to each Member within ninety (90) days after the end of each fiscal year of the Company: (i) such information as is necessary to complete federal and state income tax or information returns, and (ii) if the Company has thirty-five (35) or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for the fiscal year.

8.3.6. Unless otherwise expressly provided in this Agreement, the inspecting or requesting Member or Manager, as the case may be, shall reimburse the Company for all reasonable costs and expenses incurred by the Company in connection with such inspection and copying of the Company's books and records and the production and delivery of any other books or records.

8.4. *Annual Accounting Period.* The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Members, subject to the requirements and limitations of the Code.

8.5. *Tax Matters Partner.* Dale Lowery shall be the "Tax Matters Partner" for the purposes of IRC Section 6231.

## Article IX
## General Provisions

9.1. *Assurances.* Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2. *Notifications.* Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and delivered personally, sent by certified or registered mail, postage prepaid, return receipt requested or sent by overnight courier. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the

Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the Person to whom it is delivered. A notice that is sent by Mail will be deemed given three (3) business days after it is Mailed. A notice that is sent by courier will be deemed given one (1) business day after it is couriered. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

9.3. *Specific Performance*. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4. *Integration*. This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

9.5. *Applicable Law*. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the District of Columbia.

9.6. *Headings*. The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

9.7. *Binding Provisions*. This Agreement is binding upon, and to the limited extent specifically provided herein, inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and assigns.

9.8. *Jurisdiction and Venue*. Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the District of Columbia or any State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9.9. *Interpretation*. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require. Reference to articles, sections (or subdivisions of sections), exhibits, annexes, or schedules are to those of this Agreement, unless otherwise indicated.

9.10. *Separability of Provisions*. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those

18

portions of this Agreement which are valid.

9.11. *Counterparts*. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

9.12. *Estoppel Certificate*. Each Member shall, within ten (10) days after written request by any Member, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by such Member, or if there is a default, the nature or extent thereof.

**IN WITNESS WHEREOF,** the parties have executed, or caused this Agreement to be executed as of the date first above written.

**MEMBERS:**

_____
Dale E. Lowery
816 North Carolina Avenue, NW
Washington, DC 20003
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
_____
Social Security or other
Tax Identification Number

_____
Michael Snyder
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
_____
Social Security or other
Tax Identification Number

19

**L&S Real Estate, Limited Liability Company**
**Operating Agreement**

**Exhibit A**
**List of Members, Percentages, and Capital**

| Name, Address And Taxpayer ID No. Of Members | Ownership Interest | Description and Value of Initial Capital Contribution |
|---|---|---|
| Dale E. Lowery<br>816 North Carolina Avenue, SE<br>Washington, DC 20003<br><br>Social Security Number<br>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 | 66.67% | Checks totaling **$75,524.10** |
| Michael Snyder<br>13514 Winding Trail Court<br>Silver Spring, MD 20906<br><br>Social Security Number<br>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 | 33.33% | Checks totaling **$37,762.02** |

13

EXHIBIT 4



STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 01/27/1994
4008533 - 2372284

## CERTIFICATE OF INCORPORATION
### OF

### CASEtech Inc.
### A CLOSE CORPORATION

**FIRST:** The name of this corporation is CASEtech Inc.

**SECOND:** Its registered office in the State of Delaware is to be located at Three Christina Centre, 201 N. Walnut Street, Wilmington, DE 19801, County of New Castle. The registered agent in charge thereof is The Company Corporation, address same as above.

**THIRD:** The nature of the business and the objects and purposes proposed to be transacted, promoted and carried on, are to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

**FOURTH:** The amount of total authorized shares of stock of this corporation is 1500 shares of No par value.

**FIFTH:** The name and mailing address of the incorporator is

      Vanessa Foster, Three Christina Centre, 201 N. Walnut Street, Wilmington DE 19801

**SIXTH:** All of the corporation's issued stock, exclusive of treasury shares, shall be held of record by not more than thirty (30) persons.

**SEVENTH:** All of the issued stock of all classes shall be subject to one or more of the restrictions on transfer permitted by Section 202 of the General Corporation Law.

**EIGHTH:** The corporation shall make no offering of any of its stock of any class which would constitute a "public offering" within the meaning of the United States Securities Act of 1933, as it may be amended from time to time.

