IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL SNYDER,                      :
                                     :
        Plaintiff,                   :
                                     :
v.                                   :   Civil Action No. 06-2213 (JR)
                                     :
DALE LOWERY, et al.,                 :
                                     :
        Defendants.                  :
_____ :

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants Dale Lowery ("Lowery"), et al., by and through counsel, hereby submit this Opposition to Plaintiff Michael Snyder's Cross-Motion for Summary Judgment and state as follows:

### INTRODUCTION

In his Cross-Motion for Summary Judgment, Plaintiff Michael Snyder ("Snyder") seeks summary judgment on the claims that he has not abandoned in this case. In his Opposition to Defendants' Motion for Summary Judgment and Cross-Motion for Summary Judgment, and Amended Complaint, Plaintiff has abandoned Count I for injunctive relief, Count V for waste and misappropriation of corporate assets/funds, Count VI for fraud, Count IX for declaratory relief and the claim for an accounting set forth in Count X. Accordingly, although it is not clear in his Cross-Motion for Summary Judgment, Plaintiff

seems to be requesting summary judgment on Count II for breach
of fiduciary duty (Count I in the Amended Complaint), Count
III for breach of contract (Count II in the Amended
Complaint), Count IV for tortious breach of the covenant of
good faith and fair dealing (Count III in the Amended
Complaint), Count VII for unjust enrichment (Count IV in the
Amended Complaint), Count VIII for trover and conversion
(Count V in the Amended Complaint), Count X for equitable lien
or constructive trust (Count VI in the Amended Complaint) and
Count XI for judicial dissolution of L&S, Real Estate, LLC
("L&S") (Count VII in the Amended Complaint).[1]

For the reasons set forth in Defendants' Motion for
Summary Judgment and Defendants' Reply to Plaintiffs'
Opposition to Defendants' Motion for Summary Judgment,
Defendants, not Plaintiff, are entitled to summary judgment.
Plaintiff's Cross-Motion is merely a smoke screen, designed to
confuse and divert the Court's attention away from relevant
material facts and law which entitle Defendants to summary

---

[1] In violation of Rule 7(b)(1) and 56 of the Federal Rules
of Civil Procedure, Plaintiff did not file a Motion for
Summary Judgment, but rather in opposition to Defendants'
Motion for Summary Judgment filed a pleading entitled
Opposition to Defendants' Motion for Summary Judgment and
Cross-Motion for Summary Judgment (referred to herein as
"Plaintiff's Cross-Motion"). Plaintiff is also seeking relief
on his Amended Complaint, even though his Motion for Leave to
File an Amended Complaint has not been ruled on by the Court.

judgment.

Plaintiff's Cross-Motion is based on Snyder's argument that the Funding Allocation Agreement ("Funding Agreement"), which Snyder voluntarily agreed to, is not supported by consideration.  This is a frivolous argument.  It was never disclosed in Plaintiff's Initial Disclosures, it is not mentioned in any of the documents produced in discovery, and it is not raised in either Plaintiff's Complaint or Amended Complaint.  Instead, it was just recently concocted by counsel for Plaintiff in an effort to avert Defendants' Motion for Sanctions and Motion for Summary Judgment.  A simple review of the terms of the Funding Agreement and basic legal research, however, reveals that the Agreement was supported by consideration.  Moreover, it is undisputed that Snyder received actual consideration pursuant to the terms of the Funding Agreement and, as owner of 20% of the stock in CASEtech, Inc. ("CASEtech") also received consideration from the elimination of CASEtech debt.  As such, Defendants' Motion for Summary Judgment should be granted and Plaintiff's Cross-Motion should be denied.

The additional argument by Plaintiff in his Cross-Motion that Lowery owed a fiduciary duty to Snyder because L&S and CASEtech were operated as partnerships, is also fundamentally

defective.  Plaintiff's breach of fiduciary duty claim fails at the outset because Lowery complied with the terms of the Funding Agreement.  Also, just because Lowery at times referred to Snyder as his "partner," does not change the material[2] facts that (1) CASEtech is a Delaware corporation which was organized and has been operated as a corporation under the laws of the State of Delaware, in which Snyder and Lowery were shareholders, not partners, and (2) L&S Real Estate, LLC ("L&S") is a Limited Liability Company which was organized and has been operated as a limited liability company under the laws of the District of Columbia, in which Lowery and Snyder were members of the company, and not partners.  As such, Defendants, not Plaintiff, are entitled to summary judgment.

## ARGUMENT

### I. THE SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

---

[2] Many of the purported "material" facts set forth in the Cross-Motion and Snyder's Statement of Material Facts are irrelevant and are not material to the issues before the Court.  Nonetheless, with this Opposition Defendants have also submitted a Statement of Material Facts in Dispute which set forth the material facts which do not entitle Plaintiff to any relief.

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

When, as in this case, both parties file motions for summary judgment, each must carry its own burden under the applicable legal standard.  See Nuzzo v. FBI, 1996 WL 741587, *1 (D.D.C. 1996) ("When both parties in a cause of action move for summary judgment, each party must carry its own burden"); Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968) (cross-motion for summary judgment should "not serve to avoid consideration of the correctness of the entry of summary judgment" on the original motion).  Moreover, the mere recitation of non-material facts in dispute does not entitle a party to summary judgment.  See, e.g., Ramey v. Potomac Elec. Power Co., 468 F.Supp.2d 51, 55 (D.D.C. 2006)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  Indeed, where a plaintiff has presented no contradictory evidence as to material facts, as Snyder has done in this case, the Court need not reach other disputed, but non-material, issues of fact.  Heller v. Fortis Benefits Ins. Co., 142 F.3d 487, 494 (D.C. Cir. 1998).

## II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT WITH PREJUDICE ON PLAINTIFF'S ABANDONED CLAIMS.

As a preliminary matter, as explained in Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Defendants are entitled to summary judgment with prejudice on the claims abandoned by Plaintiff, namely Count I for injunctive relief, Count V for waste and misappropriation of corporate assets/funds, Count VI for fraud, Count IX for declaratory relief and the claim for an accounting in Count X.

## III.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE REMAINING CLAIMS IN PLAINTIFF'S COMPLAINT.

Plaintiff is not entitled to summary judgement on any of the remaining claims in Plaintiff's Complaint or Amended Complaint because Defendants complied with the terms of the Funding Agreement, which was supported by adequate legal consideration.  Moreover, even if Lowery owes a fiduciary duty to Snyder, Lowery did not breach any such duty.[3]

### A.    Count II For Breach Of Fiduciary Duty Should Be Dismissed.

As Plaintiff concedes in his Cross-Motion, his claim for

---

[3] Since Plaintiff filed his Opposition to Defendants' Motion for Summary Judgment and Cross-Motion in the same pleading, vast portions of the following argument are identical to the argument set forth in Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

breach of fiduciary duty (and his other remaining claims) depend on whether or not the Funding Agreement is an enforceable contract. Plaintiff's Cross-Motion at 10. Plaintiff argues that the Agreement is not an enforceable contract because it is void for lack of consideration. Id. at 4-5. This is a frivolous argument. The Funding Agreement is, in fact, supported by consideration in its very terms. Jacobson v. Jacobson, 277 A.2d 280, 282 (D.C. 1971) (a promise is a sufficient consideration for a return promise); 1 A. CORBIN, CORBIN ON CONTRACTS, §143 at 614 (1963) ("as a general rule . . . a promise is a sufficient consideration for a return promise if the performance that is promised would be a sufficient consideration."); accord Weaver and Associates, Inc. v. Asphalt Const., Inc., 587 F.2d 1315, 1318 (D.C. Cir. 1978). In this regard, the FOURTH paragraph of the Funding Agreement has an express promise to distribute to the partners "any funds remaining after satisfaction of the above obligations . . . according to their relative ownership interests in L&S, i.e. 66.7% to Dale E. Lowery and 33.3% to I. Michael Snyder." Exhibit A, hereto. This clause, in and of itself, is sufficient consideration to support the Agreement. Jacobson, 277 A.2d at 282; 1 A. CORBIN, CORBIN ON CONTRACTS,

§143 at 614; <u>Weaver and Associates, Inc.</u>, 587 F.2d at 1318.[4]

Also, there is no dispute that Plaintiff received actual consideration pursuant to the terms of the Funding Agreement. Plaintiff received a distribution in the total amount of $107,844.06 pursuant to the terms of the Funding Agreement ($22,416.67 for deferred salary and $85,427.59 for his 33.3% ownership interest in L&S). Exhibit B, Declaration of Dale Lowery, at ¶¶7-9; Exhibit E. Furthermore, as owner of 20% of the stock in CASEtech, Plaintiff also received consideration from the elimination of CASEtech debt. <u>Id</u>. Just because Plaintiff did not receive the consideration that he thought he should have received is not grounds to declare the Funding Agreement void for lack of consideration. <u>See In re Technical Land Inc.</u>, 172 B.R. 429, 435 (Bankr. D.C. 1994)(noting that the legally sufficient consideration required to support a contract can be nominal). Snyder was promised consideration for his execution of the Agreement and received consideration in accordance with the terms of the Agreement. As such, there can be no legitimate dispute that the Agreement is void for

---

[4] Even the case law cited by Snyder supports this conclusion. Plaintiff's Cross-Motion at 4 ("Thus, consideration may be either a benefit to the promisor (Snyder) or a detriment to the promisee (Lowery)"). A simple review of the terms of the Funding Agreement shows that there is a benefit to Snyder from his execution of the Agreement. <u>See</u> Exhibit A.

lack of consideration and Plaintiff's claim for breach of fiduciary duty fails as a matter of law.

Moreover, even if it is assumed *arguendo* that Lowery owed a fiduciary duty to Snyder, then Defendants, not Plaintiff, are still entitled to summary judgment. Because Lowery has complied with the terms of the Funding Agreement, he could not have breached any such duty. Also, Snyder had full and complete access to the books and records of both L&S and CASEtech, and took the books and records home to review them on many occasions. Exhibit B at ¶5. He was also aware and had knowledge of the debt incurred by CASEtech, including the monies that Lowery had advanced to CASEtech from his home equity line of credit to fund the operation of the business. Id. At the time that Snyder executed the Agreement, he was under no coercion to do so and signed the Agreement by his own volition. Id. at ¶6. Since Snyder has not presented any evidence other than the distribution of monies pursuant to the terms of the Funding Agreement that Lowery breached his fiduciary duty, Lowery is entitled to summary judgment on the claim for breach of fiduciary duty.[5]

---

[5] Snyder has not presented any evidence that there was a waste or misappropriation of company funds as set forth in paragraph 44 of his Complaint. Indeed, he has even withdrawn this paragraph and the allegations therein in his Amended

Moreover, Lowery is entitled to the protection of the business judgment rule, which Snyder ignores.  This rule protects Lowery from management disputes such as the one that Snyder has tried to concoct.  <u>See</u> <u>Gabelli & Co. v. Ligget Group, Inc.</u>, 479 A.2d 276, 289 (Del. 1984); <u>Behradrezaee v. Dashtara</u>, 910 A.2d 349, 361 (D.C. 2006).

Furthermore, the standard for any breach of fiduciary duty is, as cited by Snyder, set forth in the L&S Operating Agreement executed by Lowery and Snyder.  Exhibit 3 to Plaintiff's Opposition.  The Agreement provides that:

> A member's duty of care to the Company and the other Members in the conduct and winding up of the Company business **is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.**

<u>Id</u>. at 11, ¶5.4.3(b) (emphasis supplied).  Snyder has presented  no evidence whatsoever that Lowery has engaged "in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law."  <u>Id</u>.  At best, Snyder has presented evidence that he disagrees with the way in which Lowery distributed the proceeds from the sale of the Second Street property.  This evidence does not constitute gross negligence, reckless conduct, intentional misconduct or a

---

Complaint.  Moreover, even if there was any such evidence, which there is not, the claim could only be brought as a derivative claim, which Snyder did not do.

knowing violation of law.

**B.    Count III For Breach Of Contract
Should Be Dismissed.**

In his Complaint Snyder did not identify any term of any contract that he contends Lowery breached.  In his Cross-Motion, Snyder now contends that there was no breach of the Funding Agreement, but instead a breach of paragraph 5.4.3(b) of the Operating Agreement, recited above.  Plaintiff's Cross-Motion at 10-11.  As explained above, since Lowery complied with the terms of the Funding Agreement, there is no breach of paragraph 5.4.3(b) of the Operating Agreement.  Because of this, and because there are no other facts which are material to the claim for breach of contract, Defendants, not Plaintiff, are entitled to summary judgment.