**NINTH:** Directors of the corporation shall not be liable to either the corporation or its stockholders for monetary damages for a breach of fiduciary duties unless the breach involves: (1) a director's duty of loyalty to the corporation or its stockholders; (2) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (3) liability for unlawful payments of dividends or unlawful stock purchases or redemption by the corporation; or (4) a transaction from which the director derived an improper personal benefit.

I, THE UNDERSIGNED, for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Certificate and do certify that the facts herein are true, and I have accordingly hereunto set my hand.

DATED: January 27, 1994         _Vanessa Foster_



Jan 07 07 07:07p    CASEtech, Inc.    202-543-3181    p.17



*The First State*

PAGE  1

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "CASETECH INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-EIGHTH DAY OF MARCH, A.D. 2002.



*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

2372284  8300

AUTHENTICATION: 1694473

Jan 07 07 07:07p        CHSEtech, Inc.              202-543-3181              p.16

CASEtech # 52-1858291

## FEDERAL EMPLOYER IDENTIFICATION NUMBER (EIN)

Normally, it is necessary for your corporation to obtain
a federal employer identification number for tax filing
purposes.

This number which is issued by the Internal Revenue Service
serves the same function for corporations as a social
security number serves for individuals.

Additionally, you will find when opening a corporate bank
account, most banks will require this number.

Should you wish TCC to obtain this number for you, complete
and sign the power of attorney form (to be used only in
applying for this number on your behalf) as well as the
Federal Employer Identification Number application and return
them to our office.  We will do all the other work for you.

Our charge for obtaining this number on your behalf is
$35.00.  Processing normally takes 4-6 weeks to obtain your
number.

This application may be faxed to our offices along with your
Visa or MasterCard number and expiration date.  Or if you
need your EIN sooner, use our EXPEDITED SERVICE.  For only
$75, we will obtain your EIN within 5-7 working days.



# THE COMPANY CORPORATION

Three Christina Centre ● 201 N. Walnut Street ● Wilmington, Delaware 19801 ● Telephone: (302) 575-0440 ● Fax: (302) 575-1346

*800-542-2677*

January 28, 1994

Mr. Dale Lowery
443 Tenth Street, N.W., Ste. 4
Washington DC 20002-6149

RE:  CASEtech Inc.

Dear Mr. Lowery:

    The above named corporation was officially incorporated
in the State of Delaware on January 27, 1994. You will
receive the official State confirmation of this filing in
approximately ten to fourteen working days.  The State of
Delaware has assigned the file number 23722-84 to your
corporation.

    Work has already begun on your corporate kit.

    Also, as you requested, we enclose the forms for you to
complete and return to us so we can file for your
"S" Status with IRS.  In order for us to process the "S"
Status filing for you, we must have this application back
by **March 2, 1994** in order to comply with the 75 day filing
deadline imposed by the IRS.  Please return the **original**
application as soon as possible to ensure that you do not
miss this deadline, facsimiles will not be accepted.  Feel
free to contact our EIN/S processing department directly with
questions concerning this process.

    May we take this opportunity to thank you for selecting
The Company Corporation as your registered agent.  Our best
wishes for success in your new venture.  Please do not
hesitate to contact us if we may assist you in any way.

                              Sincerely,

                              Vanessa C. Foster
                      Corporate Service Representative

## BY-LAWS

### --OF--

## CASEtech, Incorporated

### A Close Corporation

### ARTICLE 1 - OFFICES

The office of the Corporation shall be located in the City,
County and State designated in the Certificate of Incorporation.
The Corporation may also maintain offices at such other places
within or without the United States as the Shareholders may, from
time to time, determine.

### ARTICLE II - MEETING OF SHAREHOLDERS

#### Section 1 - Annual Meetings:

The annual meeting of the shareholders of the Corporation shall
be held within five months after the close of the fiscal year of
the corporation, for the purpose of electing officers and
transacting such other business as may properly come before the
meeting.

#### Section 2 - Regular Meetings:

The shareholders may provide by resolution, from time to time,
for the holding of regular meetings of the shareholders and may
affix the time and place thereof.

#### Section 3 - Special Meetings:

Special meetings of the shareholders may be called at any time by
the President, and shall be called by the President or the
Secretary at the written request of the holders of ten per cent
(10%) of the shares then outstanding and entitled to vote
thereat, or as otherwise required under the provisions of the
Corporation Law.

## Section 4 - Place of Meetings:

All meetings of shareholders shall be held at the principal office of the Corporation, or at such other places within the United States as shall be designated in the notices or waivers of notice of such meetings.