**C.    Count IV For Tortious Breach of Covenant of Good
Faith and Fair Dealing Should Be Dismissed.**

Because Snyder cannot satisfy his burden of proof on his breach of contract claim, he also cannot prove his claim for breach of the covenant of good faith and fair dealing.  Contrary to the contention by Plaintiff, there can be no breach of the covenant of good faith and fair dealing in the abstract because there can only be a breach of the covenant of good faith and fair dealing when there is a breach of an express term or condition of a contract.  Parker v. Columbia

11

<u>Bank</u>, 91 Md.App. 346, 604 A.2d 521, 531 (1992); <u>Anderson v.</u>
<u>Chevron Corp.</u>, 933 F.Supp. 52, 55 (D.D.C. 1996) (<u>citing</u>
<u>Mahoney</u> v. <u>NationsBank of Virginia, N.A.</u>, 249 Va. 216, 455
S.E.2d 5, 8-9 (1995)).

The contention by Snyder that "there can be a breach of
the covenant of good faith and fair dealing even in the
absence of an express term or condition of a contract," is
wrong.  Plaintiff's Cross-Motion at 12.  The case that Snyder
cites to argue that there can be a breach of good faith and
fair dealing in the absence of an express term or condition of
a contract (<u>Overseas Private Inv. Corp. v. Industria de Pesco,</u>
<u>N.A., Inc.</u>, 920 F. Supp. 207, 211 (D.D.C. 1996)) does not
support his argument, and instead actually supports
Defendants' argument.  In <u>Overseas Private Inv. Corp.</u>, the
Court stated "**that an implied duty of good faith cannot**
**supplant the terms actually contained in a contract.**" <u>Id.</u>
(emphasis supplied).  Also, the Court's assertion that "'the
mere recitation of an express power is not always the test' of
whether there is an implied good-faith limitation on a party's
power to act under a contract," does not advance Snyder's
argument that there can be a breach of good faith and fair
dealing in the absence of an express term or condition of a
contract.  <u>Id.</u> at 211 (<u>citing</u> <u>Tymshare, Inc. v. Covell</u>, 727

12

F.2d 1145, 1153 (C.A.D.C. 1984)).

Furthermore, Lowery cannot be found to have breached the implied covenant of good faith and fair dealing because Lowery did not evade the spirit of the contract and did not willfully render imperfect performance or interfere with Snyder's performance.  Allworth v. Howard University, 890 A.2d 194, 201 (D.C. 2006); Exhibit B at ¶¶4-9.  Because of this, and because there are no disputed facts which are material to the claim, Defendants, not Plaintiff, are entitled to summary judgment.

### D.  Count VII For Unjust Enrichment Should Be Dismissed.

Plaintiff's claim for unjust enrichment must fail for the same reasons that Plaintiff's other claims must fail as explained above.  There can be no unjust enrichment when Lowery has complied with the terms of the Funding Agreement that Snyder willing agreed to.  Landa v. Astin, 193 F.2d 369, 371 (D.C. Cir. 1951) ("competent persons shall have utmost liberty of contracting and their agreements voluntarily and fairly made shall be held valid and enforced in courts") (quoting Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 356-57 (1931)).  In his Cross-Motion, Snyder even concedes that he has a claim for unjust enrichment only if the Funding Agreement is construed by the Court to be

13

unenforceable because of a failure of consideration. Plaintiff's Cross-Motion at 4, 13.  As explained above, the Funding Agreement is supported by consideration, and Plaintiff's claim is therefore barred as a matter of law.

### E.    Count VIII For Trover And Conversion Should Be Dismissed.

Plaintiff's claim for trover and conversion must fail for the same reasons as above.  There can be no trover or conversion when Lowery has complied with the terms of the Funding Agreement that Snyder willing agreed to.  <u>Landa</u>, 193 F.2d at 371.  In his Cross-Motion, Snyder even concedes that he has a claim for trover or conversion only if the Funding Agreement is construed by the Court to fail for lack of consideration.  Plaintiff's Cross-Motion at 4, 14.  As explained above, the Funding Agreement is supported by consideration, and Plaintiff's claim is therefore barred as a matter of law.

### F.    Count X For An Equitable Lien Or Constructive Trust Should Be Dismissed.

Snyder is not entitled to an equitable lien or constructive trust because he cannot prove the requisite elements of that claim as cited by Defendants in their Motion for Summary Judgment, to which Plaintiff agrees.  <u>Alsco-</u>

<u>Harvard Fraud Litigation</u>, 523 F.Supp. 790, 806-07 (D.D.C. 1981) (to establish a constructive trust, Plaintiff must establish three elements: "(1) there must be a wrongful act; (2) specific property acquired by the wrongdoer must be traceable to the wrongful conduct; and (3) there must be a reason why the party holding the property should not, in good conscience, be allowed to keep the property."). Plaintiff cannot meet any of these elements because there has been no wrongful act; just the execution of a valid contract. Also, an equitable lien or constructive trust would be improper because, as Plaintiff concedes, the distribution of the proceeds from the sale of the Second Street property has already been made, and Snyder willingly accepted his share of the proceeds pursuant to the validly executed Funding Agreement. Because Snyder cannot satisfy his burden of proof as to the elements of this claim, and because there are no disputed facts which are otherwise material to the relief sought, Defendants, not Plaintiff, are entitled to summary judgment.

> **G.    Count XI For A Judicial Dissolution**
> **Of L&S, LLC Should Be Dismissed.**

There is no basis for a claim for judicial dissolution of L&S. Just because Snyder now disagrees with the management of

L&S, even though he consented to the terms of the Funding Agreement, does not require this Court to exercise the extreme remedy of dissolving L&S. Moreover, there are no allegations in the Complaint, or in Plaintiff's Cross-Motion, that the requirements for judicial dissolution of a limited liability company set forth in the District of Columbia Limited Liability Act have been satisfied.

Instead of addressing these reasons, Snyder merely cites to the District of Columbia Uniform Partnership Act, which does not apply. L&S is a limited liability company and therefore is governed by the District of Columbia Limited Liability Company Act. Exhibit B at ¶3; Exhibit C. Indeed, Snyder even attaches the Operating Agreement of L&S as Exhibit 3 to his Cross-Motion, in which Snyder agreed to the organization and operation of L&S as a limited liability company under the Limited Liability Company Act. Snyder now, however, attempts to argue to the Court that L&S should be governed by the provisions of the District of Columbia Uniform Partnership Act. This is yet another violation of Rule 11 by Snyder. Of particular significance is Article VII, Section 7.1 of the Operating Agreement. Exhibit 3 to Plaintiff's Cross-Motion at 15. Section 7.1, entitled, Events of Dissolution, provides that:

> The Company shall be dissolved upon the happening of the first to occur of an event specified in Section 29-1347 of the Act or any of the following events:
>
>> 7.1.1. on the date fixed for its termination in Section 2.4; or
>>
>> 7.1.2. death of a Member

<u>Id</u>. Section 29-1347 does not apply for the simple reason that there is no Section 29-1347 in the D.C. Code, and obviously neither of the two events specified in the Operating Agreement have occurred. As such, Defendants, not Plaintiff, are entitled to summary judgment on Count XI of Plaintiff's Complaint.

### IV. <u>PLAINTIFF HAS NOT PRESENTED ANY EVIDENCE OF DAMAGE</u>.

In addition to the foregoing, Defendants, not Plaintiff, are entitled to summary judgment because Plaintiff has not presented any evidence of damage. Plaintiff has not presented any evidence that he is entitled to any compensatory damages, punitive damages or attorneys' fees. Indeed, in his Initial Disclosures, contrary to the express requirement of Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff did not provide a computation of his damages or produce any documents upon which such computation is based. Rule 26(a)(1) provides that "a party must, without awaiting a discovery request, provide . . . (C) a computation of any category of

damages claimed by the disclosing party . . . making available documents . . . on which such computation is based." Fed. R. Civ. P. 26(a)(1). A copy of Plaintiff's Initial Disclosures is attached as Exhibit G, in which Plaintiff did not provide any computation of damages. Indeed, after Plaintiff served his Initial Disclosures, counsel for Defendant wrote counsel for Plaintiff and requested that Plaintiff comply with Rule 26(a)(1) and Plaintiff has failed to do so. <u>See</u> Exhibit H. Therefore, Defendants, not Plaintiff, are entitled to summary judgment on all claims set forth in Plaintiff's Complaint and Amended Complaint.

<b><u>CONCLUSION</u></b>

For all the foregoing reasons, Defendants Dale Lowery, <u>et al.</u>, respectfully request that this Court deny Plaintiff's Cross-Motion for Summary Judgment and grant Defendants' Motion for Summary Judgment.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.


_____/s/_____
Dale A. Cooter, #227454
James E. Tompert, #358952
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C. 20015
(202)537-0700
<u>efiling@cootermangold.com</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL SNYDER,                    :
                                   :
        Plaintiff,                 :
                                   :
v.                                 :    Civil Action No. 06-2213 (JR)
                                   :
DALE LOWERY, <u>et</u> <u>al</u>.,          :
                                   :
        Defendants.                :
_____:

### DEFENDANTS' STATEMENT OF MATERIAL FACTS IN DISPUTE

1.  Defendant CASEtech, Inc. ("CASEtech") is a Delaware corporation organized and operated under the laws of the State of Delaware.  Exhibit 4 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Cross-Motion for Summary Judgment (Certificate of Incorporation; Certification from Delaware Secretary of State; Federal Employer Identification Number; January 28, 1994 letter from the Company Corporation, registered agent for CASEtech; By-Laws of CASEtech); Exhibit B, Declaration of Dale Lowery, in Support of Defendants' Opposition to Cross-Motion, at ¶2.

2.  Defendant Dale Lowery ("Lowery") and Plaintiff Michael Snyder ("Snyder") were shareholders, not partners, in CASEtech.  <u>Id</u>.  Lowery had an 80% shareholder interest in CASEtech and Snyder had a 20% shareholder interest in CASEtech.  <u>Id</u>.

3.  L&S Real Estate, LLC ("L&S") is a Limited Liability

Company organized and operated under the laws of the District
of Columbia.  Exhibit 3 to Plaintiff's Opposition to
Defendants' Motion for Summary Judgment and Cross-Motion for
Summary Judgment (Operating Agreement for L&S executed by Dale
Lowery and Michael Snyder); Exhibit B at ¶3; Exhibit C,
Articles of Organization of L&S.

4.  Lowery and Snyder were members of, and were not
partners in, L&S, a limited liability company.  Id.  Lowery
had an 2/3 interest in L&S and Snyder had a 1/3 interest in
L&S.  Id.

5.  The affairs of L&S are governed by the terms of the
Operating Agreement executed by Lowery and Snyder and the
provisions of the District of Columbia Limited Liability Act.
Exhibit 3 to Plaintiff's Opposition.

6.  Pursuant to the terms of the L&S Operating Agreement
any duty of care owed by Lowery to Snyder "is limited to
refraining from engaging in grossly negligent or reckless
conduct, intentional misconduct, or a knowing violation of
law."
Id. at 11, ¶5.4.3(b).

7.  At all times in the operation of CASEtech and L&S,
Lowery dealt with Snyder fairly, honestly and openly and made
disclosure of all essential information relating to the

2

business affairs of both companies.  Exhibit B at ¶4.

8.  On November 5, 2005, Lowery and Snyder executed a
contract entitled Funding Allocation Agreement ("Funding
Agreement").  Exhibit A; Exhibit B at ¶5.  The terms of that
agreement speak for themselves and Defendants dispute the
characterizations thereof set forth in Snyder's Statement of
Uncontested Facts and Plaintiff's Opposition and Cross-Motion
for Summary Judgment.

9.  As set forth in the Funding Agreement, certain real
property owned by L&S, located at 515 Second Street, N.E.,
Washington, D.C. ("Second Street Property"), "is for sale and
significant proceeds are expected," therefrom.  Exhibit A.
The Agreement provides that CASEtech "has run up significant
business debts," and that Lowery and Snyder "recognize that it
is in the best interests of themselves, the Corporation
["CASEtech"], and the LLC that the proceeds be used to reduce
overall levels of indebtedness in accordance with the terms
hereof."  Id.

10.  Prior to the execution of the Funding Agreement,
Snyder had full and complete access to the books and records
of both L&S and CASEtech, and took the books and records home
to review them. Exhibit B at ¶5.  He was also aware and had
knowledge of the debt incurred by CASEtech, including the

3

monies that Lowery had advanced to CASEtech from his home equity line of credit.  _Id._; Exhibit F.

11.  At the time that Snyder executed the Agreement, he was under no coercion to do so and signed the Agreement by his own volition.  Exhibit B at ¶6.

12.  In consideration for his execution of the Funding Agreement, Snyder received a reduction of debt in CASEtech and received a 33.3% distribution of the net proceeds from the sale.  _Id._ at ¶7.