## Section 5 - Notice of Meetings:

(a)  Written notice of each meeting of shareholders, whether annual or special, stating the time when and place where it is to be held, shall be served either personally or by mail, not less than ten or more than fifty days before the meeting, upon each shareholder of record entitled to vote as such meeting, and to any other shareholder to whom the giving of notice may be required by law.  Notice of a special meeting shall also state the purpose or purposes for which the meeting is called, and shall indicate that it is being issued by, or at the direction of, the person or persons calling the meeting.  If, at any meeting, action is proposed to be taken that would if taken, entitle shareholders to receive payment for their shares pursuant to the Business Corporation Law, the notice of such meeting shall include a statement of that purpose and to that effect.  If mailed, such notice shall be directed to each such shareholder at his address, as it appears on the records of the shareholders of the Corporation, unless he shall have previously filed with the Secretary of the Corporation a written request that notices intended for him be mailed to some other address, in which case, it shall be mailed to the address designated in such request.

(b)  Notice of any meeting need not be given to any person who may become a shareholder of record after the mailing of such notice and prior to the meeting, or to any shareholder who attends such meeting, in person or by proxy, or to any shareholder, who, in person or by proxy, submits a signed waiver of notice either before or after such meeting.  Notice of any adjourned meeting of shareholders need not be given, unless otherwise required by statute.

## Section 6 - Chairman of Meetings:

At all meetings of the Shareholders, the President, if present, shall preside.  If there shall be no President, or he shall be absent, then a Chairman of the meeting, chosen by the shareholders, shall preside.

Section 7 - Quorum:

(a) Except as otherwise provided herein, or by statute, or in the Certificate of Incorporation (such Certificate and any amendments thereof being hereinafter collectively referred to as the "Certificate of Incorporation"), at all meetings of shareholders of the Corporation, the presence at the commencement of such meetings in person or by proxy of shareholders holding of record a majority of the total number of shares of the Corporation then issued and outstanding and entitled to vote, shall be necessary and sufficient to constitute a quorum for the transaction of any business.  The withdrawal of any shareholder after the commencement of a meeting shall have no effect on the existence of a quorum, after a quorum has been established at such meeting.

(b) Despite the absence of a quorum at any annual or special meeting of shareholders, the shareholders, by a majority of the votes cast by the holders of shares entitled to vote thereon, may adjourn the meeting.  At any such adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the meeting as originally called if a quorum had been present.

Section 8 - Voting:

(a) Except as otherwise provided herein or by statute, or by the Certificate of Incorporation, any corporate action, to be taken by vote of the shareholders, shall be authorized by a majority of votes cast at a meeting of shareholders by the holders of shares entitled to vote thereon.

(b) Except as otherwise provided herein or by statute or by the Certificate of Incorporation, at each meeting of shareholders, each holder of record of stock of the Corporation entitled to vote thereat, shall be entitled to one vote for each share of stock registered in his name on the books of the Corporation.

(c) Each shareholder entitled to vote or to express consent or dissent without a meeting, may do so by proxy; provided, however, that the instrument authorizing such proxy to act shall have been executed in writing by the shareholder himself, or by his attorney-in-fact thereunto duly authorized in writing.  No proxy shall be valid after the expiration of eleven months from the date of its execution, unless the persons executing it shall have specified therein the length of time it is to continue in force. Such instrument shall be exhibited to the Secretary at the meeting and shall be filed with the records of the Corporation.

(d)  Any resolution in writing, signed by all of the shareholders entitled to vote thereon, shall be and constitute action by such shareholders to the effect therein expressed, with the same force and effect as if the same had been duly passed by unanimous vote at a duly called meeting of shareholders and such resolution so signed shall be inserted in the Minute Book of the Corporation under its proper date.

### Section 9 - Duties and Powers:

The Shareholders shall be responsible for the control and management of the affairs, property and interests of the Corporation, and may exercise all powers of the Corporation.

### Section 10 - Contracts:

(a)  No contract or other transaction between this Corporation and any other Corporation shall be impaired, affected or invalidated, nor shall any shareholder be liable in any way by reason of the fact that such shareholder of this Corporation is interested in, or is a shareholder, director or officer of such other Corporation, provided that such facts are disclosed or made known to the remaining shareholders.