13.  On May 26, 2006, the Second Street property sold for $1,800,000.  Exhibit D.  The proceeds from that sale were distributed in accordance with the terms of the Funding Agreement.  Exhibit A; Exhibit B at ¶8; Exhibit E.  First, the costs of the sale were paid.  _Id._  Second, the existing mortgage was paid.  _Id._  Third, the short and long term debt of CASEtech was paid.  _Id._  This amount included monies that Lowery had advanced to CASEtech from his home equity line of credit to fund the operation of the business.  _Id._  Fourth, the remaining funds were distributed 66.7% to Lowery and 33.3% to Snyder.  _Id._

14.  Snyder received the sum total of $107,844.06 ($22,416.47 for deferred salary and $85,427.59 for his 33.33% share).  _Id._ at ¶9.

Respectfully  submitted,

COOTER,  MANGOLD,  TOMPERT
 & KARAS, L.L.P.


_____/s/_____
Dale A. Cooter, #227454
James E. Tompert, #358952
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C. 20015
(202)537-0700
efiling@cootermangold.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 25th day of June, 2007, a copy of the foregoing DEFENDANTS' OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT, STATEMENT OF MATERIAL FACTS IN DISPUTE, EXHIBITS in support thereof, and proposed ORDER was filed electronically pursuant to the Electronic Case Filing procedures of the United States District Court for the District of Columbia and sent by electronic mail to:

> David Z. Kaufman, Esq.
> KAUFMAN LAW, P.C.
> 11350 Random Hills Road
> Suite 800
> Fairfax, VA 22030
> David@dzklaw.com

_____/s/_____
Dale A. Cooter

**EXHIBIT A**

THIS FUNDING ALLOCATION AGREEMENT is made as of this 4th day of November, 2005, and is by and between Dale E. Lowery and I. Michael Snyder, stockholders of CASEtech, Incorporated, a Delaware corporation having a principal business address of 621 Pennsylvania Avenue, S.E., Washington, D.C. (the "Corporation"); and also partners in L&S Real Estate, LLC, having the same principal business address ("L&S" or the "LLC").

WHEREAS, the L&S property known as 515 Second Street N.E. is for sale and significant proceeds are expected, and

WHEREAS, the Corporation has run up significant business debts, and

WHEREAS, much of the original capital for L&S was obtained from the Corporation,

WHEREAS, the parties hereto recognize that it is in the best interests of themselves, the Corporation, and the LLC that the proceeds be used to reduce overall levels of indebtedness in accordance with the terms hereof.

## WITNESSETH:

NOW, THEREFORE, Dale E. Lowery and I. Michael Snyder (the "Partners") agree to devote the proceeds from the sale of 515 Second Street N.E. to the following purposes:

FIRST, to pay the costs of the sale. These costs consist of taxes, recordation fees, brokers' fees, and other such fees as are a normal component of real estate transactions.

SECOND, to pay off existing mortgages on 515 Second Street, N.E.

THIRD, to contribute to the capital of the Corporation (in the proportions set forth in Article Fourth below) the amount necessary to pay off all short and long term debt of the Corporation. This debt consists primarily of (A) the major part of a $200,000.00 line of credit owed to the National Capital Bank; and (B) monies used for operating capital and secured by 816 North Carolina Avenue, S.E., a private residence owned by Dale E. Lowery.

FOURTH, any funds remaining after satisfaction of the above obligations shall be distributed to the Partners without encumbrance according to their relative ownership interests in L&S, i.e. 66.7% to Dale E. Lowery and 33.3% to I. Michael Snyder.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement under seal as of the date first hereinabove written.

Dale E. Lowery, Ph.D.                          I. Michael Snyder

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL SNYDER,                    :
                                   :
        Plaintiff,                 :
                                   :
v.                                 :    Civil Action No. 06-2213 (JR)
                                   :
DALE LOWERY, et al.,               :
                                   :
        Defendants.                :
_____:

**DECLARATION OF DALE LOWERY IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

I, Dale Lowery, declare and state under the laws of perjury
of the District of Columbia as follows:

1.  I am over the age of 18 and am competent to testify to
the matters contained herein, which are made from my personal
knowledge.

2.  I am a shareholder, director, and President of CASEtech,
Inc. ("CASEtech"), a Defendant in these proceedings.  CASEtech is
a Delaware corporation which was organized and has been operated
as a corporation under the laws of the State of Delaware.
Plaintiff Michael Snyder ("Snyder") and I were shareholders, not
partners, in CASEtech.  I have had an 80% shareholder interest in
CASEtech and Snyder has had a 20% shareholder interest in
CASEtech.

3.  Defendant L&S Real Estate, LLC ("L&S") is a Limited
Liability Company which was organized and has been operated as a
limited liability company under the laws of the District of

Columbia.  Snyder and I have been members of, and were not partners in, L&S, a limited liability company.  I have had an 2/3 interest in L&S and Snyder has had a 1/3 interest in L&S.

4.  At all times in the operation of CASEtech and L&S, I have dealt with Snyder fairly, honestly and openly and have disclosed all essential information relating to the business affairs of both CASEtech and L&S.

5.  On November 5, 2005, Snyder and I executed a contract entitled Funding Allocation Agreement ("Funding Agreement"). Prior to the execution of the Funding Agreement, Snyder had full and complete access to the books and records of both L&S and CASEtech, and took the books and records home to review them on many occasions.  He was also aware and had knowledge of the debt incurred by CASEtech, including the monies that I had advanced to CASEtech from my home equity line of credit to fund the operation of the business.

6.  At the time that Snyder executed the Agreement, he was under no coercion to do so and signed the Agreement by his own volition.

7.  In consideration for his execution of the Funding Agreement, Snyder received a reduction of debt in CASEtech and received a 33.3% distribution of the net proceeds from the sale, as set forth below.

8.  On May 26, 2006, the real estate known as the Second

2

Street property owned by L&S sold for approximately $1,800,000.
The proceeds from that sale were distributed in accordance with
the terms of the Funding Agreement.  First, the costs of the sale
were paid.  Second, the existing mortgage was paid.  Third, the
short and long term debt of CASEtech was paid.  This amount
included monies that I had advanced to CASEtech from my home
equity line of credit to fund the operation of the business.
Fourth, the remaining funds were distributed 66.7% to me and
33.3% to Snyder.

9.  Snyder received the sum total of $107,844.06 ($22,416.47
for deferred salary and $85,427.59 for his 33.33% share).

10.  Even though Snyder agreed to the distribution of the
proceeds from the sale as set forth above and received
$107,844.06 in proceeds therefrom, after the distribution was
made, he objected to the sale and asserted that the outstanding
debt should have been paid last after a one-third/two-third split
of the proceeds.

I swear under the penalties of perjury of the District of
Columbia that the facts set forth above are true and correct and
made from my personal knowledge.

3

Executed under the penalties of perjury in the District of Columbia, on the 25TH day of June, 2007.

Dale Lowery

**EXHIBIT C**

an 07 07 07:48p        CASEtech, Inc.              202-543-3181            P.2

# ARTICLES OF ORGANIZATION
## OF
## L&S REAL ESTATE, L.L.C.

Pursuant to Title 29, Chapter 13 of the District of Columbia Code (the D.C. Limited Liability Company Act of 1994), the organizer named below adopts the following Articles of Organization:

1. The name of the limited liability company is L&S Real Estate, L.L.C.

2. The latest date on which the company is to be dissolved is December 31, 2040.

3. The purposes of the Corporation are (a) to engage in the business owning and operating real estate, including acting as lessor thereof; (b) to purchase or otherwise acquire, own, hold, maintain, use, improve, develop, mortgage, convey, sell, exchange, lease, sublease and otherwise dispose of and deal in real property and personal property or any interest therein; (c) to enter into, make, perform and carry out contracts which may be necessary or convenient for the aforesaid businesses of the company; and (d) to engage in any other lawful purpose and/or business. The foregoing enumeration of the purposes of the company is not intended to limit or restrict the purposes or powers of the company or to require the company to engage in any of the activities described in such purposes.

4. The address of the limited liability company's initial registered office is 816 N. Carolina Avenue, SE, Washington, DC 20003. The name of the initial registered agent at such address is Dale E. Lowery, Ph.D., a resident of the District of Columbia.

Name of Organizer _Brett L. Antonides_              Date 4/13/00

Brett L. Antonides
McManus, Schor, Asmar & Darden
1301 Connecticut Avenue, NW
Sixth Floor
Washington, DC 20036

## L&S REAL ESTATE, L.L.C.
### Operating Agreement

This Operating Agreement (this "Agreement") is entered into this 26th day of April, 20000 by and among Dale E. Lowery, and Michael Snyder.

### Explanatory Statement

The parties have agreed to organize a limited liability company in accordance with the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, the parties agree as follows:

### Article I
### Defined Terms

The following capitalized terms shall have the respective meanings specified in this Article I. Capitalized terms not defined in this Agreement shall have the meaning specified in the Act.

*"Act"* means the Limited Liability Company Act of 1994, as amended from time to time.

*"Adjusted Capital Account Deficit"* means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i) the deficit shall be decreased by the amounts which the Interest Holder is obligated to restore pursuant to *Section* 4.4.2 or is deemed obligated to restore pursuant to Regulation Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g) and 1.704-2(i)(5); and

(ii) the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

*"Affiliate"* means (a) Person directly or indirectly controlling, controlled by, or under common control with another Person; (b) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities or beneficial interests of another Person; (c) an officer, director, partner, or member of the immediate family of an officer, director or partner, of another Person; and/or (d) any affiliate of any such Person.

*"Agreement"* means this Operating Agreement, as amended from time to time including each exhibit hereto.

*"Assignee"* means the Person who has acquired an Economic Interest in the Company but is not a Member.

*"Capital Account"* means the account to be maintained by the Company for each Interest Holder in accordance with the following provisions:

(i) an Interest Holder's Capital Account shall be credited with the amount of money and the fair market value of any property contributed to the Company (net of liabilities secured by such property that the Company either assumes or to which such property is subject), the amount of any Company unsecured liabilities assumed by the Interest Holder, and the Interest Holder's distributive share of Profit and any item in the nature of income or gain specially allocated to the Interest Holder pursuant to the provisions of *Section* 4.3 (other than *Section* 4.3.3); and

(ii) an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder (net of liabilities secured by such distributed property that the Interest Holder either assumes or to which such property is subject), the amount of any unsecured liabilities of the Interest Holder assumed by the Company, and the Interest Holder's distributive share of Loss and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of *Section* 4.3 (other than *Section* 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to *Section* 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

*"Cash Flow"* means all cash derived from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Members.

*"Code"* means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding revenue law.

*"Company"* means the limited liability company formed in accordance with this Agreement.

*"Contribution"* means any money, property, or services rendered, or a promissory note or other binding obligation to contribute money or property, or to render services as permitted in this Agreement or by law, which a Member contributes to the Company as capital in that Member's capacity as a Member pursuant to this Agreement or any other agreement between the Members, including an agreement as to value.

*"Economic Interest"* means a Person's right to share in the income, gains, losses, deductions,

2

credit, or similar items of, and to receive Distributions from, the Company, but does not include any other rights of a Member including, without limitation, the right to Vote or to participate in management, or any right to information concerning the business and affairs of the Company.

*"Interest Holder"* means any Person who holds an Economic Interest, whether as a Member or as an Assignee of a Member.

*"Involuntary Withdrawal"* means, with respect to any Member, the affirmative Vote of Members, excluding the Member whose withdrawal is being Voted upon, holding not less than seventy-five percent 75% of the Membership Interests to terminate such Member's Membership Interest.

*"Member"* means any Person who executes a counterpart of this Agreement as a Member and any Person who subsequently is admitted as a Member of the Company.

*"Member Loan Nonrecourse Deductions"* means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulation Section 1.704-2(i).

*"Member Nonrecourse Debt Minimum Gain"* has the meaning set forth in Regulation Section 1.704-2(i)(2) (determined by substituting "Member" or "Interest Holder" for "partner").

*"Membership Interest"* means a Member's rights in the Company, collectively, including the Member's Economic Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

*"Minimum Gain"* has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under IRC Section 704(b).

*"Negative Capital Account"* means a Capital Account with a balance of less than zero.

*"Nonrecourse Deductions"* has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

*"Nonrecourse Liability"* has the meaning set forth in Regulation Section 1.704-2(b)(3).

*"Percentage"* means, as to a Member, the Percentage set forth after the Member's name on *Exhibit* A, as amended from time to time, and as to an Interest Holder who is not a Member, the

Ian 07 07 07:50p    CHSEtech, Inc.    202-543-5161    p.6

Percentage or part of a Percentage that corresponds to the portion of a Member's Economic Interest that the Interest Holder has acquired, to the extent the Interest Holder has succeeded to a Member's interest.

*"Person"* means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

*"Positive Capital Account"* means a Capital Account with a balance greater than zero.