(b)  Any shareholder, personally and individually, may be a party to or may be interested in any contract or transaction of the Corporation, and no shareholder shall be liable in any way by reason of such interest, provided that the fact of such interest be disclosed or made known to the other shareholders, and provided that the shareholders shall authorize, approve or ratify such contract or transaction by a majority vote not counting the shares of any such shareholder, notwithstanding the presence of any such shareholder at the meeting at which such action is taken.  The shares of such shareholder or shareholders may be counted in determining the presence of a quorum at such meeting. This Section shall not be construed to impair or invalidate or in any way affect any contract or other transaction which would otherwise be valid under the law (common, statutory, or otherwise) applicable thereto.

### Section 11 - Committees:

The shareholders may, from time to time, designate from among its members an executive committee and such other committees, and alternate members thereof, as they deem desirable, each consisting of three or more members, with such powers and authority (to the extent permitted by law) as may be provided in such resolution.  Each such committee shall serve at the pleasure of the shareholders.  At all meetings of a committee, the

presence of all members of the committee shall be necessary to constitute a quorum for the transaction of business, except as otherwise provided for by the shareholders. Participation of any one or more members of the committee by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time, shall constitute presence in person at any such meeting. Any action authorized in writing by all of the members of a committee entitled to vote thereon and filed with the minutes of the Committee shall be the act of the committee with the same force and effect as if the same had been passed by unanimous vote at a duly called meeting of the committee.

## ARTICLE III - OFFICERS

### Section 1 - Number, Qualifications, Election and Term of Office:

(a)  The officers of the Corporation shall consist of a President, a Secretary, a Treasurer, and such other officers, as the shareholders may, from time to time, deem advisable.  Any two or more offices may be held by the same person.

(b)  The officers of the Corporation shall be elected by the shareholders at the regular annual meeting of the shareholders.

(c)  Each officer shall hold office until the annual meeting of the shareholders next succeeding his election, and until his successor shall have been elected and qualified, or until his death, resignation or removal.

### Section 2 - Resignation:

Any officer may resign at any time by giving written notice of such resignation to the President or the Secretary of the Corporation, unless otherwise specified in such written notice, such resignation shall take effect upon receipt thereof by such officer, and the acceptance of such resignation shall not be necessary to make it effective.

### Section 3 - Removal:

Any officer may be removed, either with or without cause, and a successor elected by the shareholders at any time.

### Section 4 - Vacancies:

A vacancy in any office by reason of death, resignation, inability to act, disqualification, or any other cause, may at any time be filled for the unexpired portion of the term by the shareholders.

### Section 5 - Duties of Officers:

Officers of the Corporation shall, unless otherwise provided by the shareholders, each have such powers and duties as generally pertain to their respective offices as well as such powers and duties as may be set forth in these by-laws or may from time to time be specifically conferred or imposed by the shareholders. The President shall be the chief executive officer of the Corporation.

## Section 6 - Sureties and Bonds:

In case the shareholders shall so require, any officer, employee or agent of the Corporation shall execute to the Corporation a bond in such sum, and with such surety or sureties as the shareholders may direct, conditioned upon the faithful performance of his duties to the Corporation, including responsibility for negligence and for the accounting for all property, funds or securities of the Corporation which may come into his hands.

## Section 7 - Shares of Other Corporations:

Whenever the Corporation is the holder of shares of any other Corporation, any right or power of the Corporation as such shareholder (including the attendance, acting and voting at shareholders' meetings and execution of waivers, consents, proxies or other instruments,) may be exercised on behalf of the Corporation by the President, any Vice President or such other person as the shareholder may authorize.

## ARTICLE IV - SHARES OF STOCK

## Section 1 - Certificate of Stock:

(a)  The certificates representing shares of the Corporation shall be in such form as shall be adopted by the shareholders, and shall be numbered and registered in the order issued.  They shall bear the holder's name and the number of shares, and shall be signed by (i) the president or Vice President, and (ii) the Secretary or Treasurer, or any Assistant Secretary or Assistant Treasurer, and may bear the corporate seal.

(b)  No certificate representing shares shall be issued until the full amount of consideration therefor has been paid, except as otherwise permitted by law.

(c)  The shareholders may authorize the issuance of certificates for fractions of a share which shall entitle the holder to exercise voting rights, receive dividends and participate in liquidating distributions, in proportion to the fractional holdings; or it may authorize the payment in cash of the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined; or it may authorize the issuance, subject to such conditions as may be permitted by law, of script in registered or bearer form over the signatures of an

officer or agent of the Corporation, exchangeable as therein
provided for full shares, but such script shall not entitle the
holder to any rights of a shareholder, except as therein
provided.