*"Profit"* and *"Loss"* means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with IRC Section 703(a), with the following adjustments:

(i) all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to IRC Section 703(a)(1) shall be included in computing taxable income or loss;

(ii) any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(iii) any expenditures of the Company described in IRC Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv) gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the book value as adjusted under Regulation Section 1.704-1(b) ("adjusted book value") of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v) in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi) notwithstanding any other provision of this definition, any items which are specially allocated pursuant to *Section 4.3* shall not be taken into account in computing Profit or Loss.

*"Regulation"* means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

*"Transfer"* means, when used as a noun, any sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, to sell, hypothecate, pledge, assign, or otherwise transfer.

*"Voluntary Withdrawal"* means a Member's disassociation from the Company by means other than a Transfer or an Involuntary Withdrawal.

4

Jan 07 07 07:50p    CASEtech, Inc.              202-543-3181           p.7

## Article II
## Formation and Name; Office; Purpose; Term

2.1. *Organization.* The parties hereby organize a limited liability company pursuant to the Act and the provisions of this Agreement. The Company has caused Articles of Organization to be prepared, executed, and filed with the Department of Consumer and Regulatory Affairs.

2.2. *Name of the Company.* The name of the Company is L&S Real Estate, L.L.C.

2.3. *Purpose.* The Company is organized to engage in the business owning and operating real estate, including acting as lessor thereof and to do any and all things necessary, convenient, or incidental to that purpose, and to engage in any other lawful purpose and/or business.

2.4. *Term.* The Company shall continue in existence until December 31, 2040, unless sooner dissolved as provided by this Agreement or the Act.

2.5. *Principal Place of Business.* The Company's Principal Place of Business shall be located at 816B North Carolina Avenue, NW, Washington, DC 20003, or at any other place within the District of Columbia upon which the Members agree.

2.6. *Resident Agent.* The name and address of the Company's resident agent in the District of Columbia is Dale E. Lowery, Ph.D.

2.7. *Members.* The name, present mailing address, taxpayer identification number, and Percentage of each Member are set forth on *Exhibit A.*

## Article III
## Members; Capital; Capital Accounts

3.1. *Initial Contributions.* Upon the execution of this Agreement, the Members shall make capital contributions to the Company with the value and as described in *Exhibit A.*

3.2. *No Additional Contributions.* No Member shall be required to contribute any additional capital to the Company, and no Member shall have personal liability for any obligations of the Company except as expressly provided by law.

3.3. *No Interest on Contributions.* Neither Members nor any Interest Holders shall be paid interest with respect to Contributions.

3.4. *Return of Contributions.* Except as otherwise provided in this Agreement, no Member nor Interest Holder shall have the right to receive the return of any Contribution or withdraw from the

5

Company, except upon the dissolution of the Company.

3.5. *Form of Return of Capital.* If a Member or an Interest Holder is entitled to receive the return of a Contribution, the Company may distribute in lieu of money, notes, or other, property having a value equal to the amount of money distributable to the Interest Holder money distributable to such Person.

3.6. *Capital Accounts.* A separate Capital Account shall be maintained for each Member and Interest Holder.

3.7. *Loans and Other Business Transactions.* Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Company and the Member agree. Members may also transact other business with the Company and, in doing so, as they shall have the same rights and be subject to the same obligations arising out of any such business transaction as would be enjoyed by and imposed upon any Person, not a Member, engaged in a similar business transaction with the Company.

## Article IV
## Profit, Loss, and Distributions

4.1. *Distribution of Cash Flow.* Except as provided in Section 4.4, Cash Flow for each taxable year of the Company shall be distributed to the Interest Holders in proportion to their Percentages no later than seventy-five (75) days after the end of the taxable year.

4.2. *Allocation of Profit or Loss.* After giving effect to the special allocations set forth in *Section* 4.3, for any taxable year of the Company, Profit and Loss shall be allocated to the Interest Holders in proportion to their Percentages. If Losses are reallocated under Section 4.3.1., subsequent allocations of Profit and Loss shall be made so that, to the extent possible, the net amount allocated pursuant to this Section 4.2 equals the net amount that would have been allocated to each Interest Holder if no reallocation had occurred under Section 4.3.1.

4.3. *Regulatory Allocations.*

4.3.1. *Impermissible Deficits and Qualified Income Offset.* No Interest Holder shall be allocated Losses or deductions if the allocation causes the Interest Holder to have an Adjusted Capital Account Deficit; instead, such items shall be allocated to the other Interest Holders. If an Interest Holder for any reason (whether or not expected) receives (1) an allocation of Loss or deduction (or item thereof) or (2) any Distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year (other than an allocation under *Section* 4.3.2), in the amount and in proportions required to eliminate the excess as quickly as possible. This *Section* 4.3.1 is intended to

comply with, and shall be interpreted consistently with, the "alternate test for economic effect" and "qualified income offset" provisions of the Regulations promulgated under IRC Section 704(b).

4.3.2. *Minimum Gain Chargebacks.* In order to comply with the "minimum gain chargeback" requirements of Regulation Sections 1.704-2(f)(1) and 1.704-2(i)(4), and notwithstanding any other provision of this Agreement to the contrary, in the event there is a net decrease in an Interest Holder's share of Minimum Gain and/or Member Nonrecourse Debt Minimum Gain during a Company taxable year, such Interest Holder shall be allocated items of income and gain for that year (and if necessary, other years) as required by and in accordance with Regulation Sections 1.704-2(f)(1) and 1.704-2(i)(4) before any other allocation is made. It is the intent of the parties hereto that any allocation pursuant to this *Section* 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f) and 1.704-2(i)(4).

4.3.3. *Contributed Property and Book-Ups.* In accordance with IRC Section 704(c) and the Regulations thereunder, including Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of Contribution (or deemed Contribution). If the adjusted book value of any Company asset is adjusted under Regulation Section 1.704-1(b)(2)(iv)(f), subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under IRC Section 704(c) and the Regulations thereunder. The parties hereto agree to use the traditional method with curative allocations, as described in Regulation Section 1.704-3(c), for making IRC Section 704(c) allocations.

4.3.4. *IRC Section 754 Adjustment.* To the extent an adjustment to the tax basis of any Company asset pursuant to IRC Section 734(b) or IRC Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.5. *Nonrecourse Deductions.* Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.3.6. *Member Loan Nonrecourse Deductions.* Any Member Loan Nonrecourse Deductions for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deductions are attributable in accordance with Regulation Section 1.704-2(i).

4.3.7. *Guaranteed Payments.* To the extent any compensation paid to any Interest Holder by the Company, including any fees payable to any Interest Holder pursuant to Section 5.3

hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under IRC Section 707(c) or is not paid to the Interest Holder other than in the Person's capacity as a partner (Interest Holder) within the meaning of IRC Section 707(a), the Interest Holder shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Interest Holder's Capital Account shall be adjusted to reflect the payment of that compensation.

4.3.8. *Unrealized Receivables.* If an Interest Holder's Economic Interest is reduced (provided the reduction does not result in a complete termination of the Interest Holder's Interest), the Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of IRC Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to *Section 4.4* hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Interest Holder, be specially allocated among the Interest Holders in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture

4.3.9. *Withholding.* All amounts required to be withheld pursuant to IRC Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

4.3.10. *Nonrecourse Liabilities.* Solely for purposes of determining an Interest Holder's proportionate share of "excess nonrecourse liabilities" of the Company within the meaning of Regulation Section 1.752-3(a)(3), the Interest Holders' interest in Company profits shall be based on their respective Percentages.

4.3.11. *Intent of Allocations.* The tax allocation provisions of this Agreement are intended to produce final Capital Account balances of the Interest Holders that will permit liquidating Distributions that are made in accordance with such final Capital Account balances under *Section 4.4.1* to be equal to the Distributions that would occur if such Distributions were made to the Interest Holders in proportion to their Percentages. To the extent that the tax allocation provisions of this Agreement would not produce such final Capital Account balances, (1) such provisions shall be amended by the Members (General Manager) if and to the extent necessary to produce such result and (2) taxable income or taxable loss of the Company for prior open years (or items of gross income and deduction of the Company) shall be reallocated among the Interest Holders to the extent it is not possible to achieve such result with allocations of income (including gross income) and deduction for the current year and future years. This *Section 4.3.11* shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

8

4.3.12. *Income Tax Provisions.* The Interest Holders are aware of the income tax consequences of this Article IV and agree to be bound by these provisions in reporting their shares of Profit, Losses, and other items for federal and state income tax purposes.

4.4. *Liquidation and Dissolution.*

4.4.1. Upon liquidation of the Company, the assets of the Company shall be distributed to the Interest Holders in accordance with their positive balances in their respective Capital Accounts, after giving effect to all Contributions, Distributions, and allocations for all periods. Distributions to the Interest Holders pursuant to this *Section 4.4.1* shall be made in accordance with Regulation Section 1.704-1(b)(2)(ii)(b)(2).

4.4.2. No Interest Holder shall be obligated to restore a Negative Capital Account.

4.5. *General.*

4.5.1. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Members.

4.5.2. If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Interest Holders so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Members. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in *Section 4.2* and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the Distribution of the assets in liquidation pursuant to *Section 4.4.*

4.5.3. All Profit and Loss shall be allocated and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or Distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to a Capital Transaction or to any other extraordinary non-recurring items of the Company.

4.5.4. The Members are hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated under IRC Section 704(b); provided, however, that no amendment shall materially affect Distributions to an Interest Holder without the Interest Holder's prior written consent.

lan 07 07 07:52p    CASEtech, Inc.            202-543-3181            p.12

# Article V
## Management: Rights, Powers, and Duties

5.1. *Management.* The Company shall be managed by the Members. Except as specifically provided otherwise in this Agreement, only a Member or members owning not less than 51% of the Company shall have the right to act for and bind the Company in the ordinary course of its business.

5.2. *Meetings of and Voting by Members.*

5.2.1. A meeting of the Members may be called by any Member. However, without the consent of Members owning not less than 51% interest in the Company, meetings may not be called more frequently than once per calendar quarter. Meetings of Members shall be held at the Company's principal place of business or at any other place within or without the District of Columbia, designated by the Person or Persons calling the meeting. Not less than ten (10) nor more than sixty (60) days before each meeting, the Person or Persons calling the meeting shall give written notice of the meeting to each Member entitled to Vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice may waive notice, either before or after the meeting, by executing a waiver of such notice, or by appearing at and participating, in person or by proxy in the meeting. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by Proxy of Members holding Percentages which aggregate not less than fifty-one percent (51%) constitutes a quorum. A Member may Vote either in person or by written Proxy signed by the Member or by the Member's duly authorized agent.

5.2.2. Except as otherwise provided in this Agreement, the affirmative Vote of Members holding a majority of the aggregate Percentages present at the meeting in person and by proxy shall be required to approve any matter coming before the Members.

5.2.3. In lieu of holding a meeting, the Members may take action by written consents specifying the action to be taken, which consents must be executed and delivered to the Company by Members whose combined Voting Power constitutes not less than 51% of the total Voting Power of all Members. Any such approved action shall be effective immediately. The Company shall give prompt notice to all Members of any action approved by Members by less than unanimous consent.

5.2.4. The following matters shall require the Vote or consent of the percentage interest of Members indicated after each such item for such action to be approved by the Members:

(a) A decision to continue the business of the Company after dissolution of the Company (51%);

(b) Approval of the transfer of a Membership Interest and admission of an Assignee as a Member (51%); any such consent to transfer or admission may be unreasonably withheld in the sole and absolute discretion of the consenting party;

10

(c) An amendment to the Articles of Organization or this Agreement (51%).

5.3. *Personal Service*. No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Members, no Member shall be entitled to compensation for services performed for the Company. However, upon substantiation of the amount and purpose thereof, the Members shall be entitled to reimbursement for expenses reasonably incurred, and advances of funds reasonable made, in furtherance of the business of the Company.

5.4. *Duties of Parties*.

5.4.1. Each Member shall devote such time to the business and affairs of the Company as is necessary to carry out the Member's duties set forth in this Agreement.

5.4.2. Except as otherwise expressly provided in *Section* 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and no Member shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to the Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

5.4.3. The only fiduciary duties a Member owes to the Company and the other Members are the duty of loyalty and the duty of care set forth in subdivisions (a) and (b):

(a) A Member's duty of loyalty to the Company and the other Members is limited to the following:

(1) To account to the Company and hold as trustee for it any property, profit, or benefit derived by the Member in the conduct or winding up of the Company's business or derived from a use by the Member of Company property, including the appropriation of a Company opportunity, without the consent of the other Members;

(2) To refrain from dealing with the Company in the conduct or winding up of the Company business as or on behalf of a party having an interest adverse to the Company without the consent of the other Members; and

(3) To refrain from competing with the Company in the conduct of the Company business before the dissolution of the Company without the consent of the other Members.