## Section 2 - Lost or Destroyed Certificates:

The holder of any certificate representing shares of the
Corporation shall immediately notify the Corporation of any loss
or destruction of the certificate representing the same.  The
Corporation may issue a new certificate in the place of any
certificate theretofore issued by it, alleged to have been lost
or destroyed.  On production of such evidence of loss or
destruction as the shareholders in their discretion, may require,
the shareholders may, in their discretion, require the owner of
the lost or destroyed certificate or his legal representatives,
to give the Corporation a bond in such sum as they may direct,
and with such surety or sureties as may be satisfactory to them,
to indemnify the Corporation against any claims, loss, liability
or damage it may suffer on account of the issuance of the new
certificate.  A new certificate may be issued without requiring
any such evidence or bond when, in the judgment of the
shareholders, it is proper so to do.

## Section 3 - Transfers of Shares:

(a)  Transfers of shares of the Corporation shall be made on the
share records of the Corporation only by the holder of record
thereof, in person or by his duly authorized attorney, upon
surrender for cancellation of the certificate or certificates
representing such shares, with an assignment or power of transfer
endorsed thereon or delivered therewith, duly executed, with such
proof of the authenticity of the signature and of authority to
transfer and of payment of transfer taxes as the Corporation or
agents may require.

(b)  The Corporation shall be entitled to treat the holder of
record of any share or shares the absolute owner thereof for all
purposes and, accordingly, shall not be bound to recognize any
legal, equitable or other claim to, or interest in, such share or
shares on the part of any other person, whether or not it shall
have express or other notice thereof, except as otherwise
expressly provided by law.

## Section 4 - Record Date:

In lieu of closing the share records of the Corporation, the
shareholders may fix, in advance, a date not exceeding fifty
days, nor less than ten days, as the record date for the

determination of shareholder entitled to receive notice of, or to
vote at, any meeting of shareholders, or to consent to any
proposal without a meeting, or for the purpose of determining
shareholders entitled to receive payment of any dividends or
allotment of any rights, or for the purpose of any other action.
If no record date is fixed, the record date for the determination
of shareholders entitled to notice of or to vote at a meeting of
shareholders shall be at the close of business on the day next
preceding the day on which notice is given, or, if no notice is
given, the day on which the meeting is held; the record date for
determining shareholders for any other purpose shall be the close
of business on the day on which the resolution of the directors
relating thereto is adopted.  When a determination of
shareholders of record entitled to notice of or to vote at any
meeting of shareholders has been made as provided for herein,
such determination shall apply to any adjournment thereof, unless
the directors fix a new record date for the adjourned meeting.

## ARTICLE V – DIVIDENDS

Subject to applicable law, dividends may be declared and paid out
of any funds available therefor, as often, in such amounts, and
at such time or times as the shareholders may determine.

## ARTICLE VI – FISCAL YEAR

The fiscal year of the Corporation shall be fixed by the
shareholders from time to time, subject to applicable law.

## ARTICLE VII – CORPORATE SEAL

The corporate seal, if any, shall be in such form as shall be
approved from time to time by the shareholders.

## ARTICLE VIII – AMENDMENTS

Except as otherwise provided by statute or by the Certificate of
Incorporation, all by-laws of the Corporation shall be subject to
alteration or repeal, and new by-laws may be made by a majority
vote of the shareholders.

<u>RESOLUTIONS ADOPTED BY INCORPORATOR</u>

<u>OF</u>

<u>CASEtech, Inc.</u>

The undersigned, being the sole Incorporator of the Corporation, hereby adopts the following resolutions:

(1)     RESOLVED, that a copy of the Certificate of Incorporation of the Corporation, together with the original receipt showing payment of the statutory organization tax and filing fee, be inserted in the Minute Book of the Corporation.

(2)     RESOLVED, that the form of First By-Laws submitted to the meeting be, and the same hereby are, adopted as and for the By-Laws of the Corporation, and that a copy thereof be placed in the Minute Book of the Corporation, directly following the Certificate of Incorporation.

(3)     RESOLVED, that the election is hereby made not to have a Board of Directors.