(b) A Member's duty of care to the Company and the other Members in the conduct and winding up of the Company business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

11

Jan 07 07 07:53p    CHSEtech, Inc.    202-543-3181    p.14

### 5.5. *Indemnification of Members.*

5.5.1. A Member shall not be liable, responsible, or accountable, in damages or otherwise, to any other Member or to the Company for any act performed by the Member with respect to Company matters, and within the standard of care specified in *Section* 5.4.3(b).

5.5.2. The Company shall indemnify each Member for any act performed by the Member with respect to Company matters, unless such act constitutes grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

### Article VI
### Transfer of Interests and Withdrawals of Members

6.1. *Transfers.* Except as herein provided, no Member may Transfer all, or any portion of, or any interest or rights in, the Membership Interest owned by the Member. Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members. The attempted Transfer of any portion or all of a Membership Interest in violation of the prohibition contained in this *Section* 6.1 shall be deemed invalid, null and void, and of no force or effect, except any Transfer mandated by operation of law and then only to the extent necessary to give effect to such Transfer by operation of law.

6.1.1. A Member may Transfer all or any portion of or any interest or rights in the Member's Economic Interest if each of the following conditions ("Conditions of Transfer") is satisfied:

6.1.1.1. the Transfer may be accomplished without registration, or similar process, under federal and state securities laws;

6.1.1.2. the transferee delivers to the Company a written agreement to be bound by the terms of Article VI;

6.1.1.3. the Transfer will not result in the termination of the Company pursuant to IRC Section 708;

6.1.1.4. the Transfer will not result in the Company being subject to the Investment Company Act of 1940, as amended;

6.1.1.5. the transferor or the transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number; and (ii) the transferee's initial tax basis in the transferred Membership Interest; and

6.1.1.6. the transferor complies with the provisions set forth in *Section* 6.1.3.

6.1.2. If the Conditions of Transfer are satisfied, the Member may Transfer all or any portion of the Member's Economic Interest. The Transfer of an Economic Interest pursuant to this *Section* 6.1 shall not result in the transfer of any of the transferor's other Membership rights. The transferee of the Economic Interest shall have no right to: (i) become a Member; (ii) exercise any Membership rights other than those specifically pertaining to the ownership of an Economic Interest; or (iii) act as an agent of the Company.

6.1.3. *Right of First Offer.*

6.1.3.1. If a Member (a "Transferor") desires to Transfer all or any portion of, or any interest or rights in the Transferor's Economic Interest (the "Transferor Interest"), the Transferor shall notify the Company of that desire (the "Transfer Notice"). The Transfer Notice shall describe the Transferor Interest. The Company, or its nominee(s), shall have the option (the "Purchase Option") to purchase all of the Transferor Interest for a price (the "Purchase Price") equal to the amount the Transferor would receive if the Company were liquidated and an amount equal to the Appraised Value were available for distribution to the Members pursuant to *Section* 4.4.

6.1.3.2. The Purchase Option shall be and remain irrevocable for a period (the "Transfer Period") ending at 11:59 P.M. local time at the Company's principal office on the thirtieth (30th) day following the day the Transfer Notice is given to the Company.

6.1.3.3. At any time during the Transfer Period, the Company and/or its nominee (the "Purchaser(s)") may elect to exercise the Purchase Option by giving written notice of its election to the Transferor. The Transferor shall not be deemed a Member for the purpose of Voting on whether the Company shall elect to exercise the Purchase Option.

6.1.3.4. The Purchaser's notice of its election to purchase the Transfer Interest shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be earlier than five (5) days after the date of the notice of election nor more than thirty (30) days after the expiration of the Transfer Period.

6.1.3.5. The Purchase Price shall be paid in cash on the Transfer Closing Date unless the Purchasers elect to pay the Purchase Price in installments pursuant to Section 6.5.

6.1.3.6. If the Company's Purchase Option is not exercised, the Transferor shall be permitted to offer and sell the Transferor Interest to any other person for a period of six (6) months (the "Free Transfer Period") after the expiration of the Transfer Period. If the Transferor does not Transfer the Transferor Interest within the Free Transfer Period, the Transferor's right to Transfer the Transferor Interest pursuant to this Section shall cease and terminate.

6.1.3.7. Any Transfer of the Transferor Interest made after the last day of the Free Transfer Period or without strict compliance with the terms, provisions, and conditions of this Section and all other terms, provisions, and conditions of this Agreement, shall be null and void and of no force or effect.

13

6.2. *Voluntary Withdrawal*.

6.2.1. No Member shall have the right or power to effect Voluntary Withdrawal from the Company, except as otherwise provided by this Agreement.

6.2.2. Upon withdrawal of any Member as permitted under the terms of this *Section* 6.2, the withdrawn Member and the Company shall have the respective rights and obligations set forth in *Section* 6.3 provided, however, that the Withdrawn Member's Membership Interest shall be valued at Book Value and, provided further, that the Company shall have the right to pay the amount due the Withdrawing Member in installments pursuant to Section 6.5.

6.3. *Involuntary Withdrawal*. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become an Interest Holder but shall not become a Member. If the Company is continued as provided in *Section* 7.1.3, the successor Interest Holder shall have all the rights of an Interest Holder but shall not have the right to exercise any other rights of a Member.

6.4. *Appraised Value*.

6.4.1. The term "Appraised Value" means the appraised value of the Company as hereinafter provided. Within fifteen (15) days after demand by either one to the other, the Company and the Withdrawn Member shall each appoint an appraiser to determine the value of the Company. If the two appraisers agree upon such value, they shall jointly render a single written report stating that value. If the two appraisers cannot agree upon the value of the Company, they shall each render a separate written report and shall appoint a third appraiser, who shall appraise the Company, determine its value, and render a written report of such appraiser's opinion thereon. Each party shall pay the fees and other costs of the appraiser appointed by such party, and the fees and other costs of the third appraiser shall be shared equally by both parties.

6.4.2. The value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the value of the equity contained in the appraisal report of the third appraiser is more than the higher of the first two appraisals, the higher of the first two appraisals shall govern; and provided, further, that if the value of the equity contained in the appraisal report of the third appraiser is less than the lower of the first two appraisals, the lower of the first two appraisals shall govern.

6.5. If the Company or the Remaining Members, as the case may be (the "Purchaser"), elects to pay the Purchase Price (the "Indebtedness") on an installment basis, such payments shall be in equal monthly installments of principal over a period that shall expire no later than seven (7) years from the Transfer Closing Date, and the Purchaser shall evidence the obligation to pay the Indebtedness by executing and delivering its or their promissory note to the Withdrawn Member or the Transferor (the "Payee").

14

## Article VII
### Dissolution, Liquidation, and Termination of the Company

**7.1.** *Events of Dissolution.* The Company shall be dissolved upon the happening of the first to occur of an event specified in Section 29-1347 of the Act or any of the following events:

**7.1.1.** on the date fixed for its termination in *Section 2.4*; or

**7.1.2.** death of a Member.

**7.2.** *Procedure for Winding Up and Dissolution.* If the Company is dissolved, the remaining Members shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with *Section* 4.4.

**7.3.** *Filing of Articles of Dissolution.* Upon completion of winding up the affairs of the Company, the Members shall promptly file the Articles of Dissolution with the D.C. Department of Consumer and Regulatory Affairs. If there are no remaining Members, such Articles shall be filed by the last Person to be a Member; if there are no remaining Members, or last Person to be a Member, the Articles shall be filed by the legal or personal representatives of the last Person to be a Member.

## Article VIII
### Books, Records, Accounting, and Tax Elections

**8.1.** *Bank Accounts.* All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The Members shall determine the financial institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

**8.2.** *Maintenance of Books and Records.*

**8.2.1.** The Members shall keep or cause to be kept complete and accurate books, records, and financial statements of the Company and supporting documentation of transactions with respect to the conduct of the Company's business. The books, records, and financial statements of the Company shall be maintained on the cash method of accounting. Such books, records, financial statements, and documents shall include, but not be limited to, the following:

(1) a current list of the full name and last known business or residence address of each Member and Interest Holder, in alphabetical order, with the Contribution and the share in profits and losses of each Member and Interest Holder specified in such list;

(2) the Articles of Organization, including all amendments; and any powers-of-attorney

15

under which the Articles of Organization or amendments were executed;

(3) federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(4) this Agreement and any amendments, and any powers-of-attorney under which this Agreement or amendments were executed;

(5) financial statements for the six most recent years;

(6) internal books and records for the current and three most recent years; and

(7) a true copy of relevant records indicating the amount, cost, and value of all property which the Company owns, claims, possesses, or controls.

8.2.2. Such books, records, and financial statements of the Company and supporting documentation shall be kept, maintained, and available at the Company's office within the District of Columbia.

8.3. *Right to Inspect Books and Records; Receive Information.*

8.3.1. Upon the reasonable request of a Member for a purpose reasonably related to the interest of that Member the Company shall promptly deliver to the requesting Member at the expense of the Company a copy of this Agreement, as well as the information required to be maintained by the Company under paragraphs (1) and (3) of *Section* 8.2.1.

8.3.2. Each Member and Manager has the right upon reasonable request, and for purposes reasonably related to the interest of that Member or Manager of the Company, to do the following:

(1) to inspect and copy during normal business hours any of the records required to be maintained by the Company under *Section* 8.2.1; and

(2) to obtain from the Company promptly after becoming available, a copy of the Company's federal, state, and local income tax or information returns for each year.

8.3.3. If the Company has more than thirty-five (35) Members, Members representing at least five percent (5%) of the Voting interests of all Members, or three or more Members, may make a written request to a Manager for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current fiscal year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. The statement must be delivered or Mailed to the Members within thirty (30) days thereafter. The financial statements referred to in this Section shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of a Manager of the

16

Company that the financial statements were prepared without audit from the books and records of the Company.

8.3.4. If the Company has more than thirty-five (35) Members, the Company shall cause an annual report to be sent to each Member not later than one hundred twenty (120) days after the close of the Company's fiscal year. Such report must contain the Company's balance sheet as of the end of the Company's fiscal year and an income statement and statement of changes in financial position for such fiscal year. The financial statements referred to in this Section shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of a Manager of the Company that the financial statements were prepared without audit from the books and records of the Company.

8.3.5. The Company shall send or shall cause to be sent to each Member within ninety (90) days after the end of each fiscal year of the Company: (i) such information as is necessary to complete federal and state income tax or information returns, and (ii) if the Company has thirty-five (35) or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for the fiscal year.

8.3.6. Unless otherwise expressly provided in this Agreement, the inspecting or requesting Member or Manager, as the case may be, shall reimburse the Company for all reasonable costs and expenses incurred by the Company in connection with such inspection and copying of the Company's books and records and the production and delivery of any other books or records.

8.4. *Annual Accounting Period*. The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Members, subject to the requirements and limitations of the Code.

8.5. *Tax Matters Partner*. Dale Lowery shall be the "Tax Matters Partner" for the purposes of IRC Section 6231.

## Article IX
### General Provisions

9.1. *Assurances*. Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2. *Notifications*. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and delivered personally, sent by certified or registered mail, postage prepaid, return receipt requested or sent by overnight courier. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the

Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the Person to whom it is delivered. A notice that is sent by Mail will be deemed given three (3) business days after it is Mailed. A notice that is sent by courier will be deemed given one (1) business day after it is couriered. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

9.3. *Specific Performance.* The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4. *Integration.* This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

9.5. *Applicable Law.* All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the District of Columbia.

9.6. *Headings.* The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

9.7. *Binding Provisions.* This Agreement is binding upon, and to the limited extent specifically provided herein, inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and assigns.

9.8. *Jurisdiction and Venue.* Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the District of Columbia or any State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9.9. *Interpretation.* Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require. Reference to articles, sections (or subdivisions of sections), exhibits, annexes, or schedules are to those of this Agreement, unless otherwise indicated.

9.10. *Separability of Provisions.* Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those

portions of this Agreement which are valid.

9.11. *Counterparts.* This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

9.12. *Estoppel Certificate.* Each Member shall, within ten (10) days after written request by any Member, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by such Member, or if there is a default, the nature or extent thereof.

**IN WITNESS WHEREOF,** the parties have executed, or caused this Agreement to be executed as of the date first above written.