Dated: Jan 27, 1994

_____
Incorporator

<u>RESOLUTIONS ADOPTED BY SOLE SHAREHOLDER</u>

<u>OF</u>

_C A S E tech, Inc_

The undersigned, being the sole Shareholder, hereby adopts the following resolutions:

(1)  RESOLVED, that the following persons be, and they hereby are, elected to the designated offices of the Corporation, to serve until their successors are elected and qualify:

President _Dale Lowery, Ph.D._

Vice President _____

Secretary _____

Treasurer _____

(2)  RESOLVED, that all the acts taken and resolutions adopted by the Incorporator are, approved, ratified and adopted.

(3)  RESOLVED, that the form of seal submitted to this meeting be, and it hereby is, approved and adopted as and for the corporate seal of this Corporation, and that an impression thereof be made on the margin of these minutes.

(4)  RESOLVED, that the specimen form of certificate annexed hereto be, and it hereby is, approved and adopted as the certificate representing the shares of this Corporation.

(5)  RESOLVED, that the Secretarial Certificate annexed hereto reflecting the banking arrangements of the Corporation be, and it hereby is, approved and the resolutions set forth therein adopted.

Dated: _Feb 16, 1994_

_____
Sole Shareholder

## WAIVER OF NOTICE OF SPECIAL MEETING

### OF THE

### BOARD OF DIRECTORS

### OF

CASE tech, Inc.

WE, the undersigned, being all of the Directors of the Corporation, hereby agree and consent that a special meeting of the Board of Directors of the Corporation be held on the date and time and at the place designated hereunder, and do hereby waive all notice whatsoever of such meeting and of any adjournment or adjournments thereof.

We do further agree and consent that any and all lawful business may be transacted at such meeting or at any adjournment or adjournments thereof as may be deemed advisable by the Directors present thereat.  Any business transacted at such meeting or at any adjournment or adjournments thereof shall be as valid and legal and of the same force and effect as if such meeting or adjourned meeting were held after notice.

Place of Meeting : 443 Tenth St. NE, #4 Washington, DC

Date of Meeting : Feb. 16, 1994

Time of Meeting : 10.00Am

Purpose of Meeting : To approve the election to be treated as a "small business corporation" for income tax purposes.

Dated: Feb 16, 1994

_____
Director

_____
Director

_____
Director

MINUTES OF SPECIAL MEETING

OF THE BOARD OF DIRECTORS

OF

_CASEtech, Inc._

A special meeting of the Board of Directors of the above captioned Corporation was held on the date, time and at the place set forth in the written waiver of notice signed by all the Directors, fixing such time and place, and prefixed to the minutes of this meeting.

All of the members of the Board of Directors being present, the meeting was called to order by the President. The President then advised that all of the shareholders had requested that the Corporation elect to be treated as a small business corporation for income tax purposes. He noted that the Corporation met all of the requirements for qualification and he recommended that such action be taken. Upon motion duly made, seconded and unanimously carried, it was

> RESOLVED, that the Corporation elect to be treated as a small business corporation for income tax purposes, subject to receipt of written consent to such election by all of the shareholders; and it was further

> RESOLVED, that upon receipt of written consent to said election by all of the shareholders, the President is hereby authorized and directed to take any and all action necessary or desirable to comply with all of the requirements of the Internal Revenue Service for making said election.

There being no further business to come before the meeting, upon motion duly made, seconded and unanimously carried, the same was adjourned.

_____
                              Secretary

Approved:

_____
President

Attorney's Copy

_CASEtech, Inc_
Name of Corporation

## CORPORATE DATA

as at  February 16  , 1994

Date of Incorporation: January 27, 1994

State of Incorporation: Delaware

Principal Place of Business: Washington, DC

Directors:  Dale Lowery

Officers:

Dale Lowery          .....President
                     .....Vice-President
                     .....Secretary
                     .....Treasurer

Bank Accounts: Crestar

Fiscal Year: January 1, to December 31

Annual Meeting Date:

Shareholders:                Number of Shares

Dale Lowery

## LOCATION OF CORPORATE OUTFIT

| Retained in office | Forwarded to client | Date |
|---|---|---|
| _____ Minute Book | _____ | _____ |
| _____ Share Certificate Bk. | _____ | _____ |
| _____ Share Ledger | _____ | _____ |
| _____ Seal | _____ | _____ |

FILE IN OFFICE NOTEBOOK OF CORPORATE CLIENTS