**MEMBERS:**

Dale E. Lowery
816 North Carolina Avenue, NW
Washington, DC 20003
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
Social Security or other
Tax Identification Number

Michael Snyder

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
Social Security or other
Tax Identification Number

19

## L&S Real Estate, Limited Liability Company
## Operating Agreement

### Exhibit A
### List of Members, Percentages, and Capital

| Name, Address And Taxpayer ID No. Of Members | Ownership Interest | Description and Value of Initial Capital Contribution |
|---|---|---|
| Dale E. Lowery 816 North Carolina Avenue, SE Washington, DC 20003 Social Security Number 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 | 66.67% | Checks totaling $75,524.10 |
| Michael Snyder 13514 Winding Trail Court Silver Spring, MD 20906 Social Security Number 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 | 33.33% | Checks totaling $37,762.02 |

20

lan 07 07 07:57p     CASEtech, Inc.          202-543-3181          P.23
                                              MSAD~          202 543 7283⌐ 27 5
SENT BY:MCMANUSSCHORASMARDARDE; 4-19- 0 ;12:02PM ;

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS



# CERTIFICATE

**THIS IS TO CERTIFY** that all applicable provisions of the District of Columbia Limited Liability Company Act have been complied with and accordingly, this *CERTIFICATE OF ORGANIZATION* is hereby issued to:

**L&S REAL ESTATE, L.L.C.**

**IN WITNESS WHEREOF I** have hereunto set my hand and caused the seal of this office to be affixed as of the **13th** day of **April , 2000 .**

Lloyd J. Jordan
Director

Patricia E. Grays
Acting Administrator
Business Regulation Administration

Patricia E. Grays
Superintendent of Corporations
Corporations Division

Jan 07 07 07:57p    CHSEtech, Inc.        202-543-3181        p.24
.C00042

Government of the District of Columbia
Office of the Chief Financial Officer                941 North Capitol Street, NE
Office of Tax and Revenue                            Washington, D.C. 20002

## NOTICE OF BUSINESS TAX REGISTRATION

Date of Notice: May 23, 2005                Notice Number: 2343398050516

L & S REAL ESTATE, LLC
816 N CAROLINA AVE SE                        EIN: 52-2241995
WASHINGTON, DC 20003-1361

You have been registered for the tax(es) shown below.  Your filing basis has been determined as shown.  It is important that the Employer Identification Number referenced above be used on all correspondence and returns.

| TAX TYPE | ACCOUNT ID | FILING FREQUENCY | TAX YEAR END |
|---|---|---|---|
| UNINCORPORATED FRANCHISE TAX | - | ANNUAL | FY12 |
| PERSONAL PROPERTY TAX | - | ANNUAL | FY06 |

Any tax returns currently due are enclosed with this notice.  Tax returns that are due in the future will be mailed separately to you prior to the due date.  If you have tax returns that are delinquent, you will be notified by the Office of Tax and Revenue.

If applicable you will also be registered for Unemployment Compensation Taxes and will be contacted by the Office of Unemployment Compensation regarding your filing requirements.  Any questions concerning your liability for Unemployment Compensation may be answered by calling (202) 724-7457.

A Declaration of Estimated Franchise Tax (Form D-20 ES or D-30 ES) must be filed by every corporation and unincorporated business whose franchise tax may reasonably be expected to exceed $1,000 for the taxable year.

Should you have any questions please call (202) 727-4TAX (4829) or send correspondence to:

Customer Service Administration
Business Tax Registration Section
P.O. Box 470
Washington, DC 20044

*BID Tax*

*6/15/05  Ms. Best closed this error, corrected address to 621 Penn.*

**EXHIBIT D**

eb 27 07 07:53p    CASEtech, Inc.        202-543-3181        p.2

## A. Settlement Statement

U.S. Department of Housing
and Urban Development



OMB No. 2502-0265

| B. Type of Loan |
|---|
| 1.☐ FHA  2.☐ RHS  3.☐ Conv. Unins.  4.☐ VA  5.☐ Conv. Ins.  |

| 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
|---|---|---|
| 06-206 | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for information purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| The Computing Technology Industry Association, Inc. 1815 South Meyers Road, Suite 300 Oakbrook Terrace, IL 60181 | L&S Real Estate, L.L.C. 621 Pennsylvania Avenue, SE Washington, DC 20003 | |

| G. Property Location | H. Settlement Agent | |
|---|---|---|
| 515 2nd Street, NE Washington, DC 20002 Lot 35 in Square 754 | Monarch Title at Eastern Market | |
| | Place of Settlement 210 7th Street, SE, Suite 100 Washington, DC 20003 | I. Settlement Date 05/26/06 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER | |
| 101. Contract sales price | 1,800,000.00 | 401. Contract sales price | 1,800,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 27,573.50 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes            to | | 406. City/town taxes            to | |
| 107. County taxes               to | | 407. County taxes               to | |
| 108. Assessments              to | | 408. Assessments              to | |
| 109. Capitol Hill BID Tax 5/26 - 9/30 | 274.89 | 409. Capitol Hill BID Tax 5/26 - 9/30 | 274.89 |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 1,827,848.39 | 420. GROSS AMOUNT DUE TO SELLER | 1,800,274.89 |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT TO SELLER | |
| 201. Deposit or earnest money | 50,000.00 | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 105,407.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | 802,120.58 |
| | | WashingtonFirst Bank | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes    04/01  to 05/26 | 1,290.75 | 510. City/town taxes    04/01  to 05/26 | 1,290.75 |
| 211. County taxes            to | | 511. County taxes            to | |
| 212. Assessments           to | | 512. Assessments           to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY / FOR BORROWER | 51,290.75 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | 908,818.33 |
| 300. CASH AT SETTLEMENT FROM OR TO BORROWER | | 600. CASH AT SETTLEMENT TO OR FROM SELLER | |
| 301. Gross amount due from borrower (line 120) | 1,827,848.39 | 601. Gross amount due to seller (line 420) | 1,800,274.89 |
| 302. Less amounts paid by/for borrower (line 220) | 51,290.75 | 602. Less reduction amount due to seller (line 520) | 908,818.33 |
| 303. CASH        FROM        BORROWER | 1,776,557.54 | 603. CASH        TO        SELLER | 891,456.56 |

eb 27 07 07:53p    CASEtech, Inc.    202-543-3181    p.3

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**    SETTLEMENT STATEMENT    PAGE 2

| L. SETTLEMENT CHARGES: | File Number: 06-206 | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $ 1,800,000.00 @ 5.00 = 90,000.00 | | | | |
| Division of commission (line 700) as follows: | | | | |
| 701. $ 84,825.00 to Coldwell Banker Pardoe | | | | |
| 702. $ to | (90,000.00 Less 5,175.00) | | | |
| 703. Commission paid at Settlement | Realtor Holds Deposit | | | |
| 704. Administrative Fee | Coldwell Banker Pardoe | | | 84,825.00 |
| 800. ITEMS PAYABLE IN CONNECTION WITH LOAN | | P.O.C. | 229.00 | 229.00 |
| 801. Loan Origination Fee | % | | | |
| 802. Loan Discount | % | | | |
| 803. Appraisal Fee | to | | | |
| 804. Credit Report | to | | | |
| 805. Lender's Inspection Fee | to | | | |
| 806. Mtg. Ins. Application Fee | to | | | |
| 807. Assumption Fee | to | | | |
| 808. | | | | |
| 809. | | | | |
| 810. | | | | |
| 811. | | | | |
| 812. | | | | |
| 813. | | | | |
| 814. | | | | |
| 815. | | | | |
| 900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | | | |
| 901. Interest from to @$ | May | | | |
| 902. Mortgage Insurance Premium to | | | | |
| 903. Hazard Insurance Premium yrs. to | | | | |
| 904. | | | | |
| 905. | | | | |
| 1000. RESERVES DEPOSITED WITH LENDER FOR | | | | |
| 1001. Hazard Insurance | mo. @$ | /mo. | | |
| 1002. Mortgage Insurance | mo. @$ | /mo. | | |
| 1003. City property taxes | mo. @$ | /mo. | | |
| 1004. County property taxes | mo. @$ | /mo. | | |
| 1005. Annual Assessments | mo. @$ | /mo. | | |
| 1006. | mo. @$ | /mo. | | |
| 1007. | mo. @$ | /mo. | | |
| 1008. Aggregate Adjustment | | | | |
| 1100. TITLE CHARGES | | | | |
| 1101. Settlement or closing fee to Monarch Title at Eastern Market | | | 300.00 | 300.00 |
| 1102. Abstract or title search to First American Title Ins. Co. | | | 368.00 | |
| 1103. Title examination to | | | | |
| 1104. Title Insurance binder to | | | | |
| 1105. Document preparation to | | | | |
| 1106. Notary fees to | | | | |
| 1107. Attorney's fees to | | | | |
| (includes above item No: | ) | | | |
| 1108. Title Insurance to First American Title Ins. Co. | | | 6,750.00 | |
| (includes above item No: S\ | ) | | | |
| 1109. Lender's coverage | | | | |
| 1110. Owner's coverage 1,800,000.00 — 6,750.00 | | | | |
| 1111. Tax Certificate Monarch Title at Eastern Market | | | 25.00 | |
| 1112. Process Release Monarch Title at Eastern Market | | | | 75.00 |
| 1113. | | | | |
| 1200. GOVERNMENT RECORDING AND TRANSFER CHARGES | | | | |
| 1201. Recording fees Deed $ 26.50 ; Mortgage $ ; Releases $ 53.00 | | | 26.50 | 53.00 |
| 1202. City/county/stamps Deed $ 19,800.00 ; Mortgage $ | | | | 19,800.00 |
| 1203. State tax/stamps Deed $ ; Mortgage $ | | | | |
| 1204. Recordation Tax Deed $ 19,800.00 ; Mortgage $ | | | 19,800.00 | |
| 1205. | | | | |
| 1300. ADDITIONAL SETTLEMENT CHARGES | | | | |
| 1301. Survey to | | | | |
| 1302. Pest Inspection to | | | | |
| 1303. Escrow/Final Water Reading D.C. Water and Sewer Authority | | | | 100.00 |
| 1304. Courier/Fed Ex Fees Monarch Title at Eastern Market | | | 50.00 | 25.00 |
| 1305. Recording Service First American Title Ins. Co. | | | 25.00 | |
| 1306. | | | | |
| 1307. | | | | |
| 1308. | | | | |
| 1400. TOTAL SETTLEMENT CHARGES (enter on lines 103 and 502, Sections J and K) | | | 27,573.50 | 105,407.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

**EXHIBIT E**

## L & S Real Estate LLC

2/27/2007

Register: 10110 · Suntrust Checking
From 05/25/2006 through 06/02/2006
Sorted by: Date, Type, Number/Ref

| Date | Number | Payee | Account | Memo | Payment | C | Deposit | Balance |
|---|---|---|---|---|---|---|---|---|
| 05/25/2006 | 1551 | William H Price | 2000 · Accounts Payable | Cert Of Good Standing | 150.00 | X | | 1,283.44 |
| 05/26/2006 | | | 1200 · Accounts Receivable | Deposit Net Funds fr... | | X | 891,456.56 | 892,740.00 |
| 05/31/2006 | | | 62000 · Bank Charges | Service Charge | 15.00 | X | | 892,725.00 |
| 06/01/2006 | | Toni Van Pelt | 1200 · Accounts Receivable | July 2006 Rent | | X | 2,200.00 | 894,925.00 |
| 06/01/2006 | | Center For Inquiry, Inc | 1200 · Accounts Receivable | July 2006 Rent | | X | 9,003.00 | 903,928.00 |
| 06/01/2006 | 1552 | National Capitol Bank | 89000 · Other Expense | Loan# 1-580-0722 | 198,207.98 | X | | 705,720.02 |
| 06/01/2006 | 1553 | Dale F.Lowery | 89000 · Other Expense | Deferred Salary Pay... | 80,000.00 | X | | 625,720.02 |
| 06/01/2006 | 1554 | Dale E Lowery | 89000 · Other Expense | 66.67% of payout fro... | 171,111.71 | X | | 454,608.31 |
| 06/01/2006 | 1555 | Wachovia Bank, LOC | 89000 · Other Expense | 4386-5452-1010-742... | 149,578.60 | X | | 305,029.71 |
| 06/01/2006 | 1556 | Morgan Stanley Credit Corp. | 89000 · Other Expense | 9402-390-480651!:#a... | 159,272.79 | X | | 145,756.92 |
| 06/01/2006 | 1557 | I. Michael Snyder | 89000 · Other Expense | Deferred Salary Pay... | 22,416.47 | X | | 123,340.45 |
| 06/01/2006 | 1558 | J. Michael Snyder | 89000 · Other Expense | IMS 33.33% of Sale ... | 85,427.59 | X | | 37,912.86 |
| 06/01/2006 | 1559 | Suntrust (LOC) | 2000 · Accounts Payable | 0000397912 | 20,149.45 | X | | 17,763.41 |
| 06/02/2006 | 1560 | DC WASA 611 | 2000 · Accounts Payable | Acct#0100260-9 | 7.72 | X | | 17,755.69 |
| 06/02/2006 | 1561 | Federal Express | 2000 · Accounts Payable | 2264-0155-5 | 25.55 | X | | 17,730.14 |
| 06/02/2006 | 1562 | Fry Plumbing, Heating & Air... | 2000 · Accounts Payable | Inv# 19791 | 1,100.00 | X | | 16,630.14 |
| 06/02/2006 | 1563 | National Capital Bank-6110... | 2000 · Accounts Payable | 1-401-0973 | 4,344.85 | X | | 12,285.29 |
| 06/02/2006 | 1564 | Pepco 515 2nd St | 2000 · Accounts Payable | Acct# 1601 4100 77 | 993.04 | X | | 11,292.25 |

Page 1

eb 27 07 07:54p    CASEtech, Inc.              202-543-3181           p.5

L & S Real Estate LLC - QuickBooks Premier: Accountant Edition 2006 - [Make ...]    _|□|X|

File  Edit  View  Lists  Accountant  Company  Customers  Vendors  Employees  Banking  Reports  Window  Help

Make Deposits                                    Ask a help question | Ask | ▼ How Do I? | _ |□| X|

Previous   Next   Print  ·  Payments   Journal

Deposit To [Trust Checking ▼]  Date [05/26/2006 📅]  Memo [Deposit Net Funds fro...]

Click Payments to select customer payments that you have received. List any other amounts to deposit below.

| Received From | From Account | Memo | Chk No. | Pmt Meth. | Amount |
|---|---|---|---|---|---|
| CompTIA | 1200 · Accounts Rec... | Net Funds from sale ... | | Transfer | 891,456.56 |

Deposit Subtotal    891,456.56

To get cash back from this deposit, enter the amount below. Indicate the account
where you want this money to go, such as your Petty Cash account.

Cash back goes to        Cash back memo              Cash back amount

[          ▼]  [                    ]  [            ]

Deposit Total    891,456.56

[ Save & Close ]   [ Save & New ]   [ Revert ]

eb 27 07 07:55p      CASEtech, Inc.            202-543-3181          p.6



eb 27 07 07:55p       CASEtech, Inc.          202-543-3101          p.7





Feb 27 07 07:56p     CASEtech, Inc.          202-543-3181          p.9



Feb 27 07 07:56p      CASEtech, Inc.           202-543-3181          p.10

L & S Real Estate LLC - QuickBooks Premier: Accountant Edition 2006    _ | □ | x |

File  Edit  View  Lists  Accountant  Company  Customers  Vendors  Employees  Banking  Reports  Window  Help

Write Checks - Suntrust Checking               Ask a help question  Ask  ▼ How Do I?  _ | □ | x |

◄ Previous   ▶ Next   🖨 Print  ▼ | 🔍 Find   📖 Journal

Bank Account [10100 · Suntrust Checking ▼]        Ending Balance        8,340.78

|  |  |
|---|---|
| | No. 1556 |
| | Date 06/01/2006 |
| Pay to the Order of Morgan Stanley Credit Corp. ▼ | $ 159,272.79 |

One hundred fifty-nine thousand two hundred seventy-two and 79/100* * * * * * * * * * * * Dollars

Address

Morgan Stanley Credit Corp.
PO Box, IL 60197-6435
USA
Carol Stream, IL.60197-6435

CLEARED

Memo    9402-390-489651:Pay off CASEtech's portion of this LOC fm Dale from the sale of 515 ...

Expenses   $159,272.79    Items        $0.00              ☐ To be printed

| Account | Amount | Memo | Customer:Job | |
|---|---|---|---|---|
| 89000 · Other Expense | 159,272.79 | Pay off CASEtech's portio... | | |

Clear Splits    Recalculate                    Save & Close    Save & New    Revert

eb 27 07 07:57p    CASEtech, Inc.        202-543-3181        P.11

L & 5 Real Estate LLC · QuickBooks Premier: Accountant Edition    _|□|x|

File  Edit  View  Lists  Accountant  Company  Customers  Vendors  Employees  Banking  Reports  Window  Help

Write Checks · Suntrust Checking    Ask a help question  Ask  ▼ How Do I?  _|□|X|

📇Previous  📇Next  🖨Print  ▼  🔍Find  📖Journal

Bank Account [10130 · Suntrust Checking ▼]    Ending Balance    8,340.78

|  |  |
|---|---|
| Print As: I M Snyder | No. 1557 |
| Pay to the Order of  I. Michael Snyder  ▼ | Date 06/01/2006 |
|  | $ 22,416.47 |

Twenty-two thousand four hundred sixteen and 47/100********************** Dollars

Address   I M Snyder
          5701 Dimes Road
          Rockville, MD 20855        *CLEARED*

Memo   Deferred Salary Payment from sale of 515 2nd St NE

Expenses   $22,416.47  Items    $0.00        ☐ To be printed

| Account | Amount | Memo | Customer:Job |  |
|---|---|---|---|---|
| 89000 · Other Expense | 22,416.47 | Money that CASEtech ow... |  |  |

Clear Splits   Recalculate        Save & Close  Save & New   Revert



eb 27 07 07:57p    CASEtech, Inc.            202-543-3181            p.13



**EXHIBIT F**

# THE NATIONAL CAPITAL BANK OF WASHINGTON
## 316 PENNSYLVANIA AVENUE, SE
## WASHINGTON, DC 20003
## 202-546-3568

## Variable Rate Revolving Line of Credit Promissory Note

$200,000.00                                                September 20, 2002

For value received, the undersigned promises to pay on or before September 20, 2003, to the order of The National Capital Bank of Washington ("Lender") at its headquarters office located at 316 Pennsylvania Avenue, SE, Washington, DC 20003, or at such other place as the holder hereof may from time to time designate, the unpaid amount of all sums that have been advanced to or for the benefit of the undersigned in accordance with the terms hereof and that certain Line of Credit Agreement ("Agreement"), between the undersigned and Lender, dated as of September 20th, 2002. Advances evidenced by this Note shall be made in accordance with the Agreement. Advances, which may be endorsed hereon, evidenced by this Note shall be made in accordance with the Loan Agreement, and at the oral or written request of Dale E. Lowery or I. Michael Snyder, each of whom is authorized to request advances and direct the disposition of such advances until written notice of the revocation of such authority is received by the Lender at the office set forth above. Any advance shall be conclusively presumed to have been made to or for the benefit of the undersigned when made in accordance with such requests, regardless of the fact that persons other than those authorized above may have authority to request sums to be advanced hereunder. No request for an advance will be honored if a default hereunder shall have occurred and exists, or if the amount requested, when added to the then total outstanding unpaid balance hereof, would exceed the sum of TWO HUNDRED THOUSAND *** &***Dollars ($200,000.00). Advances pursuant to the Agreement shall be made on a revolving basis and, subject to the provisions thereof, the undersigned may borrow, prepay, and re-borrow under the Agreement from time to time, and at any time prior to the due date of this Note.

The unpaid balance of this Note, at any time, shall be the total amount advanced, plus interest accrued thereon and costs, expenses, and fees chargeable hereunder, less the amount of payments made hereon by or for the undersigned, which balance may be endorsed hereon from time to time by the holder hereof.

Interest shall be charged on the unpaid principal balance of this Note to the date of maturity on a daily basis for the actual number of days any portion of the principal is outstanding, computed on the basis of a 365 day year, at "Wall Street Journal Prime Rate", presently Four Point Seven Five percent per annum, (4.75 %), plus One percent per annum, (1.00 %). Each change in the Wall Street Journal Prime Rate (or any component thereof) shall become effective, without notice to the undersigned (which notice is hereby expressly waived by the undersigned), on the last business day of each calendar quarter. Should the Wall Street Journal, during the term of this Note, abolish or abandon the practice of establishing a Prime Rate, then the Rate used during the remaining term of this Note shall be that interest rate then in effect at Lender, which, from time to time, in the reasonable judgment of Lender, most effectively approximates the original definition of the Prime

Case 1:06-cv-02213-JR    Document 20-7    Filed 06/25/2007    Page 3 of 8

 

Rate. If a range of Prime Rates is published in the Wall Street Journal then the higher of the published rates shall apply.  The undersigned acknowledges that Lender may, from time to time, extend credit to other persons at rates of interest varying from, and having no relationship to, the Wall Street Journal Prime Rate.

Interest shall be payable Monthly on the 10th day of each month commencing with the 10th day of October, 2002, until all the principal and interest and other charges hereunder shall have been fully paid.

The undersigned acknowledges that the undersigned has agreed to the rate of interest expressed above, plus; (1) any compensating balance requirement of Lender; and (2) any additional charges, costs, and fees arising out of or related to the transaction of which this Note is a part, to the extent deemed to be interest under applicable law.

Upon "default," all obligations under this Note (including principal, interest, costs, and fees) shall bear interest as aforesaid, until paid in full. In the event that any payment becomes overdue for a period in excess of fifteen (15) days, and Lender does not exercise its option to accelerate the maturity of this Note, a late charge of five percent (5%) of the overdue payment amount may be charged by Lender for the purpose of defraying the costs and expenses incident to such delinquency.

Each and every payment due under this Note shall be made in lawful money of the United States and in immediately available funds, and when made shall be first applied to accrued costs, expenses, and fees, if any, then to interest due, and then to the reduction of the principal amount of this Note.

At the option of the holder hereof, any of the following shall constitute a "default" hereunder, and, upon the occurrence of any of the following, all obligations hereunder shall, at the option of the holder hereof, become immediately due and payable, without presentment for payment, diligence, grace, exhibition of this Note, protest, further demand, or notice of any kind, all of which are hereby expressly waived: (1) any sum owing hereunder or under any other indebtedness of the undersigned to Lender is not paid as agreed; (2) any petition or application for a custodian, as defined by Title 11, United States Code, as amended from time to time (the Bankruptcy Code) or for any form of relief under any provision of the Bankruptcy Code or any other law pertaining to reorganization, insolvency, or readjustment of debts is filed by or against the undersigned, any partnership of which the undersigned is a partner, or any surety or guarantor of the indebtedness evidenced by this Note (hereinafter surety or guarantor hereof), their respective assets or affairs; (3) the undersigned (or any surety or guarantor hereof) makes an assignment for the benefit of creditors, is not paying debts as they become due, or is granted an order for relief under any chapter of the Bankruptcy Code; (4) a custodian, as defined by the Bankruptcy Code, takes charge of any property of the undersigned, any property of any partnership of which the undersigned is a partner (or any property of any surety or guarantor hereof); (5) garnishment, attachment, levy, or execution is issued against any of the property or effects of the undersigned, or any partnership of which the undersigned is a partner (or any surety or guarantor hereof); (6) the death, dissolution or termination of existence of the undersigned; (7) there is any default or breach of any representation, warranty, or covenant, or there is any false statement or material omission, by the undersigned under any document forming part of the transaction in respect of which this Note is made or forming part of any other transaction under which the undersigned is indebted to Lender; or (8) the Lender hereof in good faith deems itself insecure for any reason or believes that the prospect of payment by the undersigned (or any surety or guarantor hereof) is impaired.

Case 1:06-cv-02213-JR    Document 20-7    Filed 06/25/2007    Page 4 of 8



No provision of this Note or any other aspect of the transaction of which this Note is a part is intended to or shall require or permit the Lender, directly or indirectly, to take, receive, contract for, or reserve, in money, goods, or things in action, or in any other way, any interest (including amounts deemed by law to be interest, such amounts to then be deemed to be an addition to the rate of interest agreed upon) in excess of the maximum rate of interest permitted by applicable law in The District of Columbia as of the date hereof. If any such excess shall nevertheless be provided for, or be adjudicated by a court of competent jurisdiction to be provided for, the undersigned shall not be obligated to pay such excess but, if paid, then such excess shall be applied against the unpaid principal balance of this Note or, to the extent that the principal balance of this Note or, to the extent that the principal balance has been paid in full by reason of such application or otherwise, such excess shall be remitted to the undersigned.

The undersigned hereby agrees (1) to any and all extensions (including extensions beyond the original term hereof) and renewals hereof, from time to time, without notice, and that no such extension or renewal shall constitute or be deemed a release of any obligation of the undersigned to the holder hereof; (2) that any written modification, extension, or renewal hereof executed by the undersigned shall constitute a representation and warranty of the undersigned that the unpaid balance of principal, interest, and other sums owing hereunder at the time of such modification, renewal, or extension are owed without adjustment for any offset, counterclaim, or other defense of any kind by the undersigned against Lender; (3) that the acceptance by the holder hereof of any performance that does not comply strictly with the terms hereof shall be deemed neither to be a waiver nor bar of any right of said holder, nor a release of any obligation of the undersigned to the holder hereof; (4) to offsets of any sums or property owed to the undersigned by the holder hereof at any time; (5) that the undersigned is and shall remain subject to the in personam, in rem, and subject matter jurisdiction of the courts of The District of Columbia (including the Federal District Court for the District of Columbia) for all purposes pertaining to this instrument and all documents and instruments executed in connection herewith, securing the same, or in any way pertaining hereto; (6) that no surety or guarantor hereof shall be required to be joined in any action brought to enforce this Note, and that the undersigned waives the right to require the joinder of the undersigned in any action to enforce the liability of a surety or guarantor hereof; (7) that this Note shall be governed by the laws of The District of Columbia, and the United States applicable to the holder hereof upon demand any and all costs, expenses, and fees (including reasonable attorney fees) incurred in enforcing or attempting to recover payment of the amounts due under this Note, including negotiating, documenting, and otherwise pursuing or consummating modifications, extensions, compositions, renewals, or other similar transactions pertaining to this Note, irrespective of the existence of an event of default, and including costs, expenses, and fees incurred before, after, or irrespective of whether suit is commenced, and in the event suit is brought to enforce payment hereof, such costs, expenses, and fees and all other issues in such suit shall be determined by a court sitting without a jury.

The undersigned authorizes Lender to furnish any information in its possession, however acquired, concerning the undersigned (or any affiliate) to any person or entity, for any purpose that Lender, in good faith and in its sole discretion, believes to be proper, including without limitation, the disclosure of information to any actual or prospective lender to the undersigned, any actual or prospective participant in a loan between the undersigned and Lender, any prospective purchaser of securities issued or to be issued by Lender, and, to the extent permitted by law, any governmental body or regulatory agency, or in connection with the actual or prospective transfer of all or a portion of this Note to another financial institution.

 

If more than one person signs this Note, then all words used herein in the singular shall be deemed to have been used in the plural as the context and construction so required, and when this Note is executed by more than one person, the word "undersigned" shall mean each and all of them, jointly and severally.

The undersigned represents and warrants that the indebtedness represented by this Note is for commercial, agricultural, or business purposes. Lender shall at all times have a lien against the deposit account(s) (except IRAs) maintained by any of the undersigned with Lender until said indebtedness is paid in full.

**Signature(s)**

**Borrower:**

**CASEtech, Inc.**

611 Pa. Ave., SE Suite 300
Washington, DC 20003
202-543-4499X100 Cell 202-210-0099

BY: _____

Dale E. Lowery, President

52-1858291

_____

Dale E. Lowery, Personally

_____

I. Michael Snyder, Personally

_____

Phyllis E. English, Personally

 

# LOAN ANALYSIS ACKNOWLEDGMENT

I(We) the undersigned hereby, jointly and severally if more than one, specifically acknowledge that I(We) have applied for a loan from the National Capital Bank of Washington (Bank) in the amount of $ 200,000.00, or that I(We) have been requested by the Bank to Guarantee payment of a loan to The National Capital Bank of Washington .

I(We) hereby acknowledge that the Bank has performed an analysis of all financial information provide in conjunction with this loan and that the Bank has informed me(us) that there are not assets or cash flow necessary, in the Bank's opinion to support the granting of this loan, in my or our name only.

I(We) have willingly and without reservation agreed to become a joint applicant or guarantor of said loan, and in so doing realize that my (our) personal assets and income, as well as, any assets I(We) own jointly with another maker or guarantor of said loan may be subject to attachment, garnishment or judgment in satisfaction of the principal, interest and costs of collection of said note.

Signed X _____    Signed X _____
         Dale E. Lowery                       I. Michael Snyder

Signed X _____
         Phyllis E. English

Date: September 20, 2002



# BORROWER STATEMENT

The undersigned borrower has entered into a loan transaction with The National Capital Bank of Washington as evidenced by a promissory note executed by borrower in the principal amount of $200,000.00 . Borrower hereby certifies that they have read this statement and, that the proceeds of the loan are not to be used either to purchase or to pay to a seller any part of the purchase price of goods used or bought for use primarily for personal, family or household purposes. Borrower further certifies that the purpose of the loan is as follows:    Working Capital for Software Programming Firm CASEtech. Inc.

**DATED** this 20th day of September 2002.

**WITNESS:**

Dale E. Lowery, Personally

I Michael Snyder, Personally

Phyllis E. English

BORROWST.WPS

  *Original in Vault*

# UNIVERSAL BORROWING RESOLUTION

(Use for sole proprietorships, corporations, all partnerships, limited liability companies and organizations)

**TO: The National Capital Bank of Washington ("Bank")**

This document is intended to be a universal business resolution authorizing the acquiring and execution of one or more business loans at the Bank. The undersigned desires to obtain a loan or loans at The National Capital Bank.

I HEREBY CERTIFY that I am a duly constituted: Owner, Officer, General Partner or Managing Member, (circle one) of the: sole proprietorship, corporation, organization, partnership or limited liability company (circle one) known as: __Corporation__ __CASEtech, Inc._____ ("Borrower"), legally constituted and operating in good standing, in the State of ~~_____~~, District of Columbia, with principal offices located at __11 Pennsylvania Avenue__ __SE Washington, DC 20002__ and the keeper of the records and seal of said Borrower; that the following is a true and correct copy of resolution(s) duly adopted at a legal meeting of the Borrower held in accordance with the Authorizing Agreement of said Borrower at its offices on the __20__ day of __September__, __2002__. I further certify that said Borrower is authorized to do business in the District of Columbia and that this resolution is now in full force and effect.

BE IT RESOLVED, that the persons whose signatures and titles appear on this resolution ("Signatories") of this Borrower, or his, her or their successors in office, or any (insert the number required to sign) __1__ of them be and they, he, she hereby are (is) authorized for, on behalf and in the name of this Borrower as follows:

1. Negotiate and procure loans from the Bank up to an amount not exceeding: ~~No limit unless specified hereafter~~ $ __Unlimited__.

2. Discount with said Bank commercial or other business paper belonging to Borrower made or drawn upon by third parties, without limit.

3. Give security for any liabilities of Borrower to Bank by pledge, assignment or a lien upon any assets of Borrower.

4. Execute, in such form or forms required by Bank, all notes or other evidence of such loans, all instruments of pledge, assignment or lien and that none of the same shall be valid unless so signed or endorsed, provided however, that the endorsement of promissory notes discounted may be effected by any one of the signatories.

BE IT FURTHER RESOLVED, that said Bank be, and it hereby is, authorized and directed to pay the proceeds of any such loans or discounts as directed by the persons so authorized to sign whether payable to the individual credit of any person or not.

BE IT FURTHER RESOLVED, that the foregoing power and authority of each of the signatories appearing on said resolution shall continue in full force and effect until actual written notice of revocation is received by Bank from one of the signatories.

BE IT FURTHER RESOLVED, that by executing this resolution, Borrower agrees to all federal and state laws, rules and regulations and the policies, procedures of the Bank applicable to any transaction conducted hereunder. If Borrower is a Sole Proprietorship, Owner hereby constitutes signatories as complete and full attorney(s) in fact to accomplish each and every purpose of this resolution.

I HEREBY FURTHER CERTIFY that the signatures appearing below are the duly constituted signatories of the Borrower and that they continue as signatories at the present time, and that the signatures appearing thereon are the genuine, original signatures of each.

(Please supply genuine signatures hereunder)

Signature: _____ Printed Name: __Dale E. Lowery__ Title: __President__

Signature: _____ Printed Name: __I.Michael Snyder__ Title: __Personally__

Signature: _____ Printed Name: _____ Title: _____

IN WITNESS WHEREOF, I have hereunto affixed my name this __20rh__ day of __September__, __2002__.

Signature: _____ Printed Name: __Dale E. Lowery__ Title: __President__ SEAL

(Must be signed by Corporate Secretary, Organization Officer, Owner, General Partner, or Managing Member)

I hereby certify that I am an authorized official of said Borrower and that the foregoing resolution is true and correct in each and every detail, and that Borrower is officially organized in the District of Columbia or the State of __Delaware__ (Signature must be a different official than the one signing above, but is not required for one-person corporation or sole proprietorship.)

Signature: _____ Printed Name: __Dale E. Lowery__ Title: __President__ SEAL

Rev. 5-2001

**EXHIBIT G**

N/A Prolaw

JET Atty/E-mail

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Snyder, Michael                          *
                                         *
          Plaintiff                      *
                                         *
     v.                                  *     Case No.: 1:06cv02213 JR
                                         *
Dale Lowery  et al.                      *
                                         *
          Defendants                     *

*     *     *     *     *     *     *     *     *     *     *     *     *

**PLAINTIFF'S INITIAL DISCLOSURES UNDER
F.R.C.P. 26(a)(1)**

COMES NOW the Plaintiff, Michael Snyder, and provides this, the initial disclosures

required by Fed. R. Civ. P. 26(a) and states:

1.      The documents required to be produced under Fed. R. Civ. P. 26(a)(1)(b)

        through (d) are contained on the CD attached to this pleading in either *.pdf or

        *.doc or *.xls format.  These are standard formats used by Adobe Acrobat,

        MicroSoft Word, and MicroSoft Excel respectively.

2.      The names of individuals and, where known, contact information required to be

        disclosed under Fed. R. Civ. P. 26(a)(1)(a) are:

        a.      Christine Kirby;

        b.      Eric Cohen;

        c.      Kathleen Edwards;

Page 1 of 3                              **ENTERED** APR 1 7 2007

d.      Steve Lowery;

e.      Mike Licht

f.      Paul Buerkholtz;

g.      Elizabeth Jenkins;

h.      Ryan See;

i.      David Wendelken;

j.      Donna Hanousek;

k.      Tom Strobell;

l.      Hossein Noshirvani;

m.      Oron Strauss;

n.      Hetal Patel;

o.      Andy Greenfield;

p.      James Biggs;

q.      Stan Zdun;

r.      Christine (Tina) Baily;

s.      Chick Becker;

t.      Daniel Gilliland;

u.      George Didden;

v.      George Conners;

w.      Kitty Kaup;

x.      Brian Alpert, Esq.

Respectfully submitted,

Michael Snyder,
By Counsel

KAUFMAN LAW,  A Professional Corporation
11350 Random Hills Rd.  Suite 800
Fairfax, VA 22030
703.764.9080
703.764-0014 (fax)
David@businessbrawls.com
Counsel for Plaintiff

By:  **D.Z. Kaufman**   Digitally signed by D.Z. Kaufman
                        DN: CN = D.Z. Kaufman, C = US, O = Kaufman
                        Law, A Professional Corporation
                        Date: 2007.04.11 11:00:52 -04'00'

D.Z. Kaufman, Bar # 435123

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2007, a copy of the above document was served via
ECF of the U.S. District Court of the District of Columbia on counsel for Defendants Dale A.
Cooter, Esq.  and James E.  Tompert, Esq., 5301 Wisconsin Ave., NW, Suite 500, Washington,
D.C.  20015 and another copy of the document as well as the accompanying CD was mailed, first
class postage prepaid, to the same parties at the same address.

**D.Z. Kaufman**   Digitally signed by D.Z. Kaufman
                   DN: CN = D.Z. Kaufman, C = US, O =
                   Kaufman Law, A Professional Corporation
                   Date: 2007.04.11 11:00:40 -04'00'

David Zachary Kaufman

**EXHIBIT H**

ENTERED APR 2 6 2007

LAW OFFICES

COOTER, MANGOLD, TOMPERT & KARAS, L.L.P.

5301 WISCONSIN AVENUE, N.W.

SUITE 500

WASHINGTON, D.C. 20015

TEL: (202) 537-0700

FAX: (202) 364-3664

JAMES E. TOMPERT
WRITER'S DIRECT DIAL
(202) 537-6980
jtompert@cootermangold.com

April 26, 2007

**VIA HAND DELIVERY**

David Z. Kaufman, Esq.
KAUFMAN LAW, P.C.
11350 Random Hills Road
Suite 800
Fairfax, VA 22030

Re: **Michael Snyder v. Dale Lowery et al**.
    **No. 1:06CV02213**

Dear Mr. Kaufman:

Pursuant to your request, please find enclosed copies of the documents we have compiled as part of our initial disclosures in the above-referenced case.

Also, we have reviewed your Initial Disclosures and have determined that they do not comply with Rule 26(a)(1) of the Federal Rules of Civil Procedure. Please provide the disclosures which are required by Rule 26(a)(1) as soon as possible.

Sincerely,

James E. Tompert

Enclosures

CC: Dale A. Cooter, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL SNYDER,                    :
                                   :
        Plaintiff,                 :
                                   :
v.                                 :    Civil Action No. 06-2213 (JR)
                                   :
DALE LOWERY, et al.,               :
                                   :
        Defendants.                :
_____:


ORDER

Upon consideration of Plaintiff Michael Snyder's Cross-Motion for Summary Judgment and the Opposition of Defendants Dale Lowery, et al., it is this _____ day of _____, 2007, hereby

**ORDERED**, that Plaintiff Michael Snyder's Cross-Motion for Summary Judgment is **DENIED**.


_____
James Robertson
United States District Judge

Copies to:

Dale A. Cooter, Esq.
James E. Tompert, Esq.
Cooter, Mangold, Tompert & Karas, LLP
5301 Wisconsin Avenue, N.W., Suite 500
Washington, D.C. 20015

David Z. Kaufman, Esq.
Kaufman Law, P.C.
11350 Random Hills Road, Suite 800
Fairfax, VA 22